OCT – 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Heshmat Ansari,
11011 Grassy Knoll Terrace
Germantown, MD 20876
(301) 980-5847

       VS.

Mike Johanns,
Secretary of Agriculture
1400 Independence Avenue, SW
Washington, DC 20250

Case: 1:07-cv-01778
Assigned To : Lamberth, Royce C.
Assign. Date : 10/3/2007
Description: Employ. Discrim.

# COMPLAINT

I am currently employed by the United States Department of Transportation (DOT), Federal

Motor Carrier Safety Administration (FMCSA), IT, 400 7th Street S.W., Washington, DC 20590.

During the time of the actions at issue, I was employed with the U.S. Department of Agriculture

(USDA), in the position of Deputy Associate Chief Information Officer, GS-15; in the Office of

Chief Information Officer (OCIO), 1400 Independence Avenue, S.W., Washington, DC. 20250

I have been in my current position since January 2006. My age is 55 years, (DOB 8/7/52), my

religion, which is Muslim, and my country of origin, which is Iran.

As a veteran of the United States military, where I reached the rank of officer, and as a

successful federal civil servant with 26 years of experience, I am compelled to file this motion

for consideration with the District of Columbia Civil Court.

In this motion, I am charging responsible management officials of the United States Department

of Agriculture (USDA) with employment discrimination, retaliation, harassment, and disparate



treatment during my federal employment with that agency. I am charging employment discrimination because of my race (Iranian) and religion (Muslim). I am also charging retaliation and constant harassment. This illegal behavior came about when I divulged malfeasance to the USDA Office of Inspector General (OIG) pertaining to a multi-million dollar technology investment in (month/year).

My training as a former military officer taught me to make every effort to follow the chain of command prior to reporting fraud, waste and abuse outside of my chain of command. Unfortunately, this good faith effort to bring malfeasance to the attention of my superiors did not prevail and therefore I was forced to make contact with the agency's OIG to report what I perceived as wrongdoing and waste.

Subsequently, responsible management officials retaliated against me; overtly harassed me and undertook a campaign to malign my personal and professional reputation. Such daily adverse treatment led to adverse consequences (i.e., stress and depression) professionally and in my personal life with relationships with my family members.

The responsible management officials subjected me to the below listed series of hostile, abusive and humiliating actions at my workplace over a two-year period. The actions were committed by my supervisors. Each of the hostile actions was offensive, objectively and subjectively; that is, a reasonable person would find them hostile and abusive, and the Victim-Complainant perceived them to be so. The actions in their collective hostile impact were severe and pervasive, and occurred on a regular basis. Individually, some were physically intimidating and all were humiliating. In sum, collectively and individually, they unreasonably interfered with my work performance, and unlawfully discriminated against me by altering the terms and conditions of my employment because of my national origin, and my religion.

Heshmat Ansari

## Claim No. 1

## Management denied my disability under Rehabilitation Act of 1973, 29 U.S.C. and the Americas with Disabilities Act ("ADA") of 1990, 42 U.S.C

I retired in 1996 with a service-connected disability with ruptured lumber vertebrae Disks and Seizures Disorder. I am a qualified individual with a disability under the Rehabilitation Act of 1973, 29 U.S.C. and the Americas with Disabilities Act ("ADA") of 1990, 42 U.S.C. as is known by the Agency. I sustained lower back injuries while performing combat exercise as a Captain in the US Army in Germany in 1986 and later on with frequent Seizures. I am medically rated as 30 percent disabled with respect to mobility and function related to the use of my back and seizures disorder.

I first notified Ms. Jan Lilja, in person, on or about March 2003, about my disability. Management had knowledge, however, from the inception of my employment, in February 2003. This is because my SF-52 (Available on Request - Personnel Disposition Form), generated then, indicates my disability and 30 percent disability rating by the Department of Veterans Affairs (Available on Request – VA Certification)

I told Ms. Jan Lilja and Ms. Adrienne Bowman (Office Assistant) about my frequent Hospital visits (Seizures) (I did not give the details) because of the level of stress I was subjected to on a daily basis. I have not had a seizure since the week before I left the US Department of Agriculture (USDA).

The level of stress and continuous retaliations, I endured while working at the USDA was so heavy it caused me to become depressed and to withdraw from my wife and children. Additionally, it caused me to interact in an impatient manner with my family. This kind of behavior was not the norm for me. For example, I did not talk and share my concerns with my

wife as I normally did. My wife could not deal with the distance behavior; resultant in our separation. I did not seek professional counseling for myself. However, my wife and I did seek marriage counseling. I am feeling much better since leaving the stressful behavior to which I was subjected, within the USDA. I continue to suffer with some anxiety as I look back and think about how I was treated. For example, when I would walk into the office and speak to Ms. Lilja, most of the time, she would not speak to me. When I announced that I was leaving the USDA, Ms Lilja never acknowledged that I was speaking or that she even has heard what I had said.

Ms. Jan Lilja was my first-line supervisor and Mr. Jerry Williams was my second-line supervisor. I explained my frustrations with Ms. Lilja's behavior towards me to Mr. Williams and Mr. Dave Combs (Mr. Williams' supervisor) and they did not respond to my concerns orally or in writing; and in return I was under more attack and retaliations. It was about September 2005, when I talked again with Mr. Williams and Mr. Combs, and I told them how frustrated I was with the level of performance rating that I had received. Mr. Williams said that I would have to talk with Ms. Lilja about how I felt and why. That was the end of our discussion. Mr. Williams was the Reviewing Official for my performance appraisal.

# Claim No. 2

## Divulged malfeasance to the USDA Office of Inspector General (OIG) pertaining to a multi-million dollar technology investment in (month/year).

In early July 2005, I alerted Office of Chief Information Officer (OCIO) management on major security issues with the implementation of a Multi-million dollar Office of Chief Information Officer (OCIO) technology investment, the Universal Telecommunication Network (UTN) project. The UTN was failing in its mission to protect USDA's resources and provide access to

USDA's customers. I also stated to upper management that the UTN suffers from a poorly engineered network and security systems. Ms. Jan Lilja took this as an opportunity to add to her continuous retaliation against me for speaking up for principles and providing true, accurate, practicing oath of my profession, and full information disclosure and advice to our executive management, even when it is sometimes difficult or not the popular thing to do. I thought that was the right thing to do before they heard it or received phone calls regarding UTN failures. When I was asked, I provided them with the honest information based on my expertise, the expertise of my staff, and available information. However, management took it as an opportunity to retaliate against me.

The week after I alerted them, I wrote an email to management, explaining security issues and vulnerabilities with the current implementation of the UTN. Management never acknowledged my alert. It was during the end of July that Ms. Jan Lilja told me that I could no longer Act on her behalf when she is away from the office. I told her this is unacceptable and retaliatory against my actions and my principals. I stated that I was hired as her Deputy and Acting on her behalf was part of my job responsibilities. I asked her to read my job description and job announcement for the position (In February 2003, I was hired as Deputy Associate Chief Information Officer (2210 series)).

During August 2005, the USDA Office of Inspector General (OIG) alerted management on the UTN security, the same issues that had I alerted on in July 2005. Their testing disclosed that the recent implementation of the Universal Telecommunications Network (UTN) was put into practice with inadequate security controls.

The OIG interviewed 25 staff on their findings and the results. Ms. Karen Sifford, auditor in charge of the study called me for an interview on August 5, 2005. Before the interview with Ms.

Sifford, Ms Lilja asked me not to not discuss it with the OIG; that I should tell them that the system is working and it was secure, and it is the best program yet. I told Ms Lilja that I would not lie; and I told the truth. I told Ms. Karen Sifford and her boss Mr. Steven Eckland, that I do not wish to provide more information due to fear that it would be used as a tool by management for further retaliation. Additionally, I stated to them that I told Ms. Sifford that I would probably get fired for telling the truth. She assured me that the Whistleblower's Protection Act protected me and that there would be no retaliation against me. Three of my other Co-workers were present during this conversation: Mr. Craig Chase, Mr. Dave Williams, and Mr. Karl Hill. However, the OIG alerted the OCIO management; and consequently, the retaliation was continuous and never stopped.

When Ms Lilja learned of what I had told Ms. Sifford, she informed me that I was not to attend staff meetings; meet with the OCIO staff or Associates without her being present. I was also denied to attend the Federal Executive Institute (FEI) for Leadership training. Meanwhile, Ms. Lilja authorized Ms. Susan Moore (White female, American born) to attend the FEI for Management training. I reported this change to Mr. Williams; and that I felt harassed by not being allowed to attend training, OCIO meetings or to engage in conversation with the Chief Information Officer, Deputy, or his Associates. To my knowledge, nothing was done to stop the harassment.

To show this pattern of behavior of Ms. Lilja of not providing factual information to even OIG auditors, I attached a copy of an email from Mr. Steven Eckland, OIG Auditor-In-Charge of investigating UTN implementation to Ms. Lilja regarding information that Ms. Lilja provided OIG on preliminary investigation (Attachment A). Mr. Eckland stated in his email to Ms. Lilja *"When we discussed the Management Alert on August 24, you stated that the firewall rules in*

*place are the same as the rules for the older network, and specifically that the firewalls are still in a "deny all" status. Attached are excerpts from your firewall rules printed on August 24, provided to us by Pam Webber. The rules we marked allow any IP traffic through the firewalls. Further, this rule precedes the "deny all" rule, rendering ineffective. Please explain"*

Ms. Lilja never spoke up for principles and providing true, accurate, and full information disclosure and advice to her executive management, even when it was sometimes difficult or not the popular thing to do. She went to the extreme and kept issues away from her superiors in order to protect her standing position with the implementation of the UTN.    On the other hand, when I was asked, I provided them with the honest information based on my expertise, the expertise of my staff, and available information.  However, management took it as an opportunity to retaliate against me. Before the interview with Ms. Sifford, OIG Auditor, Ms Lilja asked me to not provide a lot of details on UTN with the OIG; that I should tell them that the system is working and it was secure, and it is the best program yet. I told Ms. Karen Sifford and her boss Mr. Steven Eckland (OIG), that I do not wish to provide more information due to fear that it would be used as a tool by management for further retaliation. Additionally, I stated to them that I told Ms. Sifford that I would probably get fired for telling the truth.   She assured me that the Whistleblower's Protection Act protected me and that there would be no retaliation against me.

*I guess that is not quite enough for the USDA Management.  They need to find a better excuse than to point to my leadership.* All of these accomplishments are exemplary of my leadership, my education, and experience; but above all they represent a testament to my sense of duty, honor, and my ethics.

On July 21 (Thursday), I was acting for Ms. Lilja while she was on vacation starting the afternoon of that Thursday; I was visiting Agriculture Research Center (ARS) at Beltsville, MD meeting with ARS staff. The ARS Chief Technology Officer saying that their email system is down due to the UTN implementation approached me. I immediately contacted Mr. Dave Combs, The USDA CIO, and his Deputy, Mr. Williams and informed them on the issues. I thought this was the proper thing to do to inform them instead of hearing it from the CIO for ARS. Mr. Combs asked me to not leave ARS until problem has been fixed. I contacted first Ms. Michelle Carlson and then Mr. Truman Harsha, two of the Mike Thomas's staff regarding the ARS Email system. They informed me that they were aware of the problem since yesterday and were working to resolve the issue. They stated that the problem is with the UTN antivirus and URL Filtering. They told me that in order to fix the problem; they have to temporarily by-pass Firewall and Antivirus. They did and the problem was temporarily resolved, until further investigation. I then called Mr. Combs and I stated that the problem has been fixed temporarily (Attachment B, C, D, and E refer to these technical issues).

On the same day at 5:03 pm, Mr. Combs (USDA Chief Information Officer) sent an email (Attachment F) to the contractor saying that he is unhappy with the evens of today and he also stated in his email that this was the second time that The Contractor had fouled up something major with the UTN implementation (Attachment G). The technical issues and solutions indeed were unacceptable by her Boss, Mr. Dave Combs (USDA CIO). At 6:00 pm on the same day, the contractor responded back to Mr. Combs that they were in complete agreement with him (Attachment H and I). At 10:23 pm on the same day, Ms. Lilja sent an email to Mr. Mike Thomas (UTN Project Manager), Mr. Hersha Truman (Mr. Thomas's Deputy), and me that she was not happy that the contractor responded directly back to Mr. Combs (Attachment J). These

Heshmat Ansari                                                                                          Page 8 of 17

sequences of emails confirm that she was aware of the issue on the first day of her vacation.

As I stated above, on the same day of the event, I contacted Ms. Carlson, Mr. Harsha who worked for Mr. Thomas and Mr. Thomas directly (Attachment K). Even Ms. Lilja herself well aware of the issue on the same day of the event (Attachment L). Ms. Lilja stated that I made a big deal of this interruption and she stated that I told here supervisor - Mr. Combs that the Firewalls were down. That is true. For many weeks, the contractor bypassing Firewalls in order to make the UTN operational. We were never told by the contractor that they were by passing Firewalls, Web filtering and antivirus in order to keep the UTN operational. My staff discovered this vulnerability through our intrusion detection systems. We even discovered that URL filtering and antivirus protection were not fully operational. That means the USDA Internet and Network was wide open to Intruders and Hackers. There were many systems that were compromised during that time (Attachment I and J), and USDA employees were able to access unauthorized Web Sites such as gambling, and many pornography sites. I personally showed this to Mr. Combs, Mr. Williams, and Ms. Bowman. And my security staff can testify to that week's events.

Additionally, I also emailed Mr. Thomas and Ms. Lilja stating that Mr. Combs wanted better control over the UTN Security. I also stated that he questioned me on recent Foreign Agriculture Services (FAS) system compromises and he was not happy with the services (Attachment K).

The week of July 21 was the week of implementation of the multi-million dollar OCIO technology investment, the Universal Telecommunication Network (UTN) project at Washington DC. Ms. Lilja was responsible for the implementation this technology. As her Deputy, I was also responsible for the USDA information security. I told Ms. Lilja and Mr. Mike Thomas numerous times that there are major security issues with the implementation of the UTN. I

stated to Ms. Lilja that the UTN was failing in its mission to protect USDA's resources and provide access to USDA's customers. I recommended stopping the implementation and postpone it to a later date after security issues are resolved. Ms. Lilja made the decision based on Mr. Thomas' information and discarded my recommendation. At the same time, the Office of Inspector General (OIG) was investigating UTN security and investment. Ms. Lilja stated in her Affidavit that there were some technical issues, which is not unusual with major deployment. These technical issues put the USDA network at a higher risk than ever before. It caused email interruptions and, later on many hosts at the USDA were compromised. The USDA OIG even stated in their report that **"the recent implementation of the Universal Telecommunications Network (UTN) was put into practice with inadequate security controls" (Attachment M-1 to M-2, OIG Report).**

## Claim No. 3

## I was no longer authorized to attend OCIO meetings or engage in conversation orally or in writing with the Chief Information Officer, Deputy, and Associates

Ms. Lilja did not allow me to Act at all after discussion with the OIG on the UTN Installation (July 21, 2006). It was not for a while; it was a permanent determination and decision. I was Ms. Lilja's Deputy, but her managers were reporting directly to her. Ms. Lilja even long before that week never trusted me and she controlled me in every respect. She never gave me full delegation to run the operations. She never trusted me and she controlled me in every respects. In one of the instances, Ms. Lilja and I were suppose to meet with Ms. Kathleen Rundle (Associate CIO for Data Center) to discuss COOP Planning (Continuity Operation). Ms. Lilja could not attend

the meeting and asked Ms. Bowman to cancel the meeting. I asked Ms. Bowman what was the reason for the cancellation. Ms. Bowman told me that Ms. Lilja did not want me to meet with Ms. Rundle and that she personally felt that was peculiar. Ms. Bowman said that Ms. Lilja told her "Don't ever let Mr. Ansari meet with Ms. Rundle alone. Do not let them meet together without me". I was her Deputy and yet I was not allowed to meet with the CIO Associates.

The following week, Ms. Jan Lilja came to my office and told me that I cannot Act on her behalf when she is away from the office and Ms. Susan Moore will Act for her (Attachment N). I said *"What is going happen to me, where will I be?"* She said, *"Well now you have to report to her, she is your Boss and laughed"* I said *"Is this a joke?"* she said, *"No. this was Mr. Williams decision"*. I approached Mr. Williams and he told me that he had nothing to do with her decision. I said *"I have a problem with reporting to Ms. Moore."* He said that I needed to discuss it with Ms. Lilja. I discussed it with Ms. Lilja and she still denied that was her decision. She said *"I am not sure why Mr. Williams said that was my decision"* Before I left her office, I said *"This is in violation of OPM code of conduct---Are you trying to humiliate and deprive me in front the OCIO staff? ---- This is an adverse decision and intentional harassment against me"* While I was leaving she said *"wakeup to reality ----I was not the one who ran to Mr. Williams and Mr. Combs and you shouldn't have done that ---- I have no obligation to discuss it with you"*. This was clear and simple, discrimination and retaliation!!!

My reputation for my expertise in Security is well known among my staff, OCIO staff, and the USDA CIO and his Deputy. I know what it takes to be a leader. My peers and comrades always respected me for the outstanding services I provide. They knew that I would get the job done, whatever the task was.

In another instance, Ms. Lilja was very intimidated with my reputation with the previous USDA Chief Information Officer (CIO), Mr. Scott Charbo and all his Associates. On many occasions, Mr. Charbo sent me directly emails requesting for information without including Ms. Lilja. On return, I always CC Ms. Lilja. Mr. Charbo did not like I included Ms. Lilja on emails and stated to me: "do not include any names if they are not on my email". I was not sure what to do after Mr. Charbo's statement. I approached Ms. Lilja and her response was: "that is okay, put my name under Blind CC". I told her I could not do that. I also stated that if Mr. Charbo found out, I could be fired. I told Ms. Bowman about this incident.

Since 2003, I asked Ms. Lilja to attend FEI training for Senior Executive Leadership training. She never planned or included this into budget during September budget submission. Meanwhile, Ms. Lilja authorized Ms. Susan Moore (White female, American born) to attend FEI for Management training in amount of approximately five thousand dollars. I reported this to Mr. Williams; and that I felt discriminated against by not being allowed to attend training, To my knowledge, nothing was done to stop this types of discrimination. However, one week before leaving the USDA for the DOT, Mr. Williams (Ms. Lilja's supervisor) offered me the opportunity to attend FEI training. Mr. Williams did not recommend Ms. Lilja for the training, but did recommend me. This shows that management trusted me with my expertise and leadership (Attachment P-1 and P-2).

# Claim No. 4

## October 1, 2005, management reassigned me as Deputy Associate Chief Information Officer to the new position

Finally, In October 2005, Ms. Lilja requested that I be moved to another component of the USDA. She successfully managed to move me to the Office of Cyber Security Operations under Mr. Lynn Allen, Associate CIO for Cyber Security Operations. This move was a simple "forced reassignment," placing me in an OCIO component responsible for subject matter about which I felt less confident. The reassignment was forced upon me in retaliation for providing information to the OIG concerning the multi-million dollar investment on UTN technology and dislike and prejudice against my national origin and religion.

On September 12, 2005, Ms. Lilja stated that management decided to remove me from my current position and reassign me to the Cyber Security office to manage security operations. I stated to her that this is a demotion and I would be losing my title as a Deputy. Plus, I told her that I was hired for telecommunications services operations and not security operations. I told her that I was hired as Deputy for Telecommunications and not Cyber Security. I asked her to read my position announcement (Attachment Q-1 and Q-2) and my job description. I also asked her under what authority had I been removed from this position. She stated that under management authority and she did not want to discuss it any more.

Regardless my protest, I was moved from the Deputy position to the Cyber Security Office without an SF-52 and a Position Description (PD). This move was degrading to me. I did not lose any money because of the move; but the level of undue stress to which I was subjected, harmed me. I was so shaken up by this move that I had to take a week's leave to get myself

together. I also sent a letter via email to Mr. Williams and Mr. Combs regarding the acts of harassment by Ms Lilja.

The differences in my duties and responsibilities were that as Deputy, I was the second person in the Chain of Command with many responsibilities. On the other hand, as Security Specialist, I was the third person in the Chain of Command with fewer responsibilities. Plus, I was never furnished with My SF-52 and PD. Since my move in October 2005, until when I left the USDA in January 2006, I have never received these documents. However, I was given a Performance Plan a few months later by Mr. Lynn Allen, Associate CIO for the Cyber Security Office. I asked Mr. Allen how I could possibly be getting a Performance Plan without a PD. I told him that I do not know my job description and I never received any PD regarding this job. I also stated that I do not know what this job entails in order for me to accept this appraisal. I knew the job of security but I did not know what was expected of me in terms of operations, supervisory and management of the system.

Attachment Q is my position announcement under Vacancy Announcement Number OCIO-02-07 which was advertised on June 26, 2002.   Under **Major Duties, 3rd line**, it states that the **"incumbent of this position serves as the Deputy Associate Chief Information Officer for the Telecommunications Services and Operations (TSO)."** Attachment R is shows the TSO Organizational Chart which was approved by management. Attachment S also shows one of sample of my emails with my Title signature to Ms. Lilja.

## Claim No. 5

## October 1, 2005, I received a performance rating of fully successful (3rd Lowest Rating) for Fiscal Year 2005.

In October 2005, Ms. Jan Lilja rated my performance as fully successful (3rd lowest rating). My rating was lowered from my previous two years in which I was rated at the Superior level. I furnished Ms. Lilja with my accomplishments for each criteria evaluation prior to the final evaluation. When I asked Ms. Lilja why I was rated lower than last year without proper counseling, first her response to my concerns was that Mr. Williams told her not to give everyone high ratings. Then she said that it was because of my leadership performance during of the week of July 21, while she was on vacation. *She therefore was rating my leadership performance based solely on 1 week out of 52 weeks during the year.* She marked me the lowest possible in the Leadership Category, as Not Meeting Fully Successful (R). Notice on Attachment T, I did not sign to agree on this rating. What she said regarding Mr. Williams not allowing high ratings was untrue. I know this because other Associates in OCIO gave their staff a rating of Outstanding or Superior. On her second response for the low rating regarding my leadership, I replied,"*There were no categories in leadership skills on my performance plan*". I also stated, *"I provided you with a list of my accomplishments and I met all of the criteria listed under my performance plan." "Please show me where this leadership category is listed on my performance plan. Show me where it is."* She said *"I do not have time to discuss it with you".* Before I ended the session, I said,"*Just to let you know, or perhaps you know, that no one in the OCIO has what it takes to be a Leader. I retired military. I have received Awards for my leadership from the President's Committee for Integrity and Efficiency (PCIE) for three years in row. For your information, I have learned to be a leader from my earliest career in the United*

Heshmat Ansari                                                                                          Page 15 of 17

*States Army as Second Lieutenant. I have learned to be a leader right from combat when I was a platoon leader to Desert Shield operations and to the Pentagon. I guess that is not quite enough for you and the USDA Management. Please find another excuse".*

I thought informing Management was the right thing to do for speaking up for principles and providing true, accurate, and full information disclosure and advice to our executive management, even when it is sometimes difficult or not the popular thing to do. I thought that was the right thing to do before they heard it or received phone calls regarding UTN failures. This is truly unfair employment practices to evaluate an individual based solely on 1 week out of 52 weeks during performance year even individual alerted management on major government multi-million dollars of technology investment issues. During August 2005, the USDA Office of Inspector General (OIG) alerted management on the UTN security, the same issues that I had alerted on in July 2005. Their testing disclosed that the recent implementation of the Universal Telecommunications Network (UTN) was put into practice with inadequate security controls.

## Main Witnesses in Allegations

Adrienne Bowman, Office Secretary, (717) 580-3538

Karen Sifford, Staff of USDA OIG, (816) 823-2388

Steven Eckland, Staff of USDA OIG, (816) 823-3886

Karl Hill, Staff of OCIO, (970) 295-5294

Dave Williams, Staff of TSO, (970) 295-5564

Karen Whiting-Diggs, Staff of OCIO, (202) 720-9017

Teresa Kelly-Reid, Staff of OCIO, (301) 504-4412

Vernelle Archer, Staff of OCIO, (301) 504-2040

Craig Chase, Staff of OCIO, (202) 690-0077

David Combs, USDA CIO, (202) 720 8833

Jerry Williams, Deputy CIO, (202) 720-8833

## ***The Remedy I Request as Redress is:***

As a result of the employment discrimination and retaliatory treatment I was subjected to during my employment with the USDA, I am seeking from the District of Columbia Civil Court both compensatory and punitive damages in the amount of $175,000 for pain and suffering.

*Heshmat Ansari, Ph.D*
*Retired, Major (O-4)*
*US Army*

Page 1 of 2



⚠ Attachments can contain viruses that may harm your computer. Attachments may not display correctly.

**Ansari, Heshmat <FMCSA>**

| | |
|---|---|
| **From:** | Ansari, Heshmat |
| **To:** | Chase, Craig; Fairfax, Kelvin; Hill, Karl; Rozecki, Jeffrey; Wasser, Barry; Williams, Dave |
| **Cc:** | |
| **Subject:** | OIG UTN Firewall Rules |
| **Attachments:** | 🗋 UTN firewall rules.pdf(1MB) |

**Sent:** Tue 1/10/2006 11:06 AM

-----Original Message-----
From: ECKLAND, STEVEN BRYCE -OIG
Sent: Friday, September 02, 2005 8:48 AM
To: Lilja, Jan
Cc: Allen, Lynn; SIFFORD, JULIE -OIG; SIFFORD, Karen -OIG; PHILIPPI,
WANDA -OIG; LaPOINT, TRACY -OIG
Subject: UTN Firewall Rules

Ms. Lija:

When we discussed the Management Alert on August 24, you stated that the
firewall rules in place are the same as the rules for the older network, and
specifically that the firewalls are still in a "deny all" status.

Attached are exerpts from your firewall rules printed on August 24, provided
to us by Pam Webber. The rules we marked allow any IP traffic through the
firewalls. Further, this rule preceeds the "deny all" rule, rendering it
ineffective.

Please explain.

Also, given this information, we'd like to obtain the following additional
information:
(1) Name of the GAO contact that reviewed the USDA firewall rules
(2) All the change control documents for all firewall changes made since GAO
reviewed the firewalls
(3) Membership in the "Trusted" group, and "USDA_Addresses" group (both the IP
addresses and who they belong to)
(4) Documentation supporting the last time the firewall rules were
effectiveness and necessity.

I appreciate your assistance in the matter,
Bryce

Steven Bryce Eckland
Assistant Regional Inspector General
Financial and IT Operations
8930 Ward Parkway, Suite 3016

07 1778

**FILED**

OCT - 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Attachment A

**Ansari, Heshmat <FMCSA>**

| | |
|---|---|
| From: | Carlson, Michelle |
| Sent: | Thursday, July 21, 2005 3:50 PM |
| To: | Ansari, Heshmat; Hill, Karl; Harsha, Truman; Weber, Pam |
| Subject: | FW: Email traffic from Agencies connected to UTN sites Albany, Portland, & Utah is suffering an outage |

FYI... Andy is continuing to work with AT&T to get this resolved ASAP.

Thank you-
Michelle Carlson, Telecom Specialist
USDA, OCIO, TSO, NTSO
ph:  301-504-2144
fax:  301-504-4826
cell: 301-775-5351

** For information updates, please call the OCIO/NTSO/WAN information line on 866-USDA-411 or for network problems, contact the OCIO/NTSO/WAN Team on 866-USDA-WAN **


-----Original Message-----
From: Stokes, Andy
Sent: Thursday, July 21, 2005 3:40 PM
To: Wilson, Stephen; want@mail.netman.usda.gov%inter2
Subject: RE: Email traffic from Agencies connected to UTN sites Albany, Portland, & Utah is suffering an outage


We're continuing to work with ATT on this issue as the initial change did not correct the problem. The intention is to have 'usda.gov' and any subdomain pass the filter. I've specifically requested the addition of 'ars.usda.gov' to the filter to correct the current outage. Updates to follow as we work towards a resolution.

-----Original Message-----
From: Wilson, Stephen
Sent: Thursday, July 21, 2005 11:26 AM
To: want@mail.netman.usda.gov
Subject: Email traffic from Agencies connected to UTN sites Albany, Portland, & Utah is suffering an outage

FYI,

The restrictions put in place on the anti-virus systems at our 10 UTN nodes has caused a disruption to email traffic at our 3 production sites.  Currently, we have multiple calls from ARS indicating that they cannot transmit email.  We are working with the GCSC and our UTN program manager to resolve the outage.

07 1778

FILED

OCT - 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

000154

1

*ATTACHMENT* Attachment B

**Ansari, Heshmat <FMCSA>**

| | |
|---|---|
| From: | Carlson, Michelle |
| Sent: | Thursday, July 21, 2005 4:05 PM |
| To: | Ansari, Heshmat |
| Subject: | FW: Email traffic from Agencies connected to UTN sites Albany, Portland, & Utah is suffering an outage |

Thank you-
Michelle Carlson, Telecom Specialist
USDA, OCIO, TSO, NTSO
ph:  301-504-2144
fax:  301-504-4826
cell: 301-775-5351

** For information updates, please call the OCIO/NTSO/WAN information line on 866-USDA-411 or for network problems, contact the OCIO/NTSO/WAN Team on 866-USDA-WAN **

-----Original Message-----
From: Wilson, Stephen
Sent: Thursday, July 21, 2005 1:26 PM
: want@mail.netman.usda.gov%inter2
Subject: Email traffic from Agencies connected to UTN sites Albany, Portland, & Utah is suffering an outage

FYI,

The restrictions put in place on the anti-virus systems at our 10 UTN nodes has caused a disruption to email traffic at our 3 production sites.  Currently, we have multiple calls from ARS indicating that they cannot transmit email.  We are working with the GCSC and our UTN program manager to resolve the outage.

07 1778

**FILED**

OCT - 3 2007

**NANCY MAYER WHITTINGTON CLERK
U.S. DISTRICT COURT**

C00155

1

Attachment C

**Ansari, Heshmat <FMCSA>**

| | |
|---|---|
| rom: | Harsha, Truman |
| ent: | Thursday, July 21, 2005 4:14 PM |
| To: | Scott Raisor (E-mail) |
| Cc: | Ansari, Heshmat; Thomas, Michael; Weber, Pam |
| Subject: | Removal of Antivirus Changes |

Scott,

Please remove the changes that were made last night to the anti-virus systems. These changes have disrupted several agencies Email traffic. Our CIO has requested immediate removal of these changes.

Thanks,

Truman

07 1778

FILED

OCT - 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

000156

1

Attachment D

**Ansari, Heshmat <FMCSA>**

| | |
|---|---|
| From: | raisor@att.com%inter2 [raisor@att.com] on behalf of raisor@att.com |
| Sent: | Thursday, July 21, 2005 5:10 PM |
| To: | Harsha, Truman; raisor@att.com%inter2 |
| Cc: | Ansari, Heshmat; Thomas, Michael; Weber, Pam; bdshoemaker@att.com%inter2 |
| Subject: | RE: Removal of Antivirus Changes |

Truman, Our teams will continue to work to identify the extent of the outage, so far we have only validated ARS being affected - outbound only.

We will leave ticket # 10003271 open

We will need to validate all Agencies that were affected that is the only way we can truly do a root cause analysis, if only ARS was affected it could be something as simple as a local DNS lookup that blocked them from sending email out.

We will continue to provide status as we receive it.


Scott Raisor
AT&T Government Solutions
Senior Program Manager
703-691-5592
703-628-9942 cell

-----Original Message-----
From: Raisor, Edward S (Scott), GVSOL
Sent: Thursday, July 21, 2005 4:29 PM
To: 'Truman.Harsha@usda.gov'
Cc: Hesh.Ansari@usda.gov; Michael.Thomas@usda.gov; Pam.Weber@usda.gov
Subject: RE: Removal of Antivirus Changes

Truman initial test has worked between Barbara and larry.winkel@morris.ars.usda.gov

Initial test was successful!

It appears that ARS was primary group affected we are looking into if Forest Service was affected

Scott Raisor
AT&T Government Solutions
Senior Program Manager
703-691-5592
703-628-9942 cell

-----Original Message-----
From: Truman.Harsha@usda.gov [mailto:Truman.Harsha@usda.gov]
Sent: Thursday, July 21, 2005 4:23 PM
To: Raisor, Edward S (Scott), GVSOL
Cc: Hesh.Ansari@usda.gov; Michael.Thomas@usda.gov; Pam.Weber@usda.gov

07 1778

FILED

OCT - 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

000157

Attachment E

**Ansari, Heshmat <FMCSA>**

| | |
|---|---|
| **From:** | Combs, Dave |
| **Sent:** | Thursday, July 21, 2005 5:03 PM |
| **To:** | 'raisor@att.com' |
| **Cc:** | Williams, Jerry -OCIO; Lilja, Jan; Ansari, Heshmat |
| **Subject:** | USDA Email Problem |

Scott,

To say that we at USDA are unhappy with the events of today is putting it mildly. This is the second time that AT&T has fouled up something major with the UTN implementation. This is unacceptable performance and I expect action to be taken to assure that these kind of errors do not happen again. Having continuously available email service in USDA is critical to our ability to do our jobs, especially in the event of a real emergency event. Bottom line, this outage was not a trivial event.

By noon tomorrow I expect to receive a detailed post mortem on this problem along with an action plan to prevent a recurrence.

Dave Combs
Chief Information Officer (Acting)
United States Department of Agriculture
1400 Independence Ave SW Mail Stop 7601
Washington, DC 20250
202-720-8833

07 1778

**FILED**

OCT - 3 2007

**NANCY MAYER WHITTINGTON, CLERK**
**U.S. DISTRICT COURT**

Attachment F

000158

### Memorandum of Record
### Meeting with AT&T and CC-OPS

This morning, July 22, 2005, at approximately 9:00 AM, Dave Combs, CIO, Jerry Williams, Deputy CIO, and Hesh Ansari, Deputy ACIO, met with Mary Ann Mitchell, President/CEO of CC-OPS, and E. Scott Raisor, Program Manager of AT&T to discuss the restriction put in place on the anti-virus systems at 10 UTN nodes which had caused a disruption at midnight of July 20 to the email traffic at 3 USDA production sites.

At the meeting, the CIO and Deputy CIO stated that OCIO is very unhappy with the way AT&T and CC-OPS handled these changes. They expected that any changes, such as these, be fully tested before they are put into operation. They also stated that any new changes should be approved by the ACIO for TSO, Jan Lilja, or her designated alternate, before the UTN team puts them into operation.

Mr. Raisor and Ms. Mitchell stated that what had happened was that a security change had been made to the AntiVirus servers that consequently affected the UTN Pilot Sites (Albany, CA; Portland, OR; and Salt Lake City, UT.). This change unexpectedly caused an interruption in USDA outgoing email. They said that it appeared that the only agency affected was ARS. AT&T is confirming this.

Mr. Raisor and Ms. Mitchell told the USDA CIO and Deputy CIO that they are taking this problem very seriously and are going to implement preventative measures to ensure this will not repeat itself. Mr. Raisor and Ms. Mitchell are also convinced that this problem will not affect the UTN cut-over scheduled for the weekend of July 22. They claim that it was an isolated incident and are doing a Root Cause Analysis to be certain of the cause.

Ms. Mitchell told the CIO and Deputy CIO that CC-OPS has had numerous discussions with AT&T Executive Management and Project Management, and the USDA UTN team members. All are in agreement that they are ready to perform the cut-over, as scheduled, this weekend.

All parties in attendance agreed to the following procedure for UTN security changes:

1) AT&T should review the security change approval process and will have a second-level security engineer validate all future changes before they are implemented;
2) AT&T will forward these proposed changes to CC-OPS;
3) CC-OPS will forward the proposed changes to the UTN COTR;
4) UTN COTR will review and forward these changes to OCIO for approval;
5) OCIO TSO Operational Security will evaluate the changes and make a recommendation based on the security and operational impact of the change;
6) OCIO will validate the change process for approving and validating changes to see if improvements are needed;

07 1778

FILED

OCT - 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Attachment G, 1 of 2

7) OCIO will send the UTN COTR concurrence or nonconcurrence on these proposed changes.

Attachment G, 2 of 2

**Ansari, Heshmat <FMCSA>**

| | |
|---|---|
| From: | raisor@att.com%inter2 [raisor@att.com] on behalf of raisor@att.com |
| Sent: | Thursday, July 21, 2005 6:00 PM |
| To: | Combs, Dave |
| Cc: | Williams, Jerry -OCIO; Lilja, Jan; Ansari, Heshmat; krivers@att.com%inter2; stephenrobinson@att.com%inter2; stacyschwartz@att.com%inter2; jamesaharrison@att.com%inter2; bdshoemaker@att.com%inter2 |
| Subject: | RE: USDA Email Problem |

Dave, I am in complete agreement with you, We take all our customer outages very seriously and I apologize on behalf of the AT&T team for the inconvenience and am already working with our technical leadership on an action plan. I will have a root cause analysis and action plan to you tomorrow as requested.

Scott Raisor
AT&T Government Solutions
Senior Program Manager
703-691-5592
703-628-9942 cell

-----Original Message-----
From: Dave.Combs@usda.gov [mailto:Dave.Combs@usda.gov]
Sent: Thursday, July 21, 2005 5:03 PM
To: Raisor, Edward S (Scott), GVSOL
Jerry.Williams@usda.gov; jan.Lilja@usda.gov; Hesh.Ansari@usda.gov
Subject: USDA Email Problem

Scott,
To say that we at USDA are unhappy with the events of today is putting it mildly. This is the second time that AT&T has fouled up something major with the UTN implementation. This is unacceptable performance and I expect action to be taken to assure that these kind of errors do not happen again. Having continuously available email service in USDA is critical to our ability to do our jobs, especially in the event of a real emergency event. Bottom line, this outage was not a trivial event.

By noon tomorrow I expect to receive a detailed post mortem on this problem along with an action plan to prevent a recurrence.

Dave Combs
Chief Information Officer (Acting)
United States Department of Agriculture
1400 Independence Ave SW Mail Stop 7601
Washington, DC 20250
202-720-8833

07 1778

**FILED**

OCT - 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Attachment H

Page 1 of 1

## Ansari, Heshmat <FMCSA>

**From:** dhoisch@ccops.com%inter2 [dhoisch@ccops.com] on behalf of dhoisch@ccops.com
**Sent:** Thursday, July 21, 2005 9:19 PM
**To:** Combs, Dave; Williams, Jerry -OCIO; Lilja, Jan; Ansari, Heshmat; Thomas, Michael; Parham, Greg
**Cc:** Weber, Pam; Harsha, Truman; bhardy@ccops.com%inter2; mmitchell@ccops.com%inter2; raisor@att.com%inter2
**Subject:** UTN Email Outage 7-21-05

Dear Mr. Combs,

As promised, I wanted to provide you with a brief update this evening on the email outage that occurred today. You will receive a joint Root Cause Analysis with a Corrective Action Plan tomorrow from CC-OPS and AT&T.

As we discussed on the phone, a security change was made to the AntiVirus servers affecting the UTN Pilot Sites (Albany, CA; Portland, OR; and Salt Lake City, UT.) This change unexpectedly caused an interruption in a some of the outgoing mail from those sites.

At this time it appears that the only agency affected was ARS. We are still confirming this.

We take this problem very seriously and we are going to implement preventative measures to ensure this problem cannot repeat itself. We are also convinced that this problem will not affect the UTN cut-over scheduled for this weekend. It was an isolated incident and we believe we know the cause. Upon completion of the Root Cause Analysis we will be certain.

We have had numerous discussions with AT&T Executive Management and Project Management, and we (CC-OPS, AT&T and the USDA) are all in agreement that we are ready to perform the cut-over as scheduled this weekend.

The AT&T Management Team working on this is:
Steven K. Robinson:    Vice President Programs & Customer Care
Kenneth Rivers:            Program Director
Scott Raisor:          UTN Program Manager

The CC-OPS Management Team Consists of:
Mary Ann Mitchell:       President & CEO
Brian Hardy:          Chief Operating Officer
David Hoisch:        Sr. Vice President

Please feel free to contact any of us if you have more questions.

Sincerely,

David Hoisch
Sr. Vice President
CC-OPS, Inc.
(10) 568-5018 Voice
(10) 417-7991 Fax
dhoisch@ccops.com

07 1778

**FILED**

OCT - 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Attachment I

C00160

2/2006

Ansari, Heshmat <FMCSA>

| | |
|---|---|
| From: | Lilja, Jan |
| Sent: | Thursday, July 21, 2005 10:23 PM |
| To: | Ansari, Heshmat; Harsha, Truman; Thomas, Michael |
| Subject: | Fw: UTN Email Outage 7-21-05 |

Hello--I didn't leave til 12:30--what happened?  Report back to Dave should come from a Fed--I'd prefer not to have the contractors emailing him directly.  Thanks
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: dhoisch@ccops.com%inter2 <dhoisch@ccops.com>
To: Combs, Dave <Dave.Combs@USDA.gov>; Williams, Jerry -OCIO <Jerry.E.Williams@usda.gov>; Lilja, Jan <Jan.Lilja@USDA.gov>; Ansari, Heshmat <Heshmat.Ansari@USDA.gov>; Thomas, Michael <Michael.Thomas@usda.gov>; Parham, Greg <Greg.Parham@USDA.gov>
CC: Weber, Pam <Pam.Weber@usda.gov>; Harsha, Truman <Truman.Harsha@USDA.GOV>; bhardy@ccops.com%inter2 <bhardy@ccops.com>; mmitchell@ccops.com%inter2 <mmitchell@ccops.com>; raisor@att.com%inter2 <raisor@att.com>
Sent: Thu Jul 21 21:18:52 2005
Subject: UTN Email Outage 7-21-05



ATTACHMENT.TXT
(1 KB)

Dear Mr. C            mbs,

As promised, I wanted to provide you with a brief update this evening on the email outage that occurred today. You will receive a joint Root Cause Analysis with a Corrective Action Plan tomorrow from CC-OPS and AT&T.

As we discussed on the phone, a security change was made to the AntiVirus servers affecting the UTN Pilot Sites (Albany, CA; Portland, OR; and Salt Lake City, UT.) This change unexpectedly caused an interruption in a some of the outgoing mail from those sites.

At this time it appears that the only agency affected was ARS. We are still confirming this.

07 1778

We take this problem very seriously and we are going to implement preventative measures to ensure this problem cannot repeat itself.  We are also convinced that this problem will not affect the UTN cut-over scheduled for this weekend. It was an isolated incident and we believe we know the cause. Upon completion of the Root Cause Analysis we will be certain.

We have had numerous discussions with AT&T Executive Management and Project Management,  and we (CC-            , AT&T and the USDA) are all in agreement that we are ready to perform the cut-over as scheduled this weekend.

The AT&T Management Team working on this is:            ꞇ09Ồ161

**FILED**

OCT - 3 2007    Attachment J

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**To:**         Lilja, Jan; Thomas, Michael

**Subject:**   Dave Combs' Inquiry

Jan and Mike,

Dave Combs asked a few minutes ago to have a better control over the AT&T security. He questioned me on FAS' compromise. He was unhappy. He specifically wants to know where was the leak? Why neither he nor his Deputy were not alerted. I stated that we notified FAS and FAS has taken it offline and is working to rebuild it. He wants to know how we can prevent these types of actions? and how do we verify that AT&T is detecting attacks that we would have been alerted to before the UTN implementation?

I suggested that in order to do IV&V on AT&T, we nee to re-deploy USDA Dragon IDS into the same insertion points as AT&T's Cisco IDS. This option would enable the USDA a view of the data traveling in and out of the USDA.

He said he wants this to happen. Please advice!!!!!!!

> Hesh

07 1778

**FILED**

OCT - 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

000163

Attachment K

**Ansari, Heshmat <FMCSA>**

| | |
|---|---|
| **From:** | Lilja, Jan |
| **Sent:** | Saturday, July 23, 2005 9:12 AM |
| **To:** | Ansari, Heshmat |
| **Subject:** | Fw: Webshield Issue |

------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Weber, Pam <Pam.Weber@usda.gov>
To: Lilja, Jan <Jan.Lilja@USDA.gov>
CC: Harsha, Truman <Truman.Harsha@USDA.GOV>; Thomas, Michael <Michael.Thomas@usda.gov>
Sent: Fri Jul 22 13:32:07 2005
Subject: Webshield Issue

Hello Jan,

Mike asked us to put together a status of the WebShield issue as follows:

WebShield Open Relay Vulnerability

The vulnerability was discovered Wednesday evening when our CC-OPS and AT&T folks working together determined that the WebShield anti-virus capability that has been implemented by UTN was actually providing an SMTP "open relay". The only site that we could confirm had been exploited was Fort Collins. We realized that this was a vulnerability that had been the subject of a GAO audit finding and that USDA is in the process of addressing the finding. Therefore, an interim fix was authorized to close this hole until AT&T could resolve the problem with a permanent solution from their Lab.

Unfortunately, the interim fix affected ARS email. We were not aware of this until early afternoon. Truman spoke to Hesh about this and provided two options for restoring outgoing email service to the affected ARS locations.

1) Remove the temporary fix that had gone in Wednesday night and leave the "open relay" problem un-addressed.
2) Take all the WebSheild anti-virus devices off line to avoid the "open relay" problem and to restore ARS Email.

Hesh decided that option 1 was the best option. We agreed that the open relay was a lesser vulnerability than allowing virus infected email to enter USDA. AT&T removed the interim fix and service was restored to the affected locations 10-15 minutes after the decision.

AT&T has found a permanent solution to the problem. The original fix was correct it was just misapplied. AT&T has informed us that in doing their lab testing they are confident this fix will work correctly. The plan is implement the fix at the sites that are not yet using the WebShields this afternoon and the pilot sites will be implemented tonight prior to implementing New Orleans. We will test the fix with our ARS contact before we proceed with implementing New Orleans.

07 1778

000164  **FILED**

OCT - 3 2007

**NANCY MAYER WHITTINGTON, CLERK**
**U.S. DISTRICT COURT**

1

Attachment L

Issue Paper
U.S. Department Of Agriculture (USDA)
Office of the Chief Information Officer (OCIO)
Federal Information Security Management Act (FISMA)
Fiscal Year 2005
Audit No. 50501-0005-FM

Audit:        Federal Information Security Management Act – Fiscal Year 2005

Audit No.:    50501-0005-FM

Issue No.:    FISMA-05-01

Subject:      Security Processes Sacrificed for UTN Implementation

Description:   We are currently performing the congressionally mandated annual review of the Department's progress in complying with FISMA. Our testing disclosed that the recent implementation of the Universal Telecommunications Network (UTN) was put into practice with inadequate security controls resulting in:

- ineffective monitoring of intrusions into the Department's backbone network;

- deactivation of URL filtering on the network's firewall;

- deactivation of anti-virus software;

- default "allow all" posture for firewall protection into the demilitarized zone; and

- intermittent failure of USDA users to access the Internet due to ineffective load balancing.

Discussions with agency officials to date have indicated that the UTN project was implemented overnight due to the pressures of the project being overbudget and past deadlines; otherwise, a more gradual conversion process would have been implemented which would have afforded more thorough testing processes over time. Prior to our testing, agency officials told the Office of Inspector General (OIG) that these problems have been corrected; however, our recent test results show that many of these issues are still outstanding.

Over the last several years, USDA and its agencies have taken numerous actions to address OIG and the U.S. Government Accountability Office's (GAO) information system security issues using a defense in depth security strategy that relies on OCIO staff to (1) monitor, analyze, and track network activities at strategic entry points; (2) provide initial anti-virus protection; (3) establish network firewall configuration and management processes; and (4) implement "deny all" posture on firewalls.

On July 23, 2005, OCIO officially implemented the UTN. The UTN was to provide OCIO, through the use of a contractor, the identification of USDA network security incidents, network capacity and utilization status reports, anti-virus protection, firewalls, Internet/intranet access,

07 1778

FILED

OCT - 3 2007

NANCY MAYER WHITTINGTON, CLE
U.S. DISTRICT COURT

Attachment M, 1 of 2

and load balancing and failover protection. Using UTN, the Department's network access points went from eight Internet access point throughout the United States, to just two access points, one in Washington, D.C., and the other in San Francisco, California.

Over 3 weeks since the date of implementation, OCIO and its contractor have been working to resolve these issues to no avail. Meanwhile, critical worms that affect common operating systems are being released that can exploit system vulnerabilities. We are still in the process of obtaining and evaluating documentation that supports the testing of the UTN program.

While the firewalls and mail gateway virus detection implemented by OCIO and the Department backbone are only the first defense in a defense-in-depth strategy, most of the Department's agencies rely solely on OCIO for intrusion detection and Internet content filtering. These services are critical for a more effective security program within the Department.

Criteria: According to performance-based software configuration management critical best practices, planning is a critical step in the project process because it outlines and organizes the activities needed for success. The planning process includes (1) continuous monitoring, (2) establishing thresholds, (3) determining the likelihood of risks, and (4) measurement of early indications of problems. Additionally, prior to delivery, the system needs to be tested in a stressed environment, nominally in excess of 150 percent of its rated capacities. Every test should be described in traceable procedures and have pass-fail criteria included. The testing process should also include stress/load testing for stability purpose. The test plan should include a "justifiable testing stoppage criteria." This gives testers a goal. If your testing satisfies these criteria, then the product is ready for release.

Agency Comments:


OIG Position:



Recommendations: We recommend that the OCIO

    1. Fully communicate the UTN weaknesses to the agencies so they have the opportunity to implement more stringent security measures as they see necessary;

    2. establish a plan, with specific completion dates, when security measures will be designed and implemented effectively; and

    3. establish a plan to revert to the old Internet gateways until a more effective security solution can be implemented under UTN.

*ATTACHMENT*
Attachment M, 2 of 2

**Ansari, Heshmat <FMCSA>**

| | |
|---|---|
| **From:** | Lilja, Jan |
| **Sent:** | Tuesday, August 16, 2005 8:15 PM |
| **To:** | Ansari, Heshmat; Moore, SusanA.; Archer, Vernelle; Thomas, Michael; Bowman, Adrienne; 'Richardk.Roberts@usda.gov' |
| **Subject:** | Acting ACIO |

Hello, while I am in Chicago on August 17 Susan .Moore is the Acting ACIO for Telecommunications.
Thank you, Jan Lilja
--------------------------
Sent from my BlackBerry Wireless Handheld

07 1778

**FILED**

OCT - 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Attachment N

To: Beans, Cheryl
Subject: Re: FEI Training



Thanks

------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Beans, Cheryl <Cheryl.Beans@USDA.gov>
To: Williams, Jerry -OCIO <Jerry.E.Williams@usda.gov>
Sent: Mon Jan 09 10:45:24 2006
Subject: FEI Training

The FEI Course started yesterday, January 8 - February 3. I understand from Richard that it was alot of forms to be completed prior to starting the course. I left a voice message for the contact at FEI, to see if someone else can attend to the course.

I will get back to you shortly.


Cheryl Beans
Management Analyst
OCIO-Resource Mgmt Staff
(202) 720-4556 work
(202) 690-0647 fax


07 1778

FILED

OCT - 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

090170

2

Attachment P, 1 of 2

**Ansari, Heshmat <FMCSA>**



| | |
|---|---|
| **m:** | Williams, Jerry -OCIO |
| **nt:** | Monday, January 09, 2006 2:07 PM |
| **To:** | Ansari, Heshmat |
| **Subject:** | RE: FEI Training |

Ok, sorry I didn't get the result we were looking for.

-----Original Message-----
From: Ansari, Heshmat
Sent: Monday, January 09, 2006 2:06 PM
To: Williams, Jerry -OCIO
Subject: RE: FEI Training

I really appreciate all your efforts. Thank you Sir.

Hesh

-----Original Message-----
From: Williams, Jerry -OCIO
Sent: Monday, January 09, 2006 2:04 PM
To: Ansari, Heshmat
Subject: FW: FEI Training

fyi

-----Original Message-----
From: Beans, Cheryl
Sent: Monday, January 09, 2006 11:59 AM
To: Williams, Jerry -OCIO
Subject: RE: FEI Training

Renita Coley, HRM, inform me that we can not let another employee attend this course, because it has already started.

Cheryl Beans
Management Analyst
OCIO-Resource Mgmt Staff
(202) 720-4556 work
(202) 690-0647 fax

-----Original Message-----
From: Williams, Jerry -OCIO
Sent: Monday, January 09, 2006 10:46 AM

000169

1

Attachment P, 2 of 2



# Vacancy Announcement

## DEPARTMENT OF AGRICULTURE (USDA)
## USDA, OFFICE OF THE CHIEF INFORMATION OFFICER

Vacancy Announcement Number: OCIO-02-07

**Opening Date:** 06/26/2002

**Closing Date:** 07/26/2002

**Position:**     SUPERVISORY INFORMATION TECHNOLOGY SPECIALIST
              GS-2210-15/15

**Salary:**     $92,060 - $119,682 per year

Promotion Potential: GS-15

Duty Location:    1 vacancy at WASHINGTON, DC

**WHO MAY APPLY:**

Open to all qualified persons.

**MAJOR DUTIES:**
This position is located in the Office of the Chief Information Officer (OCIO), Associate Chief Information Officer, TSO. The incumbent of this position serves as the Deputy Associate Chief Information Officer for the Telecommunications Services and Operations (TSO) organization. Responsibilities include implementing, managing, and maintaining USDA's telecommunications program through the development, management, and implementation of Department-wide telecommunications services and operations which facilitate the migration of existing USDA agency networks to a USDA corporate telecommunications network, for leading the Department's effort to improve telecommunications services and reduce costs by evaluating and improving USDA's telecommunications process. Other responsibilities include implementing, managing, and maintaining USDA telecommunications network security program in concert with the USDA Cyber Security program through the development, management, and implementation of Department-wide network security services and operations.

**QUALIFICATIONS REQUIRED:**

Applicant must have one year of specialized experience equivalent to the next lower grade, which has equipped the applicant with the particular knowledge, skills, and abilities to successfully perform the duties of the position. Experience is typically in or related to the work of the position described.

. Specialized Experience is experience that demonstrated accomplishment of computer project assignments that required a wide range of knowledge of computer requirements and techniques pertinent to the position to be filled. This knowledge is generally demonstrated by assignments where the applicant analyzed a number of alternative approaches in the process of advising management concerning major aspects of ADP system design, such as what system interrelationships must be considered, or what operating mode, systems software, and/or equipment configuration is most appropriate for a given project.

07 1778

# FILED

OCT - 3 2007

**NANCY MAYER WHITTINGTON, CLERK**
**U.S. DISTRICT COURT**

http://isearch.usajobs.opm.gov/ftva.asp?OPMControl=IE9654

C00171

Attachment 1 of 2

## KNOWLEDGES, SKILLS AND ABILITIES REQUIRED

Candidates should submit a narrative statement on a separate page(s) with specific responses to the knowledge, skills, and abilities (KSAs) in this announcement. Failure to submit your narrative response to the KSAs for this job may negatively affect your eligibility and/or rating for this position.

KSA #1: Knowledge and experience with state-of-the art telecommunications technologies and management strategies. (This knowledge is needed to lead complex, high visibility studies and projects directly related to telecommunications infrastructure planning and operation).

KSA #2: Experience as a supervisor/manager of a multi-discipline, diverse, fast-paced operations organization. (Describe your experience in supervising employees to include disciplinary actions; training; work status).

KSA #3: Skill in oral and written communications. (This includes reasonable accommodation). ( Describe your experience in conducting meetings, briefings conferences, writing reports developing procedures).

KSA #4: Knowledge and experience with policy formulation, strategic planning, and capital investment planning for telecommunications programs. (Describe your experience in developing strategic plans, policies).

KSA #5: Knowledge and experience with implementation of telecommunications security regulations and procedures. (Describe your knowledge of security regulations and how they were put in place).

## BASIS OF RATING:

For CTAP and ICTAP, well-qualified means that the applicant is eligible, qualified, and clearly exceeds qualification requirements for the position as demonstrated by either: (1) meeting selective and quality ranking factor levels as specified by the agency; or (2) being rated above minimally qualified under the agency's specific rating and ranking process.

Ratings will be based on an evaluation of your experience as it relates to the qualification requirements and on the knowledge, skills, and abilities (KSA's) listed. You should provide detailed evidence of the KSA's in your application in the form of clear, concise examples showing level of accomplishment and degree of responsibility. Qualified candidates will be assigned a score between 70 and 100, not including points that may be assigned for veterans preference.

C00172

Attachment D, 2 of 2



**USDA OCIO TSO**

Associate Chief Information Officer
Jan Lilja

Deputy ACIO and ISSPM
Hesh Ansari, Ph.D.

**TSO**
ACIO Confidential Assistant
Darline Coleman

**TMACO Liaison**
Telecommunications Manager
Gordon Durflinger

**TRMS**
Resource Manager
Diana Mack

**TSO**
ISO
Karen Whiting-Diggs

**NTSO**
Division Director
Mike Thomas

**WTSO**
Division Director
Vernelle Archer

**TMD**
Division Director
Vacant

**UTN Project**
Project Manager
Valarie Burks

Inter-Agency Management Council
IAMC Chair
Jan Lilja

Telecommunications Mission Area Communications Officer
TMACO Liaison
Gordon Durflinger

Telecommunications Advisory Sub-Council
TASC Co-Chairs
Jan Lilja, Keith Jackson, Mary Thomas

07 1778



FILED

OCT - 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Attachment R

**Ansari, Heshmat <FMCSA>**

| | |
|---|---|
| **From:** | Ansari, Heshmat |
| **Sent:** | Thursday, September 23, 2004 9:09 AM |
| **To:** | Lilja, Jan |
| **Subject:** | Letter to FAS on CSA |

Dear Kathy,

Enclosed is the Memorandum of Agreement (MOA) between OCIO and FAS for Cisco security Agent (CSA). This MOA outlines the CSA licenses agreement and schedule for transfer of funds. Please sign the attached MOA. The CSA Licenses for FAS will be available upon return of this MOA. This agreement grants license for FY05 and 06.

*Best Regards,*
*Hesh Ansari, Ph.D*
*Deputy Associate CIO*

CSA MOA
enses-FAS.pdf (43 K



**U.S. Department of Transportation**
Federal Motor Carrier Safety Administration

**HESH ANSARI, Ph.D**
Director, Information Technology Development & Modernization

Office of Information Technology
400 Seventh Street, SW (MC-RJD)
Suite 5107
Washington, DC 20590

Office: (202) 366-4390
Fax: (202) 366-4486
heshmat.ansari@fmcsa.dot.gov

07 1778

**FILED**

OCT - 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

ATTACHMENT S

| United States Department of Agriculture<br>Performance Appraisal | | 1 Social Security No.<br>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 | 2 Position Number<br>IT1474 | 3 Pay Plan<br>GS | 4 Occup. Series<br>2210 |
|---|---|---|---|---|---|
| 5 Name (Last, First, Middle Initial)<br>ANSARI, HESHMAT | | 6 Grade/Step or Pay Level<br>15/04 | 7 Appraisal Period | | |
| | | | From ,10/01/04 | 9/30/05 | |
| 8 Official Position Title<br>SUPVY INFORMATION TECHNOLOGY SPECIALIST | | 9 Organization Structure Code<br>IT-30-01-0000 | | | |
| 10 Duty Station<br>WASHINGTON, DC | 11 Funding Unit | 12 Agency Use | | 13 NFC Use | |

Instructions

Blocks 1 through 10, completed by NFC, should be reviewed and if, necessary, corrected.
Block 11. Enter funding unit number.
Block 14. Enter brief description of performance elements.
Block 15A. Check performance elements identified as critical.

Blocks 15B, 15C, 15D. Rate actual performance by entering 2 for critical elements and 1 for non-critical elements in appropriate column.
Blocks 15E, 15F, 15G. Enter total of each column.
Block 15H. Enter total from 15E, 15F, and 15G.
Block 16A. Check off the correct summary rating described in decision table (16B)

| 14<br>Performance Elements | 15A<br>Critical Element<br>(✓) | 15B<br>Exceeds Fully Successful | 15C<br>Meets Fully Successful | 15D<br>Does Not Meet Fully Successful |
|---|---|---|---|---|
| 1) PROGRAM MANAGEMENT | x | | 2 | |
| 2) LEADERSHIP/STAFF DEVELOPMENT | | | | 1 |
| 3) CUSTOMER SERVICE | x | 2 | | |
| 4) PROGRAM INITIATIVES/SPECIAL REPORTS | | 1 | | |
| 5) EQUAL EMPLOYMENT/CIVIL RIGHTS | x | 2 | | |
| 6) | | | | |
| 7) | | | | |
| 8) | | | | |
| 9) | | | | |
| 10) | | | | |

16B Decision Table (check off Summary Rating in block 16A)

Rating of Outstanding if 15E equals 15H.
Rating of Unacceptable if any critical element is rated in 15D. (Unsatisfactory for SES)
Rating of Superior if no element is rated in 15D; 15F is greater than zero; and 15E is greater than 15F.
Rating of Marginal if 15G is greater than 15E, and no critical element is rated in 15D. (Minimally Satisfactory for SES)
Rating of Fully Successful if none of the above apply.

| 15E Exceeds | 15F Meets | 15G Does Not Meet |
|---|---|---|
| 5 | 2 | |

15H Enter total: 15E + 15F + 15G = 15H | 15H: 0

16A Summary Rating (See Decision Table in 16B)

17 Employee (Check off appropriate box)

I have a copy of USDA and Agency regulations on employee responsibilities and conduct; I have discussed them with my supervisor and questions have been answered to my satisfaction.

Yes ☐   No ☐

☐ Outstanding
☐ Superior
☒ Fully Successful
☐ Marginal (Unsatisfactory for SES)
☐ Unacceptable (Minimally Satisfactory for SES)

18 Employee's Signature _____ Date _____ If employee did not sign, state reason.
Disagree w/ rating.

(Instructions for resolutions of disputes are on the reverse of employee copy.)

19 Supervisor's Signature _____ Date October 20, 2005
20 Reviewer's Signature _____ Date 10/20/05
21 Approving Official or Funding Unit Manager's Signature (optional) _____ Date
22 FOR SES ONLY   PLACES   Bonus Amount

AD-435 WordPerfect Version 05/96 KCRMSI

Attachment

**USDA**

# UNITED STATES DEPARTMENT OF AGRICULTURE
## Office of Adjudication and Compliance

United States
Department of
Agriculture

Office of the
Assistant Secretary
for Civil Rights

Office of Adjudication
and Compliance

1400 Independence
Avenue SW

Washington, DC
20250

|   |   |
|---|---|
| Heshmat Ansari, <br> Complainant, <br><br> v. <br><br> Mike Johanns, <br> Secretary, <br> Department of Agriculture, <br> Agency. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

USDA Complaint No. CRSD-2006-00107

## Final Agency Decision

### Introduction

In accordance with the Equal Employment Opportunity Commission (EEOC) regulations at 29 C.F.R. §1614.110(b), this is the final decision of the United States Department of Agriculture (Agency) on this complaint.

### Issues Presented

The issues presented herein are whether the Complainant was subjected to discrimination and harassment (non-sexual) based on religion (Muslim) and national origin (Iranian)[1] when:

1. His supervisor informed him that he could no longer act on her behalf when she was out of the office;

2. He was no longer authorized to attend Office of the Chief Information Officer (OCIO) meetings or engage in conversation with the Chief Information Office (CIO) or Deputy Chief Information Officer (Deputy CIO);

---

[1]   In the Agency's letter accepting the complaint, age was listed as one of the bases. However, in a fax to the EEO Investigator, the Complainant stated that he was making no allegations on the basis of his age. (Exh. G-8). In his rebuttal, the Complainant for the first time raised a claim that he was a qualified individual with a disability and that the Agency failed to accommodate him by providing an orthopedic chair. (Exh. F3). We discuss this claim separately below.

3. On October 1, 2005, management reassigned him from his OCIO position as Deputy Associate Chief Information Officer to the Cyber Security Office to manage security operations;

4. On October 31, 2005, he received a performance rating of Fully Successful for Fiscal Year 2005; and,

5. He was denied Quality Step Increases (QSIs).

## Procedural Background

The record reflects that the Complainant first contacted the Office of Adjudication and Compliance (formerly the Office of Civil Rights) regarding his equal employment opportunity (EEO) complaint on November 2, 2005. The Complainant elected to participate in traditional EEO counseling; however, the Agency was unable to arrange for EEO counseling within the statutorily mandated 30 days. The Complainant chose not to extend the counseling period. Therefore, a Notice of Right to File was issued to the Complainant on January 4, 2006. Meanwhile, the Complainant filed a formal complaint on December 22, 2005. The complaint was accepted and referred for investigation on February 17, 2006. An investigation was conducted and a copy of the Report of Investigation (ROI) was provided to the Complainant on October 20, 2006. At the same time, the Complainant was notified that, within thirty (30) days, he could elect a hearing before an EEOC Administrative Judge (EEOC AJ) or a final agency decision (FAD) based upon the evidence of record. On November 6, 2006, the Agency received the Complainant's request for a FAD.

## Relevant Facts

The record reflects that, during the relevant period, the Complainant was employed as a Supervisory Information Technology Specialist, GS-15, OCIO in Washington, D.C., with the working title of Deputy Associate Chief Information Officer.[2] The Associate Chief Information Officer for Telecommunications, Telecommunications Services and Operations (TSO), OCIO, was the Complainant's first line supervisor (hereinafter Supervisor). The Deputy Chief Information Officer (hereinafter Deputy CIO) was the Complainant's second line supervisor, and the Chief Information Officer (hereinafter CIO) was the Complainant's third line supervisor. (Exh. F1).[3]

---

[2] In January 2006, the Complainant subsequently accepted a GS-15 position with the United States Department of Transportation as Director, Information Technology Development and Modernization. (Exh. F1).

[3] Unless otherwise noted, the duty station is in Washington, D.C.

### Claims Based on Religion and National Origin

The Complainant stated that, in early July 2005, he alerted OCIO management to the existence of major security issues with the implementation of a multi-million dollar technology investment, the Universal Telecommunications Network (UTN). He described the UTN as "failing in its mission to protect USDA's resources and provide access to USDA's customers." He explained that he told "upper management" that the UTN suffered from poorly engineered network and security systems. The Complainant asserted that near the end of July 2005, the Supervisor told him that he could no longer serve as Acting Associate Chief Information Officer for TSO when she was away from the office.   According to the Complainant, he told the Supervisor that her decision was unacceptable and retaliatory and that acting on her behalf was part of his job responsibilities. The Complainant asserted that the Supervisor responded: "Wake up to reality – I was not the one who ran to [the Deputy CIO and the CIO] while I was on vacation – I have no obligation to discuss it with you." (Exh. F1).

By August 2005, the USDA's Office of the Inspector General (OIG) had interviewed 25 employees in OCIO and, during the same month, OIG "alerted management on the UTN security, the same issues that I had alerted on [sic] in July 2005." The Complainant stated that, prior to his interview with an OIG auditor, the Supervisor instructed him that he should respond to OIG's questions by stating that the system was working and was secure. According to the Complainant, he told the Supervisor he would not lie, and then told the OIG auditor and her boss that he did not wish to provide more information for fear that management would further retaliate against him and fire him. He stated that the OIG auditor assured him that he was protected by the Whistleblower Act, and, although he is not specific in his affidavit, he implied that he then answered OIG's questions. The Complainant stated that the subsequent retaliation against him "was continuous and never stopped." He also explained that three (3) other OCIO employees were present during his discussion with OIG.[4]  (Exh. F1).

The Complainant asserted that, after he spoke with OIG, the Supervisor told him that he was no longer authorized to attend staff meetings or to meet with "the OCIO staff or Associates" without her being present. He stated that the Supervisor also instructed him not to engage in oral or written communications with the CIO, the Deputy CIO, or other Associates. Further, he was denied his request to attend the Federal Executive Institute (FEI) for Leadership Training, while another Supervisory Information Technology Specialist, GS-15 (hereinafter Supervisory ITS), a White, American-born female, was authorized to attend the training. (Exh. F1).

With respect to the "forced reassignment," the Complainant stated that the reassignment placed him in an OCIO component responsible for subject matter about which he felt less confident.   He believes that the reassignment was in retaliation for his providing information to OIG concerning the UTN technology.   The Complainant stated that he

---

[4] One of the three employees, the Chief, Security Policy Branch, was interviewed by the EEO Investigator; the Branch Chief's testimony is referenced in this FAD.

was reassigned to the Cyber Security Office on September 12, 2005, to manage security operations, although he was provided no SF-52 or Position Description (PD). He complained to the Supervisor that the reassignment was a demotion because he lost his title, and that he was hired to provide telecommunications services operations and not security operations. The Complainant had been second in the chain of command as Deputy, but as a Security Specialist, he was third in the chain of command and had fewer responsibilities. He termed the reassignment "harassment." He asserted that he was told that there was no longer a need for a Deputy in TSO, but that after he left USDA, another Deputy, a White, American-born male, was hired, even though the position was never publicly announced. (Exh. F1).

Regarding his Fully Successful performance rating, the Complainant stated that the Supervisor had given no indication during his mid-year review that there was any area of performance that needed improvement and that he was on track to receive an Outstanding rating and a QSI. During the previous two (2) years, the Complainant received a Superior performance rating. According to the Complainant, the Supervisor told him that she gave him a Fully Successful because of his "leadership performance" during the week of July 2005 when she was on Annual Leave. With respect to his allegation that he never received a QSI, the Complainant stated that he accomplished many tasks during his three (3) years with USDA but never received a QSI. (Exh. F1).

The Supervisor (Congregationalist-United Church of Christ, American who was born in Lebanon) responded to the first claim by stating that she determined that the Complainant should not act in her absence, based on his conduct during the week of July 25, 2005. The Supervisor stated that they had been working on a major technical project, rebuilding the USDA-wide area network, and the final implementation date was during the weekend of July 23, 2005. (Exh. F2). She elaborated:

> On Monday, July 25, there were some technical issues, which is not unusual with a major deployment. A few people even experienced difficulty with getting on the Internet. . . . [The person in charge of the project, who was located in Fort Collins, Colorado] called to let me know there were a few problems and that things were spinning out of control in Washington, DC due to reports that [the Complainant] was giving to the CIO and other senior staff. (Exh. F2).

The Supervisor stated that the Complainant did not contact her or the person in charge of the project prior to providing inaccurate information to the CIO and others. She learned that the Complainant told all of her colleagues as well as the Deputy CIO that the firewalls were down and that there was no security, which she said was factually inaccurate. Upon her return from annual leave, the CIO, Deputy CIO, and the person in charge of the project (hereinafter Director/National TSO) met with her and the Complainant and were very upset regarding what had occurred while the Complainant was acting in her stead. After the meeting, she informed the Complainant that she did not think he would act on her behalf "for a little while." According to the Supervisor, she had never before been in a meeting in which it was made "crystal clear by several

individuals that performance had not been satisfactory." The Supervisor denied any recollection of a meeting in which she told the Complainant to "wake up to reality." However, she stated that, following the meeting with the CIO and Deputy CIO regarding the Complainant's performance during her absence in July 2005, she may have told the Complainant that, because she was not there when the situation occurred, she could not provide much insight regarding what went wrong. (Exh. F2).

The Supervisor denied that she informed the Complainant that he was not to attend any staff meetings, meet with OCIO staff, or engage in conversations with the CIO or Deputy CIO without her being present. She cited several examples of the Complainant's interaction with management and staff from August until October 1, 2005, when the Complainant was reassigned. Regarding the Complainant's requested training, the Supervisor responded that the cost of FEI training was $10,000 and she did not have the money in her budget. The Supervisor further stated that no one in her organization, including herself, was approved for FEI training during any year. (Exh. F2).

With respect to the reassignment, the Supervisor responded that the Complainant was moved when a new Associate CIO for Cyber Security joined the Agency in July 2005 and determined that the function of security operations that was performed by the Complainant belonged in the Cyber Security Office, where it had been previously. The Supervisor stated that the official title of the Complainant when he worked for her was Supervisory ITS and she assumed that remained his title when he was reassigned. The Supervisor recalled that the Complainant seemed excited about the opportunity to work in Cyber Security. She stated that an individual was assigned by her new supervisor to be her Deputy in April 2006, after the CIO decided to reorganize some four (4) months after the Complainant began employment with another Federal agency. (Exh. F2).

Responding to the Complainant's claim pertaining to his performance rating, the Supervisor stated that she saw no problems with the Complainant's performance at the time of his mid-year review, and that it was only during the aforementioned period in July 2005 that she became aware of his leadership deficiencies. She stated that the only reason for the Fully Successful rating was his handling of the acting position while she was on annual leave. The Supervisor denied having promised the Complainant a specific performance rating and denied having promised him a QSI, which she explained requires approval at a higher level. (Exh. F2).

With respect to the QSIs, the Supervisor responded that the Complainant was never denied such an increase. She stated that she never considered him for a QSI because he never had sustained outstanding performance, and that she had not provided a QSI to anyone on her staff. (Exh. F2).

The Deputy CIO (religion not identified, American) responded that the Supervisor acted within her authority when she informed the Complainant that he could no longer act on her behalf when she was out of the office, and that he agreed with the Supervisor's conclusion that the Complainant did not exercise good judgment when talking with the CIO and himself during the week that the Supervisor was absent from the office. The

Deputy CIO denied asking the Complainant to identify his religion and stated that he never asked anyone such a question. Further, the Deputy CIO denied that the Complainant referred to feeling harassed or intimidated when he was moved to the Cyber Security Office. He stated that he did not recall any specifics of the Complainant's performance review and also did not recall the Complainant's expressing any dissatisfaction with his performance rating. (Exh. F4).

The CIO (Christian, American) acknowledged, with respect to problems with the UTN project, that the Complainant notified him in writing that there were problems with its implementation. He stated that the contractors and the Director/National TSO began an action plan to resolve the problem during the period that the Complainant was acting for the Supervisor. The CIO stated that the Complainant "could not give us a straight story of exactly what he perceived to be the problem," and, consequently, there was a meeting scheduled with the contractors and the Director/National TSO. According to the CIO, during the meeting "it was discovered that there was a huge communication gap between [the Complainant] and the Director/National TSO," and the Complainant stated that because the Director/National TSO did not work under his supervision, he would not talk with him about the problems in implementation of the UTN project. (Exh. F5). The CIO explained:

> Based on [the Complainant's] lack of leadership ability, as demonstrated during his "acting" capacity, I informed him that he was no longer acting. The decision that he would no longer act on [the Supervisor's] behalf when she was out was a management decision. [The Supervisor] was the manager who communicated this decision to [the Complainant]. (Exh. F5).

The CIO denied the Complainant's claims regarding restrictions on his communications. He stated that he was unaware of any instructions that the Supervisor allegedly gave the Complainant restricting his authority to communicate or any instructions that the Complainant could not attend OCIO meetings. With respect to the reassignment, the CIO responded that management decided that the Complainant could be better utilized in Cyber Security, in which he had an excellent background. The CIO stated that he had no knowledge regarding the claims pertaining to the Complainant's performance rating and failure to receive a QSI. (Exh. F5).

The Director/National TSO (Christian, American), GS-15, OCIO, Fort Collins, Colorado, explained that he also reported to the Supervisor. He stated that he was aware that the Complainant was relieved of the responsibility to serve in an "acting" capacity in the Supervisor's absence after the Complainant provided "bad information to higher-level management." According to the Director/National TSO, the Complainant chose to misrepresent the facts to management. He stated that when problems with security devices arose during the implementation period for the UTN system in July 2005, he reported the problems to the Complainant, who was acting in the Supervisor's stead at the time. During the same week, the Deputy CIO called him to find out what was occurring with implementation of the UTN system and to obtain information about the security

devices. The Director/National TSO further stated that he was aware that OIG conducted an investigation related to the implementation problems. (Exh. F6).
The Branch Chief (Catholic, American), GS-14, Security Policy Branch, OCIO, stated that during the time at issue, he worked in OCIO's Cyber Security Office. He explained that due to performance issues, the security controls were turned off for more than 24 hours during implementation of the UTN system. He stated that the Complainant asked him for assistance in validating the problem with the system, and he concluded that the Complainant was correct in attempting to resolve the security issues with OCIO management and OIG. (Exh. F7).

A Senior Information Technology Specialist (Christian, American), GS-13, OIG, Kansas City, Missouri (hereinafter OIG Employee), stated that she knew that the Supervisor and the Director/National TSO did not want the Complainant to speak with the contractors who were responsible for the UTN system. She was told by the Complainant that he felt that they did not want him to communicate with the contractors because the implementation of the UTN system was not going well and they did not want him to talk with OIG about the problems. The OIG Employee attached to her affidavit e-mails reflecting communications between her, another OCIO employee, and the Complainant. The e-mails pertain to the UTN problems and speculation that the Supervisor concluded that the UTN problems were caused by the internal staff rather than the security design of the contractors. (Exh. F8).

An Administrative Officer (Catholic, American), GS-14, TSO, OCIO, stated that the Supervisor, for whom she provided administrative support, informed her that the Complainant had attended a meeting while she was out of the office and made derogatory comments regarding some of her management decisions related to the UTN system. The Administrative Officer also stated that she was aware that many individuals within the TSO organization did not give much credence to the Complainant's business opinions. With respect to the FEI training, the Administrative Officer explained that the funding for the Complainant was from the Working Capital Fund, while funding for the Supervisory ITS was from Appropriated funds. (Exh. F-10). The Supervisory ITS (Presbyterian, American) confirmed that she was paid from Appropriated funds. (Exh. F14).

Three (3) employees provided testimony that offered statements in support of the Complainant's claims of discrimination based upon his protected categories. One, an Information Technology Security Officer (Catholic, American), GS-12, OCIO, stated that the Supervisor "doesn't treat non-white people the same as she treats white people" and had tried to have a minority employee fired. (Exh.11). The second employee, a Secretary (Christian, American), GS-7, TSO, OCIO, Beltsville, Maryland, is the aforementioned minority employee whom the Supervisor allegedly tried to have terminated. The Secretary stated that she thought that the Supervisor and her manager "have come down hard on employees that have a strong belief in religion," and said that she based her conclusion on her own treatment. (Exh. F13). However, the Secretary did not elaborate. The third employee, a Management Analyst (Christian, American), GS-9, OCIO, stated that it appeared to her that the Supervisor discriminated against the Complainant as well as other minorities, including the Secretary, the Information

Technology Security Officer, and a Telecommunications Enterprise Architect. The Management Analyst did not offer any examples of discrimination related to religion or national origin. (Exh. F12). In his affidavit, the Telecommunications Enterprise Architect (Baptist, American), GS-15, TSO, OCIO, Beltsville, Maryland, did not indicate that he thought the Complainant was discriminated against on the bases of his religion or national origin. He also did not indicate that he himself was subjected to discrimination. (Exh. -9).

In his rebuttal affidavit, the Complainant again stated that he was never furnished with an SF-52 or PD in connection with his reassignment to the Cyber Security Office. The Complainant elaborated on his explanation of the problems with the UTN system. He stated that while he was at the Agricultural Research Center meeting with its staff, the Chief Technology Officer of USDA's Agricultural Research Service (ARS) reported to him that the agency's e-mail system was down because of the UTN implementation. The Complainant stated that he immediately contacted the CIO and Deputy CIO, and that the CIO requested that he not leave ARS until the problem had been corrected. The Complainant also informed the CIO that the contractor for the system was bypassing the "firewalls, web filtering, and anti-virus protection in order to keep the UTN operational," which exposed the USDA internet and network to intruders and hackers. (Exh. F3).

Subsequently, when the Complainant made his election for a FAD, he provided additional comments. He stated that he requested the EEO Investigator to look into his "missing PD" and that the EEO Investigator responded that she was unable to obtain assistance from Human Resources. He reiterated his claim that he was retaliated against because he was a whistleblower.[5] Further, the Complainant asserted that only six (6) of the thirteen (13) potential witnesses he requested to be interviewed during the investigation were actually interviewed. (Letter dated November 2, 2006, attached to the Complainant's form electing a FAD).

## Claims Based on Disability

In his rebuttal affidavit responding to management's statements, the Complainant raised for the first time a claim that he is a qualified individual with a disability under the Rehabilitation Act. He described his disability as ruptured lumbar vertebrae and disc, with a medical rating by the Department of Veterans Affairs of 30 percent disability with respect to mobility and function related to the use of his back. He asserted that the Supervisor discriminated against him on the basis of his disability when she never offered him an orthopedic chair during his three (3) years with USDA. (Exh. F3).

In his original affidavit, the Complainant stated that he suffered from low back pain and a seizure disorder, but that neither condition limited his ability to perform a major life activity. However, he alleged that he experienced seizures more frequently because of the level of stress and aggravation to which he was subjected.[6] According to the

---

[5] Claims raised under the Whistleblower Protection Act are not cognizable in the EEO complaint process.
[6] The Complainant stated that, at the time he provided his affidavit in the instant case (July 26, 2006), he had not experienced a seizure since the week prior to his leaving USDA. (Exh. F1).

Complainant, he first notified the Supervisor in March 2003 about his disability, but management already had knowledge of the disability when he began his employment in February of the same year. He explained that his standard personnel form, SF-52, reflected his disability; his military discharge form notes that his disability was the reason for his separation from the U.S. Army, and his 30 percent disability rating also provided notice to the Agency. (Exh. F1).

The Supervisor denied any knowledge of the Complainant's physical or mental condition, except for her awareness that he was classified as a disabled veteran. (Exh. F2). The Deputy CIO stated that he was unaware that the Complainant had any physical or mental disabilities. (Exh. F4). The CIO also stated that he was unaware that the Complainant had any physical or mental disabilities, although he did recall that the Complainant mentioned that he had a low back injury. (Exh. F5). Moreover, the record contains no evidence that the Complainant requested reasonable accommodation.

## Analysis and Findings

In any proceeding, either judicial or administrative, involving a charge of discrimination, the complainant has the burden to initially establish that there is some substance to his allegation of discrimination. In order to meet this burden, the complainant must establish a prima facie case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Furnco Construction Corp. v. Waters, 438 U.S. 567 (1978). This means that the complainant must present a body of evidence, such that were it not rebutted, the trier of fact could conclude that unlawful discrimination or retaliation did occur.

If the complainant meets his burden of presenting a prima facie case, then the agency has a burden of production to articulate some legitimate, nondiscriminatory reason for its actions. If the agency meets its burden, the complainant then has the burden to demonstrate that the reason articulated is, in actuality, a pretext for discrimination. Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981). As the Supreme Court has reiterated, the complainant's ultimate burden of persuasion is to prove that unlawful discriminatory animus motivated the agency's actions. St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).

To establish a prima facie case of harassment, a complainant must show: (1) that he is a member of the statutorily protected class; (2) that he was subjected to harassment in the form of unwelcome verbal or physical conduct involving the protected class; (3) that the harassment complained of was based on the statutorily protected class; and (4) that the harassment affected a term or condition of employment and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment. Quinn v. Department of Agriculture, EEOC Appeal No. 01A34982 (December 21, 2004). Further, the incidents must have been "sufficiently severe and pervasive to alter the conditions of complainant's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). The harasser's conduct should be evaluated from the objective viewpoint

of a reasonable person in the victim's circumstances. Enforcement Guidance on Harris v. Forklift Systems, Inc., EEOC Notice No. 915.003 (March 8, 1994).

Protection against discrimination based on disability is provided to federal employees by the Rehabilitation Act of 1973, as amended (hereinafter the Rehabilitation Act). In order to establish a prima facie case of disability discrimination, a complainant must prove, by a preponderance of the evidence, that he was treated differently from individuals not within his protected group, or that the agency failed to make a needed reasonable accommodation, resulting in adverse treatment of the complainant. Wise v. United States Postal Service, EEOC Appeal No. 01A21311 (January 21, 2003), citing Sisson v. Helms, 751 F.2d 991, 992-93 (9th Cir.), cert. denied, 474 U.S. 846 (1985).

First, we address the Complainant's claim based on disability. In his rebuttal, the Complainant raised the claim that he was a qualified individual with a disability under the Rehabilitation Act. Earlier, the Complainant explained under oath in his first affidavit that neither his low back pain nor seizure activity limited his ability to perform a major life activity. In addition to the Complainant's acknowledgment that he was not substantially limited in his ability to perform a major life activity, there is no evidence that the Complainant had a record of such a disability or was perceived as having such a disability. Therefore, we find that the Complainant was not an individual with a disability as defined under the Rehabilitation Act and was not discriminated against on the basis of disability. Even assuming arguendo that the Complainant was a qualified individual with a disability, we observe that the record includes no indication that the Complainant ever requested any type of accommodation. Because the Complainant is not entitled to the protections of the Rehabilitation Act, we find that the Agency did not have to provide an orthopedic chair or any other type of accommodation.

With respect to the accepted claims of discrimination based on religion and national origin, we observe that the Complainant contends that at least some of the actions taken by the Agency are related to the fact that he provided information regarding problems with the UTN system when he communicated with the Agency's upper management and OIG. Whistleblower activities are not considered protected activity under EEO laws. See Kennedy v. National Aeronautics and Space Administration, EEOC Appeal No. 01A23463 (November 5, 2002). Therefore, even if the Complainant were able to show that the Agency retaliated against him for exposing problems in the UTN system, absent any evidence that such retaliation was related to his membership in a protected group, such evidence would not help the Complainant prove that he was discriminated against under EEO law.

Further, although the initial inquiry in an EEO discrimination case usually focuses on whether the complainant has established a prima facie case of discrimination, following this order of analysis is unnecessary when the agency has articulated a legitimate, nondiscriminatory reason for its actions. In such cases, the inquiry shifts from whether the complainant has established a prima facie case to whether he has demonstrated by

a preponderance of the evidence that the agency's reasons for its actions were merely a pretext for discrimination. <u>Washington v. Department of the Navy</u>, EEOC Petition No. 03900056 (May 31, 1990).

The Agency denied that the Complainant was told that he could not attend staff meetings, meet with OCIO staff, or speak with the CIO or Deputy CIO without the Supervisor also being present, and it offered evidence that the Complainant continued to engage in these meetings and communications. The Agency also proffered legitimate, nondiscriminatory reasons for the remaining actions that which are the subject of the instant complaint. Management explained that it determined the Complainant should no longer serve in an "acting" capacity for the Supervisor because management had lost faith in his ability to exercise good judgment, based on how he responded to problems with the UTN system in July 2005. Management stated that the new head of Cyber Security decided that the Complainant's job functions should be returned to the Cyber Security Office and management believed the Complainant could be better utilized in this office. The Supervisor stated that the Complainant's performance during the week that she was on annual leave, when he was acting in her stead, was the only reason that the Complainant was given a Fully Successful rating. With respect to QSIs, the Supervisor responded that she did not recommend anyone for a QSI and that the Complainant was not considered for a QSI because he had not sustained outstanding performance.

Regarding his claim that his authority to meet or speak with various staff members and management was restricted, we find that the Complainant has not proffered evidence that persuades us that any restrictions imposed were related to his religion or national origin. In trying to show that the Agency's reasons for its other actions were unbelievable or merely a pretext to mask discrimination, the Complainant essentially elaborated on what he described as the problems of the UTN system and reiterated his claim that he was retaliated against because he was a whistleblower.

After a careful review of the record, we find that the Complainant has failed to proffer evidence that shows that the Agency's articulated reasons for its actions lacked credibility or were a pretext for discrimination. We conclude that the Complainant has failed to demonstrate that he was subjected to disparate treatment based on his protected categories of religion or national origin. With respect to the harassment claims, the Complainant must show that he was subjected to <u>unlawful</u> harassment, which means, in the instant case, that it was based on his religion or national origin. Because the Complainant has failed to show that the Agency's actions were motivated by discriminatory animus on these bases, he cannot prove unlawful harassment. <u>See Oakley v. United States Postal Service</u>, EEOC Appeal No. 01982923 (September 21, 2000).

## Conclusion

The weight of the evidence indicates that discrimination did not occur with respect to the issues of this complaint. Accordingly, no order of relief or corrective action is warranted in this matter.

## Appeal Rights

This is the final decision of the USDA on the cited complaint. The following are the only rights available to challenge this decision.

## APPEAL TO THE EEOC

A Notice of Appeal may be filed with the EEOC within thirty (30) calendar days after receipt of this final decision. EEOC Form 573, Notice of Appeal/Petition, should be used in filing the appeal, as well as what is being appealed should be indicated in the form. A copy of EEOC Form 573 is provided with this decision. Such notice should be addressed to:

**Equal Employment Opportunity Commission**
**Office of Federal Operations**
**P.O. Box 19848**
**Washington, DC 20036**

As an alternative to mailing, your appeal may be hand-delivered to:

**Equal Employment Opportunity Commission**
**Office of Federal Operations**
**1801 L Street, N.W.**
**Washington, DC 20507**

As an alternative, you may also send your appeal by fax to the Office of Federal Operations at **(202) 663-7022**.

If there is an attorney of record, the thirty (30) calendar day time limit within which to appeal shall be calculated from the date of receipt of this decision by the attorney. In all other cases, the thirty (30) calendar day time limit within which to appeal shall be calculated from the date of your receipt of this decision.

The appeal shall be deemed filed on the day it is postmarked, or in the absence of a postmark, on the date it is received by the EEOC.

At the same time information is provided to the EEOC (to include a copy of the Notice of Appeal and any submissions in support of the appeal), there **must** be a service certification that a copy of the submission **has been** submitted to the Civil Rights Services Division and the date and method of service. A copy of the appeal and any submissions in support thereof shall be forwarded to the agency at the following address:

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

*07-1778*
*RCL*

## I (a) PLAINTIFFS

Heshmat Ansari

*88888*

## DEFENDANTS

Mike Johanns, Secretary of Agriculture

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY) _____
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

11011 grassy Knoll Terrace
Germantown, MD 20876
301-980-5847

ATTORNEYS (IF KNOWN)

Case: 1:07-cv-01778
Assigned To : Lamberth, Royce C.
Assign. Date : 10/3/2007
Description: Employ. Discrim.

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

◎ 2 U.S. Government Defendant

○ 3 Federal Question
(U.S. Government Not a Party)

○ 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)** OR ○ **F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

③

| O  G. *Habeas Corpus/ 2255* | O  H. *Employment Discrimination* | O  I. *FOIA/PRIVACY ACT* | O  J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General <br> ☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment <br> (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act <br> ☐ 890 Other Statutory Actions (if Privacy Act) <br><br> *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| O  K. *Labor/ERISA (non-employment)* | O  L. *Other Civil Rights (non-employment)* | O  M. *Contract* | O  N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act <br> ☐ 720 Labor/Mgmt. Relations <br> ☐ 730 Labor/Mgmt. Reporting & Disclosure Act <br> ☐ 740 Labor Railway Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) <br> ☐ 443 Housing/Accommodations <br> ☐ 444 Welfare <br> ☐ 440 Other Civil Rights <br> ☐ 445 American w/Disabilities-Employment <br> ☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment & Enforcement of Judgment <br> ☐ 153 Recovery of Overpayment of Veteran's Benefits <br> ☐ 160 Stockholder's Suits <br> ☐ 190 Other Contracts <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multi district Litigation ☐ 7 Appeal to District Judge from Mag. Judge

**VI.  CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 USC 2000 Employment Discrimination,- Race and Religion

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   DEMAND $ 175,000   Check YES only if demanded in complaint

**JURY DEMAND:**   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE  10/03/2007   SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.