UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

HESHMAT ANSARI,                           )
                                          )
        Plaintiff,                      )
                                          )
           v.                        )        Civil Action 07-1778 (RCL)
                                          )
MIKE JOHANNS,                             )
                                          )
        Defendant.                      )
_____)

## DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S WHISTLEBLOWER CLAIMS

Defendant respectfully submits that this Court lacks jurisdiction to consider Plaintiff's

whistleblower claims and therefore moves, pursuant to Federal Rule of Civil Procedure 12(b)(1),

to dismiss those claims.  Attached hereto are:  (1) Defendant's memorandum of points and

authorities in support of its motion to dismiss; and (2) a proposed order dismissing Plaintiff's

whistleblower claims and requiring Plaintiff to file an amended complaint.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


_____/s/_____
CHRISTOPHER B. HARWOOD
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 307-0372
Fax: (202) 514-8780
Christopher.Harwood@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                  )
HESHMAT ANSARI,                                   )
                                                  )
          Plaintiff,                              )
                                                  )
          v.                                      )          Civil Action 07-1778 (RCL)
                                                  )
MIKE JOHANNS,                                     )
                                                  )
          Defendant.                              )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S WHISTLEBLOWER CLAIMS

### INTRODUCTION

Plaintiff, in his Complaint, asserts employment discrimination claims (based on his religion, national origin and alleged disability) arising under Title VII and the Rehabilitation Act,[1] as well as whistleblower claims arising under the Whistleblower Protection Act (the "WPA"). As demonstrated below, the whistleblower claims must be dismissed because this Court lacks jurisdiction over them.

### SUMMARY OF ARGUMENT

Under settled law, a federal employee who believes that he has been retaliated against for being a whistleblower must bring his whistleblower claims first to the Office of Special Counsel (the "OSC") and then to the Merit Systems Protection Board (the "MSPB"). If the employee receives an unfavorable decision from the MSPB, he may then appeal that decision to the United

---

[1] Plaintiff also asserts employment discrimination claims arising under the Americans with Disabilities Act (the "ADA"). However, the ADA claims are not cognizable because "[t]he ADA explicitly exempts the federal government from coverage." Bolden v. Ashcroft, 515 F. Supp. 2d 127, 137 (D.D.C. 2007); see 42 U.S.C. § 12111(5)(B)(i); Bramwell v. Blakey, No. 04-927, 2006 WL 1442655, at *1 n.2 (D.D.C. May 24, 2006).

States Court of Appeals for the Federal Circuit.  An employee may <u>not</u> bypass the OSC/MSPB process and bring his whistleblower claims to federal district court.

Here, Plaintiff failed to bring his whistleblower claims to the OSC or the MSPB.  Instead, he attempted to bring those claims, along with his employment discrimination claims, to his agency's EEO office.  Now, after the agency (rightly) refused to consider the whistleblower claims, Plaintiff is asking this Court to consider those claims in the first instance.  This the Court cannot do.

If Plaintiff had wanted to obtain judicial review of his whistleblower claims, he should have followed the requisite process governing such claims and brought them first to the OSC, and then to the MSPB and finally to the Federal Circuit.  No part of that process provides for the filing of whistleblower claims in this Court.  Accordingly, Plaintiff's whistleblower claims must be dismissed.

## BACKGROUND

At all times relevant to this case, Plaintiff was employed by the United States Department of Agriculture (the "USDA") in the Office of the Chief Information Officer (the "OCIO"). (Compl. at 1.)

On November 2, 2005, Plaintiff filed an informal EEO complaint with the USDA's Office of Adjudication and Compliance (the "OAC").[2]  (<u>See</u> Ex. 1 at 1.)  On the USDA's standard informal EEO complaint form, Plaintiff alleged that he had experienced employment discrimination on the bases of religion (Muslim), national origin (Iranian) and disability (lower

---

[2] At the time Plaintiff filed his informal EEO complaint, the OAC was referred to as the Office of Civil Rights.

back injury and seizure disorder).[3]  (See id.)  Plaintiff attached to his informal EEO complaint a multi-page document (the "Attachment") in which he alleged that he had been discriminated against due to his "culture, ethnic heritage, religion, and ancestral background."[4]  (Id. at 4.)  The Attachment also alleged that Plaintiff had been retaliated against for alerting OCIO management and the USDA's Office of Inspector General (the "OIG") to problems associated with the implementation of a USDA telecommunications project.  (See id. at 4-5.)  Specifically, in the Attachment, Plaintiff alleged that after he had spoken to OCIO management and the OIG about the telecommunications project (in August 2005), he was told that he:  (1) could no longer act on his supervisor's behalf when she was out of the office; (2) was not authorized to attend OCIO meetings or speak directly with the Chief Information Officer or his Deputy; and (3) was being reassigned from his position as Deputy Associate Chief Information Officer for Telecommunications to Associate Chief Information Officer for Cyber Security.[5]  (See id. at 5.) The reassignment did not result in a reduction in grade or pay.  (See Compl. at 13; Lilja Aff. at 8 (the reassignment resulted in "no change to [Plaintiff's] salary or his duty station").)[6]

On December 22, 2005, Plaintiff filed his formal complaint of discrimination with the OAC.  (Ex. 2.)  On the USDA's standard formal complaint form, in the section titled "Basis of Discrimination (Check all that apply [])," Plaintiff checked the boxes next to "Religion,"

---

[3] It is not clear from the informal complaint form whether Plaintiff also intended to allege employment discrimination on the bases of gender, race and/or age.  However, whether or not Plaintiff had intended to allege race, gender and/or age discrimination on his informal complaint form is immaterial for purposes of this litigation.

[4] The Attachment does not allege disability discrimination.

[5] In the Attachment, Plaintiff also alleged that he had received a lower performance rating in 2005 than he had received previously, and that, "[f]or the past 3 years," he had not received any quality step increases to his base pay.  (Ex. 1 at 6.)

[6] Citations in the form "(Lilja Aff. at __)" refer to the affidavit of Janice G. Lilja, attached hereto.

"National Origin" and "Age." (See id.) Plaintiff attached the Attachment to his formal

complaint.

On February 17, 2006, the OAC sent Plaintiff a letter informing him that it was

"accepting and referring for investigation the following claims":

> Whether since August 3, 2005 and continuing, the agency subjected the complainant to discrimination and harassment (non-sexual) based on age (D.O.B. 8/7/52),[7] religion (Muslim), and national origin (Iranian), when:
>
> 1.     your supervisor informed you that you could no longer act on her behalf when she was out of the office;
>
> 2.     you were no longer authorized to attend OCIO meetings or engage in conversation with the Chief Information Officer or Deputy;
>
> 3.     on October 1, 2005, management reassigned you from your OCIO position as Deputy Associate Chief Information Officer to the Cyber Security office to manage security operations;
>
> 4.     on October 31, 2005, you received a performance rating of "fully successful" for fiscal year 2005; and
>
> 5.     you were denied quality step increases.

(Ex. 3.) Nowhere did the February 17, 2006 letter indicate that the agency had accepted for

investigation any whistleblower claims. (See id.) The letter did, however, advise Plaintiff that

"within seven (7) calendar days from receipt of this letter," he could "submit a written statement

[to the OAC] concerning the agency's articulation of the accepted claims." (Id.) The

February 17, 2006 letter further stated that "an impartial, factual and appropriate investigation"

---

[7] Plaintiff subsequently withdrew his age discrimination claim (Ex. 4 at 1 n.1) and has not asserted it in this lawsuit. During the agency's investigation of Plaintiff's claims, Plaintiff reasserted his claim of disability discrimination. (Id.)

would be completed as to the "accepted claims."  (Id.)  Plaintiff never informed the OAC that he

disagreed with its articulation of the accepted claims.  (Newell Decl. ¶4.)[8]

Following the agency's investigation of the "accepted claims" and the creation of a

Report of Investigation (the "ROI"), Plaintiff elected to receive a final agency decision based

upon the evidence in the ROI.  (Ex. 4 at 2.)  On July 20, 2007, the OAC issued a final agency

decision (the "FAD") in which it found that Plaintiff had not been subjected to unlawful

employment discrimination on the bases of religion, national origin or disability.  (Id. at 10-11.)

The FAD observed that Plaintiff's whistleblower claims had not been accepted for investigation

and were not properly before the OAC.  (See id. at 1-2, 8 n.5, 10-11.)  The OAC declined to

make any factual findings with respect to those claims.  (See id.)

## LEGAL STANDARD

Federal courts are courts of limited jurisdiction and must dismiss claims over which they

lack subject-matter jurisdiction.  Runkle v. Gonzales, 391 F. Supp. 2d 210, 219-220 (D.D.C.

2005).  The party seeking to invoke the jurisdiction of a federal court bears the burden of

establishing the court's subject-matter jurisdiction.  Id. at 220; see U.S. Ecology, Inc. v. Dep't of

the Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  In deciding a motion to dismiss for lack of

subject-matter jurisdiction, a court is not limited to the allegations contained in the complaint; it

may consider materials outside the pleadings.  Herbert v. Nat'l Academy of Sciences, 974 F.2d

192, 197 (D.C. Cir. 1992); Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22

(D.D.C. 2000).

---

[8] Citations in the form "(Newell Decl. ¶__)" refer to the declaration of Larry W. Newell,
attached hereto.

## ARGUMENT

As stated above, Plaintiff's whistleblower claims should be dismissed because this Court lacks jurisdiction to consider those claims. Plaintiff's whistleblower claims were not properly before the USDA. Nor are they properly before this Court. If Plaintiff had wanted to pursue his whistleblower claims, he should have followed the requisite process governing such claims and brought them first to the OSC, and then to the MSPB and finally to the Federal Circuit.

A.     The Process Governing Whistleblower Claims.

The WPA provides most federal agency employees—including employees of the USDA—with protection against agency reprisals for whistleblowing activity. 5 U.S.C. § 2302(a)(2)(C), (b)(8); see Stella v. Mineta, 284 F.3d 135, 142 (D.C. Cir. 2002). Under the WPA, an agency is prohibited from taking any personnel action[9] with respect to an employee based upon the employee's disclosure of information that he "reasonably believes evidences," inter alia, "gross mismanagement, a gross waste of funds, [or] an abuse of authority." 5 U.S.C. § 2302(b)(8).

An employee who believes that he is the victim of an unlawful reprisal for whistleblower activities must first bring his claim to the OSC.[10] 5 U.S.C. § 1214(a)(3); see Stella, 284 F.3d

---

[9] The WPA defines "personnel action" to include, among other things, a "reassignment," "a performance evaluation" and "any other significant change in duties, responsibilities, or working conditions." 5 U.S.C. § 2302(a)(2)(A).

[10] In certain, limited circumstances, i.e., where an employee has experienced an adverse personnel action that is appealable directly to the MSPB, the employee may bypass the OSC and bring his whistleblower claim directly to the MSPB. See 5 U.S.C. § 1214(a)(3) ("Except in a case in which an employee . . . has the right to appeal directly to the [MSPB]. . . , any . . . employee . . . shall seek corrective action from the [OSC] before seeking corrective action from the [MSPB].").  In this case, Plaintiff has not alleged a personnel action that is appealable directly to the MSPB.  (See infra n.12.)  See also Marren v. Dep't of Justice, 51 M.S.P.R. 632, 638 n.5 (M.S.P.B. 1991) ("[T]he adverse personnel actions appealable [directly] to the Board . . . include a removal, a suspension for more than 14 days, a reduction in grade, a reduction in pay, and a furlough of 30 days or less."); 5 C.F.R. §§ 1209.2(b)(2), 1201.3(a)(1)-(a)(19) (describing

at 142; Weber v. United States, 209 F.3d 756, 758 (D.C. Cir. 2000); Carson v. U.S. Office of

Special Counsel, 514 F. Supp. 2d 54, 56 (D.D.C. 2007); Nichols v. Truscott, 424 F. Supp. 2d

124, 144 n.23 (D.D.C. 2006); Runkle, 391 F. Supp. 2d at 231.  The OSC must then investigate

the claim.  5 U.S.C. § 1214(a)(1)(A); see Stella, 284 F.3d at 142.  If the OSC finds that there was

agency wrongdoing, then it must report its findings to the MSPB, and may petition the MSPB on

the employee's behalf.  5 U.S.C. § 1214(b)(2)(B)-(C); see Stella, 284 F.3d at 142.  If the OSC

finds no agency wrongdoing, then the employee may himself bring his claim before the MSPB.

See 5 U.S.C. §§ 1214(a)(3), 1221(a); see Stella, 284 F.3d at 142.  The MSPB's ultimate decision

is appealable to the Federal Circuit, and is reviewed on the record under a deferential standard.

See 5 U.S.C. § 7703(c) (stating that the Federal Circuit reviews decisions of the MSPB to

determine whether they were:  "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law"; "obtained without procedures required by law, rule, or regulation having

been followed"; or "unsupported by substantial evidence").

Importantly, "[u]nder no circumstances does the WPA grant [a] [d]istrict [c]ourt

jurisdiction to entertain a whistleblower cause of action brought directly before it in the first

instance."[11]  Stella, 284 F.3d at 142.  This rule ensures that the OSC and the MSPB are afforded

an opportunity to bring their expertise to bear on whistleblower claims.

---

circumstances where an employee may bring a claim directly to the MSPB); 5 U.S.C. § 7512
(same).  Thus, this limited exception to the general rule that an employee must first bring his
whistleblower claims to the OSC is inapplicable here.  (See infra n.12.)

[11] Indeed, the only circumstance where a federal district court could consider a
whistleblower claim is where an employee has experienced a personnel action that is appealable
directly to the MSPB and the employee alleges that the personnel action was effected (in whole
or in part) because of discrimination.  In that circumstance—and that circumstance only—the
employee would be "able to bring both [his] discrimination and WPA claims to the MSPB as a
'mixed case.'"  See Stella, 284 F.3d at 143-44.  If the MSPB were to render an unfavorable
decision, the employee could then appeal that decision to a federal district court, which would
review the ruling on the WPA claims on the record using a deferential standard, and the ruling on

B.     This Court Lacks Jurisdiction Over Plaintiff's Whistleblower Claims.

As stated above, an employee who believes that he has been retaliated against for being a whistleblower must bring his whistleblower claims to the OSC for investigation.[12]  Here, Plaintiff failed to follow this procedural requirement.  Instead, he attempted to bring both his whistleblower claims and his employment discrimination claims to the USDA's OAC.  However, the OAC (rightly) recognized that the whistleblower claims were not properly before it and, as a result, refused to investigate or make any factual findings with respect to those claims.  (See Exs. 3, 4.)  Indeed, the OAC's FAD addressed only Plaintiff's employment discrimination claims.  (See Ex. 4.)  Now, in his appeal of the OAC's finding of no employment discrimination, Plaintiff is asking this Court to consider his whistleblower claims in the first instance.  In other words, Plaintiff is asking this Court to do precisely that which the D.C. Circuit has expressly forbidden it to do—"entertain a whistleblower cause of action . . . in the first instance."  Stella, 284 F.3d at 142.  Needless to say, this Court should decline Plaintiff's request.  Any other result would contravene not only prevailing D.C. Circuit case law, but also the carefully crafted regulatory scheme governing review of whistleblower claims.

If Plaintiff had wanted to obtain judicial review of his whistleblower claims, he could have—and should have—brought those claims first to the OSC, and then to the MSPB and

the discrimination claims de novo.  See id. (citing Barnes v. Small, 840 F.2d 972, 979 (D.C. Cir. 1988)).

[12] The only exception to this requirement is where the employee is authorized by a statute or a regulation to bring his claims directly to the MSPB.  (See supra n.10.)  Here, however, Plaintiff could not have brought his whistleblower claims directly to the MSPB because the personnel actions underlying his claims are not among those which are directly appealable to the MSPB.  (See id.)  See also 5 C.F.R. §§ 1209.2(b)(2), 1201.3(a)(1)-(19); 5 U.S.C. § 7512.  In any event, even if Plaintiff could have brought his whistleblower claims directly to the MSPB, that would not change the fact that this Court lacks jurisdiction to consider them now.

finally to the Federal Circuit.[13]  And, he should have initiated that process no later than February

2006, when the USDA's OAC informed him that it was not accepting his whistleblower claims

for investigation.  (See Ex. 3.)  What Plaintiff should not have done if he wanted to obtain

judicial review of his whistleblower claims is what he did—ignore the requirement that he bring

his whistleblower claims to the OSC and the MSPB; ignore the clear warning signs from the

USDA's OAC that he had brought his whistleblower claims to the wrong forum; and then seek to

assert his whistleblower claims in federal district court in the first instance.

     Because Plaintiff failed to adhere to the strict procedural requirements governing his

whistleblower claims, those claims must be dismissed.[14]  See Stella, 284 F.3d at 143 (dismissing

a whistleblower claim for want of jurisdiction where plaintiff had failed to bring the claim to the

OSC and the MSPB).

---

[13] Under the circumstances of this case, Plaintiff could not have brought both his
employment discrimination and WPA claims directly to the MSPB as a "mixed case" and then
obtained judicial review of the MSPB's decision on those claims in this Court.  (See supra n.11.)
This is because, as discussed above (see supra n.12), Plaintiff did not experience a personnel
action directly appealable to the MSPB.  See Stella, 284 F.3d at 144 ("The 'mixed case' . . . route
to [d]istrict [c]ourt would have required [plaintiff] to initiate her action at the MSPB, which she .
. . could not[] do.").  Thus, the only court that could have considered Plaintiff's whistleblower
claims was the Federal Circuit.

[14] Even assuming, arguendo, that there existed some procedure whereby Plaintiff could
have properly raised his whistleblower claims before the USDA and then appealed an adverse
agency decision on those claims to this Court (and there does not), Plaintiff could not benefit
from that procedure here because he chose not to pursue his claims at the agency level.  Indeed,
he remained silent when the USDA's OAC expressly refused to refer his whistleblower claims
for investigation.  (See Ex. 3; Newell Decl. ¶4.)  Accordingly, the OAC did not investigate or
make any findings with respect to those claims.  Thus, even if there did exist some procedure
whereby Plaintiff could have avoided bringing his whistleblower claims to the OSC and the
MSPB (and, it bears repeating, there does not), Plaintiff could not avail himself of that procedure
here.

C.    <u>If this Court Dismisses Plaintiff's Whistleblower Claims (and it Should), Plaintiff Should Be Required to File an Amended Pleading.</u>

Plaintiff's Complaint is a seventeen-page narrative—with lengthy, unnumbered paragraphs—that focuses primarily on his whistleblower claims.  (<u>See, e.g.</u>, Compl. at 4-10, 15-16.)  If this Court dismisses Plaintiff's whistleblower claims (and it should), it should require Plaintiff to file an amended pleading containing only those allegations which he believes support his claims of employment discrimination based upon national origin, religion and disability.  <u>See</u> Fed. R. Civ. P. 8(a) ("[a] pleading . . . must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief").  Moreover, Plaintiff should be required to set forth each such allegation in a separate, numbered paragraph.  <u>See</u> Fed. R. Civ. P. 10(b) ("A party must state its claims . . . in numbered paragraphs, each limited as far as practicable to a single set of circumstances.").

<u>**CONCLUSION**</u>

For the reasons set forth above, Defendant respectfully requests that this Court DISMISS Plaintiff's whistleblower claims.

Respectfully submitted,


<u>    /s/                                              </u>
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney


<u>    /s/                                              </u>
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

_____/s/_____

CHRISTOPHER B. HARWOOD
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 307-0372
Fax: (202) 514-8780
Christopher.Harwood@usdoj.gov

**Of Counsel:**

Steven C. Brammer
Attorney-Advisor
U.S. Department of Agriculture

**CERTIFICATE OF SERVICE**

I hereby certify that on February 7, 2008, I caused a copy of the foregoing to be served

via first class prepaid postage as follows:

Mr. Heshmat Ansari
11011 Grassy Knoll Terrace
Germantown, MD 20876

_____/s/_____
Christopher B. Harwood

# INFORMAL EEO COMPLAINT
## INITIAL INTAKE FORM

ALLEGED DISCRIMINATING AGENCY: _OCIO_
Date of Action: _October 31, 2005_    Date of Initial Contact: _11-2-2005_
90TH Day of Processing: _____    Case Type:    Individual _X_    Class ____

## AGGRIEVED EMPLOYEE'S INFORMATION

NAME: _HESHMAT ANSARI_    Gender: Male: _X_    Female: ____
Status: _1_    (1 Permanent/ 2 Temporary/ 3 Applicant / 4 Former Employee/ 5 Special)
Job Title/Series/Grade: _Director of Security operations, OCIO/ 2210/ GS-15_
Service Computation Date: _____    USDA Agency you currently work for: _Room 438_
Work Address: _1400 Grassy Knoll Testate Independent Ave, SW, Washington, D 2025_
Work Phone#: _202-720-0422_    Work Fax#: _____
Home Address: _11011 Grassy Knoll Terrace, Germantown MD 20876_
Home Phone#: _201-540-0291_    Home Fax#: _____
Attorney/Representative's Name: _None_
Attorney/Representative's Address: _None_
_____
Attorney/Representative's Phone#. _____    Fax#: _____

Requesting Anonymity: Yes ____ No _✓_        Union Member: Yes ____ No _✓_

## COMPLAINT INFORMATION

**INDICATE BASIS(ES) – check ALL that apply**

____ Sex:
    _X_ Male
    ____ Female
____ Race
    ____ African-American
    ____ Hispanic
    ____ Asian
    ____ Native American
    ____ White
    _X_ Other (specify: _IRANIAN_)
____ Color
    Specify: ____
____ Age
    Date of Birth: _08/07/52_

_✓_ Religion
    Specify: _MUSLIM_
_✓_ National Origin
    Specify: _IRAN_
_X_ Physical Disability
    Specify: _Lower Back Injury_
_X_ Mental Disability
    Specify: _Seizure Disorder_
____ Reprisal
____ Parental Status
____ Sexual Orientation
____ Political Party
____ Marital Status
____ Genetic Information

Claims of discrimination on the following bases **are not** covered by Federal anti-discrimination statutes: political belief, sexual orientation, marital status, family status, parental status, or genetic information. Consequently, individuals who file EEO discrimination complaints on these bases have **NO** appeal rights after a final agency decision **AND NO** rights to a hearing before the Equal Employment Opportunity Commission.

## INFORMAL EEO COMPLAINT
## INITIAL INTAKE FORM

**INDICATE ISSUE(S): circle All that apply**                    (Fully Season)

| | | |
|---|---|---|
| A. Appointment/Hire | J. Examination/Test | R. Retirement |
| B. Assignment of Duties | K. Evaluation/Appraisal | S. Time and Attendance |
| C. Awards | L. Harassment/Non-sexual | T. Training |
| D. Demotion | M. Harassment/Sexual | U. Term/Conditions of Employment |
| E. Reprimand | N. Promotion/Non-selection | V. Other – Reasonable Accommodations |
| F. Suspension | O. Reassignment Denied | W. Other: |
| G. Termination | P. Reassignment Direct | |
| H. Duty Hours | Q. Reinstatement | |
| I. Equal Pay Act Violation | | |

K. 11-2-05
D. 9-12-05

Responsible USDA Agency: _O C I O_          Responsible State: _DC_
Responsible Management Official's (RMO)
Name: _JAN LILJA_                    Title: _ASSOCiate CIO_
RMO Phone#: _202-720-8695_      RMO Fax#: _____
Name: _____                         Title: _____
RMO Phone#: _____              RMO Fax#: _____
Resolving Agency Official (if known)_____          Phone#:_____

Do you have any pending complaints? NO: _X_    YES ___, If yes,
A. INFORMAL_____      DATE COMPLAINT INITIATED: _____
B. FORMAL _____       DATE(S) FILED:_____      Case#:_____
Status:_____

### ELECTION OF PARTICIPATION – INFORMAL EEO COMPLAINT PROCESS
### (PLEASE CHECK ONE)

| | |
|---|---|
| | Alternative Dispute Resolution (ADR) |
| X | Traditional EEO Counseling |

| | | |
|---|---|---|
| Has the Aggrieved been given a written copy of their Notice of Rights and Responsibilities | YES _X_ | NO_____ |

Aggrieved Employee's Signature: _[signature]_     Date: _11/2/2005_

COMMENTS: _See Attachment_.

**Office of Civil Rights Use Only.**
Contact Person's Name _Tashra Marshall_    Title _EOS_
Phone number _202-401-4086_      Fax number _(202) 205-8694_
**If ADR elected**, date file sent to CPRC:_____
**If Counseling elected**, date file sent for counselor contracting:_____

HESHMAT ANSARI, Page 1 of 4

## Administrative Grievance Form

### PERSONAL INFORMATION

Name: Heshmat Ansari
Sex: Male
National Origin: Iranian
Status: Disabled Veteran
Office: 202-720-0492
Cell:   202-255-3819

Employment Place: United States Department of Agriculture, Office of Chief Information
Officer (OCIO), Cyber Security Office (CSO)
Address: 1400 Independence Avenue, SW, Room # 438W, Whitten Building,
Washington, DC 20250

### AGENCY

United States Department of Agriculture, Office of Chief Information Officer (OCIO),
Telecommunications Services and Operations (TSO)

### MANAGEMENT OFFICIALS

Jan Lilja, Associate Deputy of Chief Information Officer, 202-720-8695

### MAIN WITNESSES IN ALLEGATIONS

Karen Whiting-Diggs, Staff of ITS, 202-720-9017
Teresa Kelly-Reid, Staff of TSO, 301-504-2040
Vernelle Archer, Staff TSO, 301-504-2040
Adrienne Bowman, Staff of TSO, 202-720-8695
Dave Williams, Staff of TSO, 970-295-5209
Karen Sifford, Staff of OIG, 816-823-3886
Steven Eckland, Staff of OIG, 816-823-3886
Craig Chase, Staff of CSO, 202-690-0271
Karl Hill, Staff of TSO, 970-295-5294
Ron Lester, Staff of TSO, 970-295-5314
~~Rajiv Sharma, Staff of TSO, 202-694-5981~~
~~Stu Adler, Staff of TSO, 202-694-5985~~

**HESHMAT ANSARI, Page 2 of 4**

## DESCRIPTION OF GRIEVANCE

a. Action, Incident, or Event Giving Rise to Grievance: **Performance Appraisal**
b. Date of Action: **October 31, 2005**
c. Date Employee Became Aware of Action: **October 31, 2005**
d. Person Involved: **Jan Lilja, Associate Chief Information Officer (ACIO), OCIO, USDA**
e. Other Information to clarify Grievance Issu(s): **See Attachments: 1) Performance Standards; 2) My Year 2005 Accomplishments.**

## ALLEGATIONS

I am alleging Ms. Jan Lilja has engaged in discriminatory practices and unlawful employment practices against me, for my national origin (Iranian) under Title VII of the Civil Rights Act of 1964. She has disliked and misjudged me because of my culture, ethnic heritage, religion, and ancestral background. I have been encouraged by policy and tradition to resolve harassment and discrimination complaints within my "Chain of Command", meaning with my direct superior, who is the alleged person in this case and part of the problem.

Ms. Lilja has continuously made adverse decisions and intentional discrimination against me. She has deprived, harmed, humiliated, and destroyed my reputation among OCIO staff, my peers, colleague, and my comrades. She has harmed my personality and reputation; and caused mental stress, and family disturbance.

Ms. Jan Lilja has demonstrated discriminatory practices and unlawful employment practices against four other minority employees in the past years. I have listed their names under Witnesses: Vernelle Archer, Karen Whiting-Diggs, Teresa Kelly-Reid, Ron Lester, and more.

There are strong evidences that Ms. Lilja making out a continuing violation and illegal discrimination on the basis of National Origin and Race under Title VII of the Civil Rights Act of 1964. It is reasonable to say that OCIO Management has supported her in this practice, as evidenced by not preventing this practice.

## SUMMARY OF ALLEGATIONS

On August 2, I alerted OCIO management on major security issues with implementation of Universal Telecommunication Network (UTN) project, which was failing in its mission to protect USDA's resources and provide access to USDA's customers. I also stated to upper management that UTN suffers from poorly engineered network and security systems. Jan Lilja took this as an opportunity to add to her continuous retaliation against me for speaking up for principles and providing true, accurate and full information disclosure and advice to our executive management, even when it is sometimes difficult or not the popular thing to do. I thought is the right thing to do before they heard it or received phone calls regarding UTN

HESHMAT ANSARI, Page 3 of 4

failures. When I was asked, I provided them with the honest information based on my expertise, the expertise of my staff and available information. However, Management took it as an opportunity to retaliate against me. I believe this is because of my National Origin, (Iranian) and speaking the truth.

On August 3, 2005, I wrote an email to the management and explain security issues and vulnerability with current implementation of the UTN. I did not hear from management on this letter until Jan Lilja told me that I can no longer act on her behalf when she is away from the office. I told her this is unacceptable and retaliatory against my actions and my principals. I stated that I was hired as her Deputy and acting on her behalf is part of my job responsibility. I asked her to read my job description and job announcement for the position (In February 2003, I was hired as Deputy Associate Chief Information Officer (2210 series)).

A week later of my alert, The USDA Office of Inspector General (OIG) alerted management on the same issues that I alerted on August 2, 2005. Their testing disclosed that the recent implementation of the Universal Telecommunications Network (UTN) was put into practice with inadequate security controls.

The OIG interviewed 45 staff on their findings and the results. Karen Sifford, auditor in charge of the study called me for interview on August 5. I told Karen and her boss Steven Eckland that I do not wish provide more information due to fear that it will be used as a tool by management for further retaliation. I answered her questions under oath and no more and less.

After the OIG altered the OCIO management, the retaliation has been continuous and has not stopped.

I have been removed from acting on her behalf; I am not authorized to attend the OCIO meeting and engaged any conversation with CIO or his Deputy. The final blow came with the worst part of the whole retaliation. On September 12, 2005, Jan Lilja stated that management decided to remove me from current position and reassign me to the Cyber Security office to manage security operations. I stated to her that this is demotion by losing my title. Plus I told her I was hired for telecommunications services and not security operations. I asked her again to read my job description and job announcement. I also stated that under what authority I have been removed from this position? She stated that under management authority and she did not want to discuss it any more.

Regardless my willingness, management decided to remove me from my current position and place me into a down graded position. OCIO management imposed a *"forced reassignment,"* in retaliation for practicing the oath of my profession and my National Origin (Iranian).

*As I described several instances of violations of merit system principles by Jan Lilja in such allegations, revealing a pattern of prohibited personnel practices, as defined by section 2302 (b) of title 5 of the United states Code and under Title VII of the Civil Rights Act of 1964, including, but not limited to, systematic harassment and unlawful employment practices.*

HESHMAT ANSARI, Page 4 of 4

## PERSONAL RELIEF DESIRED

a. Overall rating at minimum should be kept as "Outstanding Performance" Since my supervisor never advised me on my leadership style during mid-year evaluation. She never stated any in competency in performing my duties. (See Attachment for My accomplishment against my rating evaluation). Based on OPM governing policies, Employer cannot lower the rating if the employee was not properly counseld or was told during midyear evaluation or stated in writing their expectations. I met my expectation beyond my duty call. See Attachment for my 2005 accomplishments.

b. Step Quality Increase: For the past 3 years, I have been with the Office of Chief Information Officer (OCIO), USDA, I have accomplished many challenging task that have sometimes been verbally acknowledged, but I have never received any step quality increase for any my accomplishments because of my national origin (Iranian). I think that form a statistical perspective; someone should look at the numbers, when compared to how many times others in the OCIO at the same grade level received incentive award and SQI.

c. Punitive and Compensatory Damages: Jan Lilja has deprived, harmed, humiliated, and destroyed my reputation among staff, OCIO staff, my peers, colleague, and my comrades. She has harmed my personality and reputation; and caused mental stress, family disturbance; and the trauma to my family and me has been considerable. I am never being able to recover my sanity and peace of mind and restore my reputation and damages caused to my family and I. Since these incidents I have many Seizure attack and used medication to control stress and attacks.

d. Cease Discrimination, Retaliation, and Harassment: This is unfair practice by treating one person differently from all other staff. I would like be treated equally with other OCIO employees.

**EMPLOYEE'S SIGNATURE**

Heshmat Ansari, Ph.D
CSO, OCIO, USDA

Date Submitted: November 2, 2005

Hesh Ansari FY 2004 - 2005 Accomplishments

1. **President's Management Agenda**

   A. **Capital Planning and Investment Control**

      1. Completed all waivers for hardware/software purchases over $25,000
      2. Provided timely review of waiver recommendations for TPPD within 14 days.

   B. **Enterprise Architecture**

      1. Developed Telecommunication enterprise architecture
      2. Developed Wireless networking framework within the USDA enterprise Architecture
      3. Supported TSO lead for Enterprise Architecture
      4. Ensured TSO services align and support USDA Enterprise Architecture
      5. Managed CSA licenses and Funding. Coordinated with agencies and processed funding for FY05 before the scheduled time of July 2005.
      6. Developed the wireless networking technical reference for the department
      7. Assisted in the development of the wireless network equipment BPA

   C: **Certification And Accreditation (C&A)**

      1. Updated C&A Documents for Systems that underwent C&A in 2004 – October 2005
      2. Phase 1 C&A for CRES – March 2005
      3. Phase 1 C&A for UTN – In Progress

2. **Department-wide Telecommunications Management and Oversight**

   A. **NTSO Network Management and Operations**

      1. Coordinated and assisted first Customer Service Survey and assisted in development and deployment of second survey.
      2. Assisted and managed 5% reduction expenses from Security operations in FY 04 TSO budget.

   B. **Security Operations**

      1. Effectively maintained a security boundary on the USDA's Wide Area Network (WAN), catching all manner of attacks and compromises, prior to the USDA's transition to UTN.
      2. Developed IDS performance metrics
      3. Completed steps needed to close SMTP GAO audit issues
      4. Coordinated agency wide data call for authorized SMTP gateways
      5. Performed agency wide scanning of USDA network resources to validate SMTP gateways
      6. Maintenance of the authorized gateway list
      7. Firewall rules are scheduled to be implemented by October 15
      2. Provided strategies for redeployment of IDS sensors in the post-UTN USDA Wide Area Network (WAN)
      3. Developed a penetration-testing program for USDA's agencies to take advantage of to provide cost effective and factual risk management.
      8. Coordinated agency-wide data call on GAO survey on IPV6 and wireless security and prepared response to GAO.

**Exhibit 1**

Hesh Ansari FY 2004 – 2005 Accomplishments

Page 2 of 4

9. Coordinated agency-wide data call on OMB and GAO audit on Telecommunications government owned COOP facilities
10. Provided network perimeter security including firewall, intrusion detection administration, and anti-virus administration support to the Telecommunications services and Operations (TSO) and USDA agencies
11. Penetration Testing for 3 NTSO Major Applications – Summer 2005

## C. Performance and Project Management

1. Managed SMTP project on time and under budget
2. Developed strategy for NetJunction replacement and saving USDA 2.6 million dollars annually.
3. Managed all projects using effective project management techniques and performance metrics and delivered them on time and under budget. These projects included the GAO SMTP findings, analysis of a Security Information Management (SIM) solution before the project was given to NTIC, MARS, and USDA Departmental Intrusion Detection System monitoring and management contracts with SAIC, RedSiren and ITX.
4. Reduced the cost of the Department's Wireless Priority Service (WPS) program by $57,575.00.

## D. Financial Management

1. Managed and monitored CSA MOU's with agencies and obtained FY '05 agency funds prior to June 2004.
2. Developed procedures and practices to perform penetration testing for TSO (FTS/FIR, NEAA) and ITS (HQMan, ENTLAN, PCTS, FBCIWF and EMS) systems in order to meet FISMA and industry best practices.

## E. Security

1. Coordinated and completed all TSO systems were certified and accredited in a fashion timeframe. UTN in progress
2. Coordinated and assisted AT&T and contractor with completing C&A on UTN – In Progress
3. Revised the TSO Continuing Operations Plan (COOP).
4. Coordinated the efforts in revising USDA COOP Annex J
5. Completed FY2004 FISMA Quarterly, Monthly, and Annual reporting throughout the Year
6. Managed TSO POAM activities and monitored and coordinated with staff for open activities
7. Closed 97% all POAM open activities
8. Completed all TSO material weakness by June 30th.
9. Coordinated and developed the responses to Departmental data calls (e.g., GISRA, OIG, GAO, and FISMA). January 2005, March 2005, May 2005, August 2005, and September 2005.
10. Assisted Cyber Security with development of the Incident Response Handling policy May 3rd 2005
11. Developed the process for reporting incidents and firewalls rule changes.
12. Completed Disaster recovery Plan for IDS

**Exhibit 1**

### Hesh Ansari FY 2004 - 2005 Accomplishments

Page 3 of 4

13. Completed System TSO Security Program Plan April   2005Completed IDS Metrics Performance Metrics August 10th 2005 Completed Business Resumption Plan for IDS August 10th 2005
14. Complete 800-26 Self Assessments for FISMA- June 2005
15. Completed Mission Impact Assessment for TSO – December 2004

## 4. General Operating Procedures

1. Completed Performance Standards and Individual Development Plans for all employees in place by February 15, 2005
2. Completed 40 hours COTR/COR training
3. Coordinated team efforts for MARS project.
    a. Developed Project management to control the activities
    b. Developed RFI and was posted for 30 days
    c. Coordinated responses and reviewing all 55 proposal
    d. In process of developing Business Cases and RFP
4. Managed the transition of IDS from SAIC to RedSiren. Developed project plan and monitored the activities. Transition was completed two weeks prior to the end of the contract and budged for ($116,000) which is 45% less of the original cost of $540,000

## 5. USDA OSEC COOP Support

1. Fully supported the USDA HQ COOP Planning and Testing
2. Managed and participated in and fully support OCIO COOP planning and testing .
3. Engaged 100% in COOP test and take corrective actions as appropriate
4. Ensured and tested that 100% availability for COOP sites.

## 6. TEMPEST and NSA Activities

1. Developed policy on secure devices in accordance with National Communications Security Guidelines
2. Replaced all STU-III secure phone systems with the new Secure Terminal Equipment (STE) within the Department.
3. Increased the amount of secure communications devices from 49 units to 176.
4. Developed policy on TEMPEST within the Department in accordance with National TEMPEST policy.
5. Performed TEMPEST inspections of the Department's Sensitive Compartmented Information (SCIF) facilities.
6. Reduced the cost of the Department's Wireless Priority Service (WPS) program by $57,575.00.

## 7. Training

1. Placed IDS training and MPLS training on AgLearn
2. Posted List of all IT Summit Training Summits on ISSPM Website June 2005
3.
4. Coordinated Security Awareness training for TSO employees and contractors. 100% staff completed training two month earlier than project completion time June 30th 2005

**Page 9**

**Exhibit 1**

Hesh Ansari FY 2004 - 2005 Accomplishments

Page 4 of 4

5. Managed and conducted USDA IT Summit in November 2004
6. Developed material and coordinated resources for the November 2005 USDA IT Summit
7. Fully utilized AgLearn for Summit registration
8. Provided security training to the ARS staff
9. Worked with Cyber Security Developing ISSO \ISSPM training Class – May 2005
10. Coordinated Civil Rights Stopping Sexual Harassment Before It Starts July \ August 2005
11. Coordinated Civil Rights Handing Diversity in the Workplace July \ August 2005
12. Coordinated USDA Constitution Day September 2005

## 8. Civil Rights

1. Contracted IDS monitoring with Native American disabled Veteran contractor:

   a. Caucasian: 12
   b. Hispanic: 2
   c. African-American: 2
   d. Japanese: 1
   e. Handicap: 1

2. Contracted IDS Administrator contractor with an 8(A) Company.  In addition the contractor on-site is Indian born and a minority

**Exhibit 1**

Hesh Ansari

FY 2005 Performance Plan

### Element 1: Leadership/Management (critical)

### 1. President's Management Agenda

### A. Capital Planning and Investment Control

Objective: Ensure that TSO acquisitions that meet USDA criteria for CPIC submission follow USDA CPIC policies and guidelines.

| No | Executive Performance Measure | No. | Employee Performance Measure |
|---|---|---|---|
| 1 | Waivers completed for hardware/software purchases over $25,000; all projects use evm or operational analysis as appropriate; projects off of OMB watchlist by May 30; all projects with 4 in security by May 30. | 1 | Same |

Objective: Manage Telecommunications Waiver Program to ensure timely waiver review and enable agencies to "earn autonomy."

| No | Executive Performance Measure | No | Employee Performance Measure |
|---|---|---|---|
| 1 | Waivers completed within 14 calendar days; Monthly summary status report due at the end of each month to Deputy CIO. | 1 | Provide timely review of waiver recommendations for TPPD within 14 days. |
| 2 | Telecommunications conditions must be reviewed and agencies must comply with 90% of conditions or issues should be raised to the CIO for resolution. | 2 | N/A |

P.15    20220528746    USDA    Jan 14 2008 4:27PM    USDA

**Exhibit 1**

FY 2005 Performance Plan

**B. Enterprise Architecture**

Objective: Ensure TSO services align and support USDA Enterprise Architecture.

| No. | Executive Performance Measure | No. | Employee Performance Measure |
|---|---|---|---|
| 1 | TSO projects/services should use enterprise licenses and adhere to USDA Enterprise Architecture. | | Same |
| 2 | Telecommunications Architecture is fully integrated into the USDA EA as a component.<br>--List of current Telecommunication functions completed by end of 2nd Quarter<br>--List of Current USDA Deployed Solution/Contracts mapped to the functions mid Q3<br>--List of "to be"USDA Telecommunication Architecture mid Q4<br>--Telecomm EA is within USDA EA Rep by end 4th Q (??) | 1 | Support TSO lead for Enterprise Architecture. |

**2. Department-wide Telecommunications Management and Oversight**

**A. NTSO Network Management and Operations**

Objective: Provide excellent WAN services, network engineering, circuit management to customers.

| No | Executive Performance Measure | No. | Employee Performance Measure |
|---|---|---|---|
| 1 | 99% availability of USDA WAN, exclusive of external events such as power outages and scheduled maintenance outside of core hours. | 1 | N/A |
| 2 | Baseline for Customer Service Survey established by end of Q2; 80% Customer Satisfaction in second survey. | 2 | Coordinate first Customer Service Survey; assist in development and deployment of second survey. |

Exhibit 1

Hesh Ansari

FY 2005 Performance Plan

3

| | | | |
|---|---|---|---|
| 3 | 5% reduction in FY 04 federal admin. Expenses<br>Complete list of products by end of Q2<br>Complete list of costs of product by mid Q3<br>Itemize costs to product/agency customer by Feb. 20th | 3 | N/A |

### B. Security Operations

| No | Executive Performance Measure | No. | Employee Performance Measure |
|---|---|---|---|
| 1 | Resolve SMTP GAO audit issues. | 1 | Same |
| 2 | Performance metric for IDS/incident management. | 2 | Develop performance metric by June 1, 2005. |
| 3 | Post-UTN implementation IDS strategy established. | 3 | Same |

### C. Performance and Project Management:

Objective: Specific Telecommunications Program Focus Areas for FY 2004 include:

- Wireless Strategy,
- Email Infrastructure; Email standards and policy
- Spectrum Management.
- IP Database

| No | Executive Performance Measure | No | Employee Performance Measure |
|---|---|---|---|
| 1 | Meets the Cost, Schedule, and Performance for each Initiative.<br>—Wireless Result: Wireless Strategy Established | 1 | Provide security assistance as required. |

**Exhibit 1**

Hesh Ansari

FY 2005 Performance Plan

| No. | Executive Performance Measure | No. | Employee Performance Measure |
|---|---|---|---|
| 2 | --Email result: Decision on NetJunction replacement; email standard and policy in circulation<br>--Spectrum: Comply with Dept Commerce requirements<br>--IP Database: resolve GAO audit finding.<br>Project/Initiative results Incorporate and consistent with Enterprise Architecture. | 2 | N/A |
| 3 | All projects use earned value management or operational analysis as appropriate. | 3 | N/A |

**D. Financial Management:**

Objective: Demonstrated Improvements in TSO cost management.

| No. | Executive Performance Measure | No. | Employee Performance Measure |
|---|---|---|---|
| 1 | Demonstrated improvements the management and tracking of TSO finances—initiate cost accounting efforts. | 1 | Monitor CSA MOU's with agencies – obtain FY '05 agency funds. |
| 2 | Research Telcom share-in-savings contract, develop draft SOW. | 2 | Assist as required. |

**E. Business Development:**

Objective: Demonstrated Progress acquiring new business for TSO.

**Exhibit 1**

Hesh Ansari

FY 2005 Performance Plan

| No. | Executive Performance Measure | No. | Employee Performance Measure |
|-----|-------------------------------|-----|------------------------------|
| 1 | Develop SLAs with three new customers or activities in FY05. | 1 | Develop 1 new SLA. |

## F. Security

**Objective: Ensure that cyber security is an integral part of TSO management process.**

| No. | Executive Performance Measure | No. | Employee Performance Measure |
|-----|-------------------------------|-----|------------------------------|
| 1 | All TSO systems are certified and accredited. POAM 70% completed; complete 100% POAM that are material weakness by August 15th. | 1 | Lead on UTN C&A process. |
| 2 | All audit findings by oversight agencies are addressed and remediated in FY '05, including FISMA. | 2 | Same |
| 3 | Incident Management procedures established and agreed to by all parties. | 3 | Same |
| 4 | Document Configuration Management and Governance Architecture to EA by start Q4. | 4 | N/A |

## 3. Universal Telecommunications Network

### A. UTN Project Management

**Objective: USDA Successfully Implements UTN.**

| No. | Executive Performance Measure | No. | Employee Performance Measure |
|-----|-------------------------------|-----|------------------------------|
| 1 | Meets the Cost, Schedule, and Performance for this Initiative—provide EVM data monthly to ? | 1 | N/A |

5

**Exhibit 1**

**Hesh Ansari**

**FY 2005 Performance Plan**

| No. | | |
|---|---|---|
| 2 | Minimal customer disruption or outage with implementation | N/A |
| 3 | · UTN completely in place, Q4 | Lead UTN C&A so that C&A is complete by Q4. |

**B. UTN Reporting**

Objective: Management is kept aware of UTN Program Progress.

| No. | Executive Performance Measure | No. | Employee Performance Measure |
|---|---|---|---|
| 1 | Monthly UTN Updates; usage metrics report format for UTN in Q4. | 1 | N/A |

**4. General Operating Procedures**

**A. General Operating Procedures**

Objective: Effectively manage employees to achieve the following performance measures:

| No | Executive Performance Measure | No. | Employee Performance Measure |
|---|---|---|---|
| 1 | Performance Standards and Individual Development Plans for all employees in place by February 15, 2005. Performance Standards and Individual Development Plans for all new employees in place within 60 days of starting employment. | 1 | Same |
| 2 | New supervisors take 40 hours of supervisory training by September 30, 2005; 24 hours refresher training for experienced supervisors. | 2 | Same |
| 3 | Performance assessments for all employees are completed within 30 days of the conclusion of the FY; evaluations for GS-15's will be reviewed with Deputy and CIO prior to | 3 | Same |

6

**Exhibit 1**

Hesh Ansari

FY 2005 Performance Plan

| | | |
|---|---|---|
| | presenting to employee. | |
| 4 | Project management discipline and project planning for major initiatives are demonstrated and adhered to across the area of responsibility. Costs, schedule and performance are tracked as a regular way of conducting the business of the unit. Regular reporting that demonstrates progress toward completion of business objectives is an integral part of the plan. Earned value management is used where applicable. | 4 | Same |

**Element II: Mission Results (critical)**

**1. President's Management Agenda**

**A. PMA Support**

Objective: Leverage the Presidential Initiatives, USDA Smart Choices, and the USDA Enterprise Architecture, as appropriate, to support the delivery of USDA programs and services.

| No. | Executive Performance Measure | No. | Employee Performance Measure |
|---|---|---|---|
| 1 | Support the President's Management Agenda<br>–Network Modeling of Enterprise Applications<br>–Technical support for Enterprise Application operations. | | Provide technical support for Enterprise Application operations as required. |

**2. Department-wide Telecommunications Management and Oversight**

**Exhibit 1**

**Hesh Ansari**                                                          **FY 2005 Performance Plan**

## A. TSO Mission

Objective: Improve enterprise-wide and agency telecommunications management programs and services.

| No | Executive Performance Measure | No. | Employee Performance Measure |
|---|---|---|---|
| 1 | Complete customer survey, develop strategies to improve service delivery—reach 80% customer satisfaction. | 1 | Complete customer survey, assist in developing strategies to improve service delivery. |
| 2 | Demonstrated leadership in the development of employees and operating processes, which move the TSO technologically and managerially forward. Support Ag Learn<br>–All Cyber Security Training through AgLearn<br>–1 Department Telecom training through AgLearn<br>–1 TSO Training through AgLearn<br>–Distribute TSO Directives through Ag Learn. | 2 | Provide:<br>- 1 Security Summit<br>- Cyber Security Training through AgLearn<br>- 1 Department Telecom Training through AgLearn<br>- 1 TSO Training through AgLearn. |

## 3. Universal Telecommunications Network

Objective: USDA successfully implements UTN.

| No | Executive Performance Measure | No. | Employee Performance Measure |
|---|---|---|---|
| 1 | Governance strategy in place—hold meetings of Oversight Boards. | 1 | |
| 2 | Initiate business case/transition planning with one agency. | 2 | |
| 3 | Draft policy/business case prepared for EHTRIB consideration. | 3 | |

**Exhibit 1**

Hesh Ansari

FY 2005 Performance Plan

## Element III: Homeland Security (critical)

### 1. USDA OSEC COOP Support

#### A. Manage IT in support of USDA HQ COOP Program

Objective: Fully support USDA HQ COOP Planning and Testing.

| No. | Executive Performance Measure | No. | Employee Performance Measure |
|---|---|---|---|
| 1 | 95% of systems have Disaster Recovery/Business Resumption plans; 80% tested by August 15, 2005. | 1 | Same |
| 2 | Engage in COOP test and take corrective actions as appropriate. 100% availability for COOP sites. | 2 | N/A |

Objective: Enhance and improve management of existing Secure Communications Program.

#### B. OCIO COOP Support

| No | Executive Performance Measure | No. | Employee Performance Measure |
|---|---|---|---|
| 1 | Provide training, develop policy and comply with NSA guidelines. | 1 | Same |

Objective: Participate in and fully support OCIO COOP planning and testing.

**Exhibit 1**

Hesh Ansari                                                                      FY 2005 Performance Plan

| No. | Executive Performance Measure | No. | Employee Performance Measure |
|-----|-------------------------------|-----|------------------------------|
| 1 | Maintain and test OCIO Washington Area COOP sites; 100% availability; subject to ITS network constraints. | 1 | Provide support as required to WTSO. |

### C. Internal OCIO Security Plan

**Objective: Fully support OCIO in implementation of security plan.**

| No. | Executive Performance Measure | No. | Employee Performance Measure |
|-----|-------------------------------|-----|------------------------------|
| 1 | Provide relevant documents in a timely manner. C&A of systems; POAM's all maintained and complete. | 1 | Same |

### Element IV: Communication, Collaboration, and Customer Relationship Management (non-critical)

### 1. President's Management Agenda

### A. PMA Support

**Objective: Planning and implementation efforts demonstrate coordination with Associate CIOs, advocacy with major industry partners, and foster awareness among TSO customers and employees**

| No | Executive Performance Measure | No. | Employee Performance Measure |
|----|-------------------------------|-----|------------------------------|
| 1 | Conduct Monthly Briefings at IT Leadership<br><br>Monthly Progress Reports. | 1 | Support monthly briefings as required. |
| 2 | Review, modify, and develop necessary TSO directives, documentation and/or training in support of PMA and USDA EA principles. | 2 | Provide training in support of PMA and USDA EA principles. |

10

**Exhibit 1**

Hesh Ansari

FY 2005 Performance Plan

## 2. Department-wide Telecommunications Management and Oversight

### A. Customer Relationship Management

Objective: Improve TSO communications and customer relationship management.

| No | Executive Performance Measure | No | Employee Performance Measure |
|----|-------------------------------|----|------------------------------|
| 1 | Agency participation in customer related initiatives tracked and reported monthly. Regular meetings with USDA TASC and TMACOs. | 1 | Track Agency participation in SMTP initiative. Participate in TMACO meetings. |
| 2 | Represent USDA interests to the GSA for the Networx acquisition. | 1 | Participate in security related issues. |

## 3. Universal Telecommunications Network

### A. UTN Communications

Objective: Agencies are informed of UTN implementation; services are marketed.

| No | Executive Performance Measure | No | Employee Performance Measure |
|----|-------------------------------|----|------------------------------|
| 1 | Develop and initiate marketing strategy. | 1 | Assist in targeting and recruiting customers. |
| 2 | Develop and validate necessary TSO policies documentation and training to institutionalize UTN across USDA. | 2 | Provide updates to CS policy for new UTN architecture. |

11

**Exhibit 1**

**Hesh Ansari**

**FY 2005 Performance Plan**

**Element V: Civil Rights (non-critical)**

1. **Civil Rights**

   A. **Civil Rights**

   Objective: Enforce all civil rights laws, rules, regulations, and executive orders; ensures that sufficient resources are available to provide for an effective civil rights program; holds all managers and supervisors accountable for achieving measurable civil rights goals and objectives in all employment, program delivery, and procurement decisions.

| No. | Executive Performance Measure | No. | Employee Performance Measure |
|-----|-------------------------------|-----|------------------------------|
| 1 | ACIO's Program meets the meets the 33% FY 2005 OCIO level performance goals for small business and related firms (8A, women owned, minority owned, etc.) for contracting. ACIO provides documentation to support this achievement. | 1 | Consider small business and related firms as source of supply. |
| 2 | Associate CIO demonstrates and promotes equal opportunity and civil rights in the course of conducting USDA business, and in the day-to-day management of HR in their area of responsibility. ACIO provides specific documentation to support this achievement. | 2 | Same |
| 3 | No findings of an adverse nature during the course of the fiscal year. ACIO provides specific documentation to support this achievement, including descriptions of all CR related activities. | 3 | Same |

12

p. 26          20220587416          USDA          MADE:A 8002 ÞI uɐſ

Jan 14 2008 4:23PM    USDA                                          2022058746                    P.3

**Exhibit 2**

United States
Department of
Agriculture    **Complaint of Employment Discrimination.**

1. Name    (First)    (MI)    (Last)

☒ Mr. *Heshmat    ANSARI*                   ☐ USDA Employee        ☐ USDA Applicant
☐ Ms. _____

2. Address *11001 GRASSY KNOLL Terrace*        3. Telephone Number
   (Street)                                    Work *902-255-3819* ( )
   *GERMANTOWN    MD    20876*                                    FTS              COMM
   (City)        (State)    (Zip)             Home *(301) 540-0271*

4. Name of Agency Which You Believe Discriminated Against You

*USDA, OCIO*
                                        (Office)
*Washington,        DC*                                    *20250*
   (City)              (State)                               (Zip)

5. Basis of Discrimination (Check all that apply and specify your type.)

☐ Race _____              ☐ Handicap _____
☐ Color _____             ☐ Sexual Harassment _____
☒ Religion _____          ☐ Reprisal _____
☒ National Origin _____   ☒ Age (over 40) _____
☐ Sex _____               ☐ Marital Status _____

6. Issue(s) (Put date on line. Provide details on reverse side.)

☐ Selection _____         ☐ Working Conditions _____
☐ Promotion _____         ☐ Discipline _____
☒ Performance Appraisal _____  ☒ Reassignment _____
☐ Duties _____            ☒ Other _____

7. Representative, if any

_____                        (    )
_____                          (Telephone Number)

_____
   (Street)        (City)        (State)        (Zip)

8. Name of EEO Counselor Contacted: *NASHIRA MARSHALL*

9. Requested Corrective Action *See ATTAChment*

10. Signature *[signature]*                          Date *12/22/2005*

**Exhibit 2**

## Privacy Act Statement

| 1. Authority | 29 CFR 1613 |
|---|---|

<table>
<tr><td>2. Purpose</td><td>The information will be used by the Department to process a complaint of discrimination or reprisal. This includes the acceptance or rejection of the complaint, the investigation of accepted complaints, and the issuance of a Departmental decision, should the complaint not be resolved.</td></tr>
<tr><td>3. Routine uses</td><td>The information may be disclosed to Department employees or individuals contracted by the Department, who are involved in the acceptance, investigation, attempted resolution, or adjudication of the complaint. It may be disclosed to the Equal Employment Opportunity Commission, the Merit Systems Protection Board, and to Federal Courts.</td></tr>
<tr><td>4. Disclosure & Effects</td><td>Disclosure of all information requested is voluntary. Failure to disclose may result in rejection of the Complaint, or in delays until the information is provided.</td></tr>
</table>

**Exhibit 3**



---

**United States
Department of
Agriculture**

**Sent by Certified Mail
Return Receipt Requested**

FEB 17 2006

Office of the
Assistant Secretary
for Civil Rights

Mr. Heshmat Ansari
11011 Grassy Knoll Terrace
Germantown, Maryland 20876

Office of
Civil Rights

1400 Independence
Avenue SW

Washington, DC
20250

**Re: Complaint No.: CRSD-2006-00107**

Dear Mr. Ansari:

The subject Equal Employment Opportunity (EEO) complaint of discrimination
against the United States Department of Agriculture (USDA), Office of the Chief
Information Officer (OCIO) dated December 22, 2005 is considered filed on the same
date. It has been assigned the complaint number shown above. Please refer to this
complaint number in any future communication on the subject EEO complaint.

We are accepting and referring for investigation the following claims:

Whether since August 3, 2005 and continuing, the agency subjected the
complainant to discrimination and harassment (non-sexual) based on age (D.O.B
8/7/52), religion (Muslim), and national origin (Iranian), when:

1. your supervisor informed you that you could no longer act on her behalf when
   she was out of the office;

2. you were no longer authorized to attend OCIO meetings or engage in
   conversation with the Chief Information Officer or Deputy;

3. on October 1, 2005, management reassigned you from your OCIO position as
   Deputy Associate Chief Information Officer to the Cyber Security office to
   manage security operations;

4. on October 31, 2005, you received a performance rating of "fully successful"
   for fiscal year 2005; and

5. you were denied quality step increases.

If you desire, you may submit a written statement concerning the agency's articulation
of the accepted claims. Any such statement must be submitted within seven (7)
calendar days from receipt of this letter and will be included in the complaint file. The
statement should be sent to the following address:

**USDA - Office of Civil Rights
Chief, Civil Rights Services Division
Reporter's Building, Room 250
300 7th Street, S.W.**

000044

**Exhibit 3**

2

The USDA is required, under 29 C.F.R. §1614.108 to complete an impartial, factual and appropriate investigation of the accepted claims within 180[1] days of the date the subject EEO complaint was filed. An appropriate factual record is one that allows a reasonable fact finder to draw conclusions as to whether discrimination occurred. You and the USDA may voluntarily extend the 180-day time period not to exceed an additional 90 days. In addition, the USDA may unilaterally extend the 180-day time period or any period of extension for not more that 30 days where it must sanitize a complaint file that contains classified information.

When the investigation begins, you will be contacted by an investigator. You are required to fully cooperate with the investigator. Failure to do so may result in the dismissal of your EEO complaint.(s). You are required to present to the investigator all information you consider relevant to the accepted claim(s). Also, you are required to provide the investigator with the names of any witnesses you believe should be contacted.

The agency must be informed of any changes in the names, addresses or locations of you and any representative you select. If the USDA is unable to locate you, it may dismiss the formal EEO complaint pursuant to 29 C.F.R. §1614.107(a)(6).

When you receive the investigation report, you also will receive written notice of your right to elect either an agency decision based on the record or a hearing with a decision from an Equal Employment Opportunity Commission (EEOC) administrative judge. The notice will give you specific instructions on how you may exercise your election rights.

If you have not received the investigation report after 180 days from the filing of your EEO complaint, you have the right to request a hearing from an EEOC administrative judge. Should you request a hearing, you must send the request to the following EEOC office:

**EEOC – Washington Field Office**
**1801 L Street, N.W., Suite 100**
**Washington, D.C. 20507**

**Phone: (202) 419-0700**
**Fax: (202) 419-0740**
**TTY: (202) 419-0702**

You are required to certify to the EEOC office that a copy of the hearing request was sent to the following address:

**USDA - Office of Civil Rights**
**Chief, Civil Rights Services Division**
**Reporter's Building, Room 250**
**300 7th Street, S.W.**
**Washington, D.C. 20024 - 9403**

C00045

Please be advised that, consistent with EEOC Regulations and the Secretary of Agriculture's strong commitment to the early resolution of EEO complaints, parties are encouraged to seek resolution of complaints at any stage of the EEO complaint process. Settlement discussions may take place throughout the administrative complaint process. If a resolution is achieved, a copy of the settlement agreement must be provided to this office promptly to avoid unnecessary confusion and additional cost. Likewise, if at any stage of the EEO complaint process the complainant wishes to voluntarily withdraw their complaint, the complainant must promptly provide to this office, a written request to withdraw their EEO complaint. The withdrawal request must be signed, dated, and include the EEO complaint number. To ensure prompt receipt, please fax a copy of the voluntary settlement agreement or voluntary withdrawal directly to the **Civil Rights Services Division, at Fax Number (202) 720-0953**.

If you have any questions or concerns regarding the status of your formal EEO complaint, please call the **Customer Service Unit at (800) 795-3272 or (202) 401-0005.**

Sincerely,

Larry W. Newell
Chief, Civil Rights Services Division
Office of Civil Rights

cc:    Jerry E. Williams, Deputy Chief Information Officer

**Exhibit 4**



### UNITED STATES DEPARTMENT OF AGRICULTURE
### Office of Adjudication and Compliance

united States
Department of
Agriculture

Office of the
Assistant Secretary
for Civil Rights

Office of Adjudication
and Compliance

1400 Independence
Avenue SW

Washington, DC
20250

Heshmat Ansari,                              )
        Complainant,           )
                      )
                      )
         v.                        )  USDA Complaint No. CRSD-2006-00107
                      )
Mike Johanns,                                )
Secretary,                                   )
Department of Agriculture,                   )
        Agency.                   )

### Final Agency Decision

#### Introduction

In accordance with the Equal Employment Opportunity Commission (EEOC) regulations at 29 C.F.R. §1614.110(b), this is the final decision of the United States Department of Agriculture (Agency) on this complaint.

#### Issues Presented

The issues presented herein are whether the Complainant was subjected to discrimination and harassment (non-sexual) based on religion (Muslim) and national origin (Iranian)[1] when:

1. His supervisor informed him that he could no longer act on her behalf when she was out of the office;

2. He was no longer authorized to attend Office of the Chief Information Officer (OCIO) meetings or engage in conversation with the Chief Information Office (CIO) or Deputy Chief Information Officer (Deputy CIO);

---

[1] In the Agency's letter accepting the complaint, age was listed as one of the bases. However, in a fax to the EEO Investigator, the Complainant stated that he was making no allegations on the basis of his age. (Exh. G-8). In his rebuttal, the Complainant for the first time raised a claim that he was a qualified individual with a disability and that the Agency failed to accommodate him by providing an orthopedic chair. (Exh. F3). We discuss this claim separately below.

3. On October 1, 2005, management reassigned him from his OCIO position as Deputy Associate Chief Information Officer to the Cyber Security Office to manage security operations;

4. On October 31, 2005, he received a performance rating of Fully Successful for Fiscal Year 2005; and,

5. He was denied Quality Step Increases (QSIs).

### Procedural Background

The record reflects that the Complainant first contacted the Office of Adjudication and Compliance (formerly the Office of Civil Rights) regarding his equal employment opportunity (EEO) complaint on November 2, 2005. The Complainant elected to participate in traditional EEO counseling; however, the Agency was unable to arrange for EEO counseling within the statutorily mandated 30 days. The Complainant chose not to extend the counseling period. Therefore, a Notice of Right to File was issued to the Complainant on January 4, 2006. Meanwhile, the Complainant filed a formal complaint on December 22, 2005. The complaint was accepted and referred for investigation on February 17, 2006. An investigation was conducted and a copy of the Report of Investigation (ROI) was provided to the Complainant on October 20, 2006. At the same time, the Complainant was notified that, within thirty (30) days, he could elect a hearing before an EEOC Administrative Judge (EEOC AJ) or a final agency decision (FAD) based upon the evidence of record. On November 6, 2006, the Agency received the Complainant's request for a FAD.

### Relevant Facts

The record reflects that, during the relevant period, the Complainant was employed as a Supervisory Information Technology Specialist, GS-15, OCIO in Washington, D.C., with the working title of Deputy Associate Chief Information Officer.[2] The Associate Chief Information Officer for Telecommunications, Telecommunications Services and Operations (TSO), OCIO, was the Complainant's first line supervisor (hereinafter Supervisor). The Deputy Chief Information Officer (hereinafter Deputy CIO) was the Complainant's second line supervisor, and the Chief Information Officer (hereinafter CIO) was the Complainant's third line supervisor. (Exh. F1).[3]

---

[2] In January 2006, the Complainant subsequently accepted a GS-15 position with the United States Department of Transportation as Director, Information Technology Development and Modernization. (Exh. F1).

[3] Unless otherwise noted, the duty station is in Washington, D.C.

<u>**Claims Based on Religion and National Origin**</u>

The Complainant stated that, in early July 2005, he alerted OCIO management to the existence of major security issues with the implementation of a multi-million dollar technology investment, the Universal Telecommunications Network (UTN). He described the UTN as "failing in its mission to protect USDA's resources and provide access to USDA's customers." He explained that he told "upper management" that the UTN suffered from poorly engineered network and security systems. The Complainant asserted that near the end of July 2005, the Supervisor told him that he could no longer serve as Acting Associate Chief Information Officer for TSO when she was away from the office. According to the Complainant, he told the Supervisor that her decision was unacceptable and retaliatory and that acting on her behalf was part of his job responsibilities. The Complainant asserted that the Supervisor responded: "Wake up to reality – I was not the one who ran to [the Deputy CIO and the CIO] while I was on vacation – I have no obligation to discuss it with you." (Exh. F1).

By August 2005, the USDA's Office of the Inspector General (OIG) had interviewed 25 employees in OCIO and, during the same month, OIG "alerted management on the UTN security, the same issues that I had alerted on [sic] in July 2005." The Complainant stated that, prior to his interview with an OIG auditor, the Supervisor instructed him that he should respond to OIG's questions by stating that the system was working and was secure. According to the Complainant, he told the Supervisor he would not lie, and then told the OIG auditor and her boss that he did not wish to provide more information for fear that management would further retaliate against him and fire him. He stated that the OIG auditor assured him that he was protected by the Whistleblower Act, and, although he is not specific in his affidavit, he implied that he then answered OIG's questions. The Complainant stated that the subsequent retaliation against him "was continuous and never stopped." He also explained that three (3) other OCIO employees were present during his discussion with OIG.[4] (Exh. F1).

The Complainant asserted that, after he spoke with OIG, the Supervisor told him that he was no longer authorized to attend staff meetings or to meet with "the OCIO staff or Associates" without her being present. He stated that the Supervisor also instructed him not to engage in oral or written communications with the CIO, the Deputy CIO, or other Associates. Further, he was denied his request to attend the Federal Executive Institute (FEI) for Leadership Training, while another Supervisory Information Technology Specialist, GS-15 (hereinafter Supervisory ITS), a White, American-born female, was authorized to attend the training. (Exh. F1).

With respect to the "forced reassignment," the Complainant stated that the reassignment placed him in an OCIO component responsible for subject matter about which he felt less confident. He believes that the reassignment was in retaliation for his providing information to OIG concerning the UTN technology. The Complainant stated that he

---

[4] One of the three employees, the Chief, Security Policy Branch, was interviewed by the EEO Investigator; the Branch Chief's testimony is referenced in this FAD.

**Exhibit 4**

4

was reassigned to the Cyber Security Office on September 12, 2005, to manage security operations, although he was provided no SF-52 or Position Description (PD). He complained to the Supervisor that the reassignment was a demotion because he lost his title, and that he was hired to provide telecommunications services operations and not security operations. The Complainant had been second in the chain of command as Deputy, but as a Security Specialist, he was third in the chain of command and had fewer responsibilities. He termed the reassignment "harassment." He asserted that he was told that there was no longer a need for a Deputy in TSO, but that after he left USDA, another Deputy, a White, American-born male, was hired, even though the position was never publicly announced. (Exh. F1).

Regarding his Fully Successful performance rating, the Complainant stated that the Supervisor had given no indication during his mid-year review that there was any area of performance that needed improvement and that he was on track to receive an Outstanding rating and a QSI. During the previous two (2) years, the Complainant received a Superior performance rating. According to the Complainant, the Supervisor told him that she gave him a Fully Successful because of his "leadership performance" during the week of July 2005 when she was on Annual Leave. With respect to his allegation that he never received a QSI, the Complainant stated that he accomplished many tasks during his three (3) years with USDA but never received a QSI. (Exh. F1).

The Supervisor (Congregationalist-United Church of Christ, American who was born in Lebanon) responded to the first claim by stating that she determined that the Complainant should not act in her absence, based on his conduct during the week of July 25, 2005. The Supervisor stated that they had been working on a major technical project, rebuilding the USDA-wide area network, and the final implementation date was during the weekend of July 23, 2005. (Exh. F2). She elaborated:

> On Monday, July 25, there were some technical issues, which is not unusual with a major deployment. A few people even experienced difficulty with getting on the Internet. . . . [The person in charge of the project, who was located in Fort Collins, Colorado] called to let me know there were a few problems and that things were spinning out of control in Washington, DC due to reports that [the Complainant] was giving to the CIO and other senior staff. (Exh. F2).

The Supervisor stated that the Complainant did not contact her or the person in charge of the project prior to providing inaccurate information to the CIO and others. She learned that the Complainant told all of her colleagues as well as the Deputy CIO that the firewalls were down and that there was no security, which she said was factually inaccurate. Upon her return from annual leave, the CIO, Deputy CIO, and the person in charge of the project (hereinafter Director/National TSO) met with her and the Complainant and were very upset regarding what had occurred while the Complainant was acting in her stead. After the meeting, she informed the Complainant that she did not think he would act on her behalf "for a little while." According to the Supervisor, she had never before been in a meeting in which it was made "crystal clear by several

individuals that performance had not been satisfactory." The Supervisor denied any recollection of a meeting in which she told the Complainant to "wake up to reality." However, she stated that, following the meeting with the CIO and Deputy CIO regarding the Complainant's performance during her absence in July 2005, she may have told the Complainant that, because she was not there when the situation occurred, she could not provide much insight regarding what went wrong. (Exh. F2).

The Supervisor denied that she informed the Complainant that he was not to attend any staff meetings, meet with OCIO staff, or engage in conversations with the CIO or Deputy CIO without her being present. She cited several examples of the Complainant's interaction with management and staff from August until October 1, 2005, when the Complainant was reassigned. Regarding the Complainant's requested training, the Supervisor responded that the cost of FEI training was $10,000 and she did not have the money in her budget. The Supervisor further stated that no one in her organization, including herself, was approved for FEI training during any year. (Exh. F2).

With respect to the reassignment, the Supervisor responded that the Complainant was moved when a new Associate CIO for Cyber Security joined the Agency in July 2005 and determined that the function of security operations that was performed by the Complainant belonged in the Cyber Security Office, where it had been previously. The Supervisor stated that the official title of the Complainant when he worked for her was Supervisory ITS and she assumed that remained his title when he was reassigned. The Supervisor recalled that the Complainant seemed excited about the opportunity to work in Cyber Security. She stated that an individual was assigned by her new supervisor to be her Deputy in April 2006, after the CIO decided to reorganize some four (4) months after the Complainant began employment with another Federal agency. (Exh. F2).

Responding to the Complainant's claim pertaining to his performance rating, the Supervisor stated that she saw no problems with the Complainant's performance at the time of his mid-year review, and that it was only during the aforementioned period in July 2005 that she became aware of his leadership deficiencies. She stated that the only reason for the Fully Successful rating was his handling of the acting position while she was on annual leave. The Supervisor denied having promised the Complainant a specific performance rating and denied having promised him a QSI, which she explained requires approval at a higher level. (Exh. F2).

With respect to the QSIs, the Supervisor responded that the Complainant was never denied such an increase. She stated that she never considered him for a QSI because he never had sustained outstanding performance, and that she had not provided a QSI to anyone on her staff. (Exh. F2).

The Deputy CIO (religion not identified, American) responded that the Supervisor acted within her authority when she informed the Complainant that he could no longer act on her behalf when she was out of the office, and that he agreed with the Supervisor's conclusion that the Complainant did not exercise good judgment when talking with the CIO and himself during the week that the Supervisor was absent from the office. The

Exhibit 4

Deputy CIO denied asking the Complainant to identify his religion and stated that he never asked anyone such a question. Further, the Deputy CIO denied that the Complainant referred to feeling harassed or intimidated when he was moved to the Cyber Security Office. He stated that he did not recall any specifics of the Complainant's performance review and also did not recall the Complainant's expressing any dissatisfaction with his performance rating. (Exh. F4).

The CIO (Christian, American) acknowledged, with respect to problems with the UTN project, that the Complainant notified him in writing that there were problems with its implementation. He stated that the contractors and the Director/National TSO began an action plan to resolve the problem during the period that the Complainant was acting for the Supervisor. The CIO stated that the Complainant "could not give us a straight story of exactly what he perceived to be the problem," and, consequently, there was a meeting scheduled with the contractors and the Director/National TSO. According to the CIO, during the meeting "it was discovered that there was a huge communication gap between [the Complainant] and the Director/National TSO," and the Complainant stated that because the Director/National TSO did not work under his supervision, he would not talk with him about the problems in implementation of the UTN project. (Exh. F5). The CIO explained:

> Based on [the Complainant's] lack of leadership ability, as demonstrated during his "acting" capacity, I informed him that he was no longer acting. The decision that he would no longer act on [the Supervisor's] behalf when she was out was a management decision. [The Supervisor] was the manager who communicated this decision to [the Complainant]. (Exh. F5).

The CIO denied the Complainant's claims regarding restrictions on his communications. He stated that he was unaware of any instructions that the Supervisor allegedly gave the Complainant restricting his authority to communicate or any instructions that the Complainant could not attend OCIO meetings. With respect to the reassignment, the CIO responded that management decided that the Complainant could be better utilized in Cyber Security, in which he had an excellent background. The CIO stated that he had no knowledge regarding the claims pertaining to the Complainant's performance rating and failure to receive a QSI. (Exh. F5).

The Director/National TSO (Christian, American), GS-15, OCIO, Fort Collins, Colorado, explained that he also reported to the Supervisor. He stated that he was aware that the Complainant was relieved of the responsibility to serve in an "acting" capacity in the Supervisor's absence after the Complainant provided "bad information to higher-level management." According to the Director/National TSO, the Complainant chose to misrepresent the facts to management. He stated that when problems with security devices arose during the implementation period for the UTN system in July 2005, he reported the problems to the Complainant, who was acting in the Supervisor's stead at the time. During the same week, the Deputy CIO called him to find out what was occurring with implementation of the UTN system and to obtain information about the security

Exhibit 4

7

devices. The Director/National TSO further stated that he was aware that OIG conducted an investigation related to the implementation problems. (Exh. F6).
The Branch Chief (Catholic, American), GS-14, Security Policy Branch, OCIO, stated that during the time at issue, he worked in OCIO's Cyber Security Office. He explained that due to performance issues, the security controls were turned off for more than 24 hours during implementation of the UTN system. He stated that the Complainant asked him for assistance in validating the problem with the system, and he concluded that the Complainant was correct in attempting to resolve the security issues with OCIO management and OIG. (Exh. F7).

A Senior Information Technology Specialist (Christian, American), GS-13, OIG, Kansas City, Missouri (hereinafter OIG Employee), stated that she knew that the Supervisor and the Director/National TSO did not want the Complainant to speak with the contractors who were responsible for the UTN system. She was told by the Complainant that he felt that they did not want him to communicate with the contractors because the implementation of the UTN system was not going well and they did not want him to talk with OIG about the problems. The OIG Employee attached to her affidavit e-mails reflecting communications between her, another OCIO employee, and the Complainant. The e-mails pertain to the UTN problems and speculation that the Supervisor concluded that the UTN problems were caused by the internal staff rather than the security design of the contractors. (Exh. F8).

An Administrative Officer (Catholic, American), GS-14, TSO, OCIO, stated that the Supervisor, for whom she provided administrative support, informed her that the Complainant had attended a meeting while she was out of the office and made derogatory comments regarding some of her management decisions related to the UTN system. The Administrative Officer also stated that she was aware that many individuals within the TSO organization did not give much credence to the Complainant's business opinions. With respect to the FEI training, the Administrative Officer explained that the funding for the Complainant was from the Working Capital Fund, while funding for the Supervisory ITS was from Appropriated funds. (Exh. F-10). The Supervisory ITS (Presbyterian, American) confirmed that she was paid from Appropriated funds. (Exh. F14).

Three (3) employees provided testimony that offered statements in support of the Complainant's claims of discrimination based upon his protected categories. One, an Information Technology Security Officer (Catholic, American), GS-12, OCIO, stated that the Supervisor "doesn't treat non-white people the same as she treats white people" and had tried to have a minority employee fired. (Exh.11). The second employee, a Secretary (Christian, American), GS-7, TSO, OCIO, Beltsville, Maryland, is the aforementioned minority employee whom the Supervisor allegedly tried to have terminated. The Secretary stated that she thought that the Supervisor and her manager "have come down hard on employees that have a strong belief in religion," and said that she based her conclusion on her own treatment. (Exh. F13). However, the Secretary did not elaborate. The third employee, a Management Analyst (Christian, American), GS-9, OCIO, stated that it appeared to her that the Supervisor discriminated against the Complainant as well as other minorities, including the Secretary, the Information

Technology Security Officer, and a Telecommunications Enterprise Architect. The Management Analyst did not offer any examples of discrimination related to religion or national origin. (Exh. F12). In his affidavit, the Telecommunications Enterprise Architect (Baptist, American), GS-15, TSO, OCIO, Beltsville, Maryland, did not indicate that he thought the Complainant was discriminated against on the bases of his religion or national origin. He also did not indicate that he himself was subjected to discrimination. (Exh. -9).

In his rebuttal affidavit, the Complainant again stated that he was never furnished with an SF-52 or PD in connection with his reassignment to the Cyber Security Office. The Complainant elaborated on his explanation of the problems with the UTN system. He stated that while he was at the Agricultural Research Center meeting with its staff, the Chief Technology Officer of USDA's Agricultural Research Service (ARS) reported to him that the agency's e-mail system was down because of the UTN implementation. The Complainant stated that he immediately contacted the CIO and Deputy CIO, and that the CIO requested that he not leave ARS until the problem had been corrected. The Complainant also informed the CIO that the contractor for the system was bypassing the "firewalls, web filtering, and anti-virus protection in order to keep the UTN operational," which exposed the USDA internet and network to intruders and hackers. (Exh. F3).

Subsequently, when the Complainant made his election for a FAD, he provided additional comments. He stated that he requested the EEO Investigator to look into his "missing PD" and that the EEO Investigator responded that she was unable to obtain assistance from Human Resources. He reiterated his claim that he was retaliated against because he was a whistleblower.[5] Further, the Complainant asserted that only six (6) of the thirteen (13) potential witnesses he requested to be interviewed during the investigation were actually interviewed. (Letter dated November 2, 2006, attached to the Complainant's form electing a FAD).

<u>**Claims Based on Disability**</u>

In his rebuttal affidavit responding to management's statements, the Complainant raised for the first time a claim that he is a qualified individual with a disability under the Rehabilitation Act. He described his disability as ruptured lumbar vertebrae and disc, with a medical rating by the Department of Veterans Affairs of 30 percent disability with respect to mobility and function related to the use of his back. He asserted that the Supervisor discriminated against him on the basis of his disability when she never offered him an orthopedic chair during his three (3) years with USDA. (Exh. F3).

In his original affidavit, the Complainant stated that he suffered from low back pain and a seizure disorder, but that neither condition limited his ability to perform a major life activity. However, he alleged that he experienced seizures more frequently because of the level of stress and aggravation to which he was subjected.[6] According to the

---

[5] Claims raised under the Whistleblower Protection Act are not cognizable in the EEO complaint process.

[6] The Complainant stated that, at the time he provided his affidavit in the instant case (July 26, 2006), he had not experienced a seizure since the week prior to his leaving USDA. (Exh. F1).

Exhibit 4

9

Complainant, he first notified the Supervisor in March 2003 about his disability, but management already had knowledge of the disability when he began his employment in February of the same year. He explained that his standard personnel form, SF-52, reflected his disability; his military discharge form notes that his disability was the reason for his separation from the U.S. Army, and his 30 percent disability rating also provided notice to the Agency. (Exh. F1).

The Supervisor denied any knowledge of the Complainant's physical or mental condition, except for her awareness that he was classified as a disabled veteran. (Exh. F2). The Deputy CIO stated that he was unaware that the Complainant had any physical or mental disabilities. (Exh. F4). The CIO also stated that he was unaware that the Complainant had any physical or mental disabilities, although he did recall that the Complainant mentioned that he had a low back injury. (Exh. F5). Moreover, the record contains no evidence that the Complainant requested reasonable accommodation.

## Analysis and Findings

In any proceeding, either judicial or administrative, involving a charge of discrimination, the complainant has the burden to initially establish that there is some substance to his allegation of discrimination. In order to meet this burden, the complainant must establish a prima facie case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Furnco Construction Corp. v. Waters, 438 U.S. 567 (1978). This means that the complainant must present a body of evidence, such that were it not rebutted, the trier of fact could conclude that unlawful discrimination or retaliation did occur.

If the complainant meets his burden of presenting a prima facie case, then the agency has a burden of production to articulate some legitimate, nondiscriminatory reason for its actions. If the agency meets its burden, the complainant then has the burden to demonstrate that the reason articulated is, in actuality, a pretext for discrimination. Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981). As the Supreme Court has reiterated, the complainant's ultimate burden of persuasion is to prove that unlawful discriminatory animus motivated the agency's actions. St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).

To establish a prima facie case of harassment, a complainant must show: (1) that he is a member of the statutorily protected class; (2) that he was subjected to harassment in the form of unwelcome verbal or physical conduct involving the protected class; (3) that the harassment complained of was based on the statutorily protected class; and (4) that the harassment affected a term or condition of employment and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment. Quinn v. Department of Agriculture, EEOC Appeal No. 01A34982 (December 21, 2004). Further, the incidents must have been "sufficiently severe and pervasive to alter the conditions of complainant's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). The harasser's conduct should be evaluated from the objective viewpoint

**Exhibit 4**

10

of a reasonable person in the victim's circumstances. Enforcement Guidance on Harris v. Forklift Systems, Inc., EEOC Notice No. 915.003 (March 8, 1994).

Protection against discrimination based on disability is provided to federal employees by the Rehabilitation Act of 1973, as amended (hereinafter the Rehabilitation Act). In order to establish a prima facie case of disability discrimination, a complainant must prove, by a preponderance of the evidence, that he was treated differently from individuals not within his protected group, or that the agency failed to make a needed reasonable accommodation, resulting in adverse treatment of the complainant. Wise v. United States Postal Service, EEOC Appeal No. 01A21311 (January 21, 2003), citing Sisson v. Helms, 751 F.2d 991, 992-93 (9th Cir.), cert. denied, 474 U.S. 846 (1985).

First, we address the Complainant's claim based on disability. In his rebuttal, the Complainant raised the claim that he was a qualified individual with a disability under the Rehabilitation Act. Earlier, the Complainant explained under oath in his first affidavit that neither his low back pain nor seizure activity limited his ability to perform a major life activity. In addition to the Complainant's acknowledgment that he was not substantially limited in his ability to perform a major life activity, there is no evidence that the Complainant had a record of such a disability or was perceived as having such a disability. Therefore, we find that the Complainant was not an individual with a disability as defined under the Rehabilitation Act and was not discriminated against on the basis of disability. Even assuming arguendo that the Complainant was a qualified individual with a disability, we observe that the record includes no indication that the Complainant ever requested any type of accommodation. Because the Complainant is not entitled to the protections of the Rehabilitation Act, we find that the Agency did not have to provide an orthopedic chair or any other type of accommodation.

With respect to the accepted claims of discrimination based on religion and national origin, we observe that the Complainant contends that at least some of the actions taken by the Agency are related to the fact that he provided information regarding problems with the UTN system when he communicated with the Agency's upper management and OIG. Whistleblower activities are not considered protected activity under EEO laws. See Kennedy v. National Aeronautics and Space Administration, EEOC Appeal No. 01A23463 (November 5, 2002). Therefore, even if the Complainant were able to show that the Agency retaliated against him for exposing problems in the UTN system, absent any evidence that such retaliation was related to his membership in a protected group, such evidence would not help the Complainant prove that he was discriminated against under EEO law.

Further, although the initial inquiry in an EEO discrimination case usually focuses on whether the complainant has established a prima facie case of discrimination, following this order of analysis is unnecessary when the agency has articulated a legitimate, nondiscriminatory reason for its actions. In such cases, the inquiry shifts from whether the complainant has established a prima facie case to whether he has demonstrated by

Exhibit 4

a preponderance of the evidence that the agency's reasons for its actions were merely a pretext for discrimination. <u>Washington v. Department of the Navy</u>, EEOC Petition No. 03900056 (May 31, 1990).

The Agency denied that the Complainant was told that he could not attend staff meetings, meet with OCIO staff, or speak with the CIO or Deputy CIO without the Supervisor also being present, and it offered evidence that the Complainant continued to engage in these meetings and communications. The Agency also proffered legitimate, nondiscriminatory reasons for the remaining actions that which are the subject of the instant complaint. Management explained that it determined that the Complainant should no longer serve in an "acting" capacity for the Supervisor because management had lost faith in his ability to exercise good judgment, based on how he responded to problems with the UTN system in July 2005. Management stated that the new head of Cyber Security decided that the Complainant's job functions should be returned to the Cyber Security Office and management believed the Complainant could be better utilized in this office. The Supervisor stated that the Complainant's performance during the week that she was on annual leave, when he was acting in her stead, was the only reason that the Complainant was given a Fully Successful rating. With respect to QSIs, the Supervisor responded that she did not recommend anyone for a QSI and that the Complainant was not considered for a QSI because he had not sustained outstanding performance.

Regarding his claim that his authority to meet or speak with various staff members and management was restricted, we find that the Complainant has not proffered evidence that persuades us that any restrictions imposed were related to his religion or national origin. In trying to show that the Agency's reasons for its other actions were unbelievable or merely a pretext to mask discrimination, the Complainant essentially elaborated on what he described as the problems of the UTN system and reiterated his claim that he was retaliated against because he was a whistleblower.

After a careful review of the record, we find that the Complainant has failed to proffer evidence that shows that the Agency's articulated reasons for its actions lacked credibility or were a pretext for discrimination. We conclude that the Complainant has failed to demonstrate that he was subjected to disparate treatment based on his protected categories of religion or national origin. With respect to the harassment claims, the Complainant must show that he was subjected to <u>unlawful</u> harassment, which means, in the instant case, that it was based on his religion or national origin. Because the Complainant has failed to show that the Agency's actions were motivated by discriminatory animus on these bases, he cannot prove unlawful harassment. <u>See Oakley v. United States Postal Service</u>, EEOC Appeal No. 01982923 (September 21, 2000).

### Conclusion

The weight of the evidence indicates that discrimination did not occur with respect to the issues of this complaint. Accordingly, no order of relief or corrective action is warranted in this matter.

**Exhibit 4**

12

### Appeal Rights

This is the final decision of the USDA on the cited complaint. The following are the only rights available to challenge this decision.

### APPEAL TO THE EEOC

A Notice of Appeal may be filed with the EEOC within thirty (30) calendar days after receipt of this final decision. EEOC Form 573, Notice of Appeal/Petition, should be used in filing the appeal, as well as what is being appealed should be indicated in the form. A copy of EEOC Form 573 is provided with this decision. Such notice should be addressed to:

**Equal Employment Opportunity Commission**
**Office of Federal Operations**
**P.O. Box 19848**
**Washington, DC 20036**

As an alternative to mailing, your appeal may be hand-delivered to:

**Equal Employment Opportunity Commission**
**Office of Federal Operations**
**1801 L Street, N.W.**
**Washington, DC 20507**

As an alternative, you may also send your appeal by fax to the Office of Federal Operations at **(202) 663-7022**.

If there is an attorney of record, the thirty (30) calendar day time limit within which to appeal shall be calculated from the date of receipt of this decision by the attorney. In all other cases, the thirty (30) calendar day time limit within which to appeal shall be calculated from the date of your receipt of this decision.

The appeal shall be deemed filed on the day it is postmarked, or in the absence of a postmark, on the date it is received by the EEOC.

At the same time information is provided to the EEOC (to include a copy of the Notice of Appeal and any submissions in support of the appeal), there **must** be a service certification that a copy of the submission **has been** submitted to the Civil Rights Services Division and the date and method of service. A copy of the appeal and any submissions in support thereof shall be forwarded to the agency at the following address:

Exhibit 4

13

**USDA – Office of Adjudication and Compliance**
**Chief, Civil Rights Services Division**
**1400 Independence Ave., S.W.**
**Washington, D.C. 20250-9410**

Please note that, if your appeal is not filed within the thirty (30) calendar day time limit, the appeal may be dismissed by the EEOC. However, the EEOC may, at its discretion, extend the time limits and accept the appeal based upon a written statement that there was no actual notification of the time limit, or that a timely Notice of Appeal could not be filed, due to extenuating circumstances.

Any statement or brief in support of your appeal must be submitted to the EEOC within thirty (30) calendar days of filing the Notice of Appeal. The EEOC, Office of Federal Operations, accepts statements or briefs in support of appeals by facsimile transmittal, provided that they are no more than ten (10) pages long.

Any statement or brief in opposition to your appeal must be submitted to the EEOC and served on you (or your attorney of record, if represented by an attorney) within thirty (30) calendar days of receipt of the statement or brief supporting the appeal, or if no statement or brief supporting the appeal has been filed, within sixty (60) calendar days of receipt of the appeal.

It is the responsibility of USDA to submit the entire complaint file to the EEOC, Office of Federal Operations, within thirty (30) calendar days of initial notification that an appeal has been filed.

**CIVIL ACTION IN FEDERAL DISTRICT COURT**

You also have the right to file a civil action in an appropriate United States District Court. If you choose to file a civil action, you may do so:

    (1) within ninety (90) days of receipt of this final decision if no appeal has been filed; or

    (2) within ninety (90) days after receipt of the EEOC's final decision on appeal; or

    (3) after one hundred and eighty (180) days from the date of filing an appeal with the EEOC if there has been no final decision by the EEOC.

You must name the person who is the official agency head or department head as the defendant. Agency or department means the national organization, and not just the local office, facility, or department in which you might work. Do not name just the agency or department. In your case, you **must** name **Mike Johanns, Secretary of Agriculture**, as the defendant. You must also state the official title of the agency head or department head. Failure to provide the name or official title of the agency head or department head may result in dismissal of your case.

**Exhibit 4**

14

If you decide to file a civil action, under Title VII or under the Rehabilitation Act, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and civil action <u>MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS</u> of the date you receive the final decision by USDA or an EEOC decision on appeal.

Unless an appeal is filed with the EEOC, failure to file a civil action within ninety (90) calendar days may result in the dismissal of your civil action. Filing a civil action under 29 C.F.R. §1614.407 or §1614.408 shall terminate processing an appeal before the EEOC. If a civil action is filed subsequent to filing an appeal with the EEOC, the parties are requested to notify the EEOC in writing.

Sadhna G. True
Director

Date

Attachment

**Exhibit 4**

15

## U.S. DEPARTMENT OF AGRICULTURE
### OFFICE OF ADJUDICATION AND COMPLIANCE
### Complaint of Employment Discrimination

**Complainant:**      Heshmat Ansari

**Complaint No.:**    CRSD-2006-00107

**Office:**             Office of the Chief Information Officer

### Certificate of Service

I certify that the documents listed were sent on this date by certified mail (unless otherwise specified) to:

Complainant:                     Heshmat Ansari
                                 11011 Grassy Knoll Terrace
                                 Germantown, MD 20876

Complainant's Representative:    None

Office Head:                     Charles Christopherson (*interoffice mail*)
                                 Chief Information Officer
                                 Office of the Chief Information Officer, USDA
                                 Room 414-W, Whitten Building

Agency Liaison:                  Sherri Schilling (*interoffice mail*)
                                 Chief, Labor/Employee Relations
                                     & Litigation Branch
                                 Office of Human Capital Management
                                 Departmental Administration
                                 Whitten Building, Room 27-W

Enclosures:    Final agency decision dated JUL 2 0 2007
               Form 573 (to the complainant and representative only)

Certified by: _Michelle Cate_          Date _July 20, 2007_

**Lilja Aff.**

1                          **Witness' AFFIDAVIT**

2

3      I, Janice G. Lilja, am an employee of the U.S. Department of Agriculture, Office of

4      the Chief Information Officer, located in Washington, DC in the capacity of

5      Associate Chief Information Officer, for Telecommunications. I am a member of the

6      SES. My telephone number during working hours is: 202 720-8695.

7      **I HAVE BEEN ADVISED OF THE FOLLOWING:**

8      I am required by Federal regulations and Department of Agriculture policy to
9      cooperate fully and promptly with the investigator who has been assigned to conduct
10     a thorough and impartial investigation into a complaint of discrimination against the
11     Department of Agriculture. I must provide a statement for the investigative report
12     which is true and complete to the best of my knowledge and which discloses all of
13     my first hand knowledge having a bearing on the merits of the complaint. My
14     statement, is provided under oath (or affirmation), without a pledge of confidentiality,
15     in accordance with Equal Employment Opportunity Commission rules and
16     regulations and Department of Agriculture policy. This means that any employee(s)
17     whom I accuse of discrimination or other acts of impropriety may be shown relevant
18     portions of this statement and be given an opportunity to respond for the record. In
19     addition, the complainant and the appropriate Departmental officials involved in the
20     EEO complaint process will receive the entire investigative file. I have the right to
21     review my statement prior to signing it and may make initialized corrections if it is
22     incomplete or inaccurate. I have the right to receive a copy of the signed statement.
23

24     Having been advised of the above information about my role as a witness in the

25     investigative process, I solemnly affirm that the statement, which follows, is true and

26     complete to the best of my knowledge and belief, and addresses the concerns raised

27     with me by the investigator.

28     The investigator has informed me that the accepted claim(s) in this complaint are:

29     Whether since August 3, 2005; and continuing, the agency subjected Hesh Ansari to
30     discrimination and harassment (non sexual) based on age (D.O.B. 8/7/52), religion
31     (Muslim), and national origin (Iranian), when:
32          1. His supervisor informed him that he could no longer act on her behalf when
33             she was out of the office;
34          2. He was no longer authorized to attend OCIO meetings or engage in
35             conversation with the Chief Information Officer or Deputy;

Initials _____

000090

**Lilja Aff.**

3.  On October 1, 2005, management reassigned him from my OCIO position as Deputy Associate Chief Information Officer for Telecommunications to the Cyber security office to manage security operations;

4.  On October 32, 2005, he received a performance rating of Fully Successful, for fiscal year 2005; and

5.  He was denied quality step increases.

My full name is Janice G. Lilja. My position title and grade is:  Associate Chief Information Officer for Telecommunications, SES.  I make the following statement freely and voluntarily to Sallie Jenkins who has identified herself to me as an EEO Investigator, Janver, Inc. assigned by the US Department of Agriculture to perform this investigation, knowing that this statement may be used in evidence.

I am currently employed by the U S Department of Agriculture, Office of the Chief Information Officer, Telecommunication Services and Operations, Washington, D C. I have been in my current position as Associate Chief Information Officer for approximately four years. My organizational relationship to (complainant) Heshmat Ansari is that I was his immediate supervisor. My age is 51 years, (DOB 4/30/55), my religion is (Congregationalist – United Church of Christ).  My country of origin is (United States of America).  I was born in Beirut, Lebanon and attended elementary school there.

I am aware that Mr. Ansari has a physical disability resulting from his military service.  I did not know details about what was involved other than that it was a back injury. I learned about his physical disability from the selection certificate, where he was shown as a ten- point veteran; which means disabled veteran, and he was at the top of the selection certificate. Additionally, Dr. Ansari went back to the VA hospital

Initials _____

**Lilja Aff.**

1    every year for check ups and recertification of his disability status. I never heard Dr.

2    Ansari say anything about having seizures and I never witnessed any. He never told

3    me anything about a mental disorder (seizures). If Dr. Ansari's alleged mental

4    disability was aggravated by activities of the job, he didn't tell me anything about it. I

5    was also aware, immediately after he joined my organization, that he had a lot of

6    personal family issues.   Shortly after he started working with me in 2003, he

7    informed me that he had separated from his wife. She used to call him frequently at

8    the office and they would argue. My understanding is that that separation continued

9    throughout the time he worked for me. Also, his son was a Marine serving in

10   Afghanistan, and in addition Dr. Ansari worried about paying for his daughter's law

11   school education. I remember that he worried that everyone was placing financial

12   demands on him. Nevertheless, he was always up-beat and high energy; never acted

13   as though he was depressed and never had any mental seizures. However, when Mr.

14   Ansari was transferred to Cyber Security at the beginning of October, 2005, he was in

15   another office around the corner, reporting to a different supervisor and I did not see

16   him every day. I have no knowledge of Mr. Ansari's feelings of depression and

17   humiliation because of the move to Cyber Security. He never expressed anything to

18   me relating to how he felt about the move to Cyber Security; or how the move

19   affected him.

20        I disagree wholeheartedly with the allegation that I discriminated against Mr.

21   Ansari because of his age, religion and national origin. We are both over 50 and have

Initials ____

000092

1   children nearly the same age. We are contemporaries. It is preposterous that I would

2   discriminate against him based on religion or national origin.  I studied comparative

3   religion and Islam in college.  My father, a political scientist who taught at the

4   American University of Beirut, was a founding member of the Middle East Studies

5   Association.  My daughter is a Near Eastern Studies major at Cornell and studies

6   Arabic.  I attended elementary school in Beirut, Lebanon and socialized with

7   Lebanese children.  To make such a claim displays total ignorance of who I am, my

8   education, my religion, and of my cultural breadth and understanding.   I find it

9   deeply offensive and insulting.

10  **Claim No. 1:  Your supervisor informed you that you could no longer act on her**
11  **behalf when she was out of the office**
12

13       The idea that Dr. Ansari should not act in my absence for a while, was based

14  on his behavior during the week of July 25, 2005, while I was on vacation and he was

15  acting for me. We had been working on a major technical project for a long time——

16  rebuilding the USDA wide area network; and the final implementation date was the

17  weekend of July 23, 2005.  I was on vacation at the time and Mr. Ansari was acting

18  for me.  On Monday, July 25, 2005, there were some technical issues, which is not

19  unusual with a major deployment.  A few people even experienced difficulty with

20  getting on the internet. While I was on vacation and assisting my disabled mother, I

21  was informed of this by one of the GS-15s who work for me, Michael (Mike) Thomas

22  who was in charge of the entire project.  Mr. Thomas is physically located in Fort

Initials ____

**Lilja Aff.**

1    Collins, Colorado. He called to let me know there were a few problems with the

2    network and that things were spinning out of control in Washington, DC due to

3    reports that Mr. Ansari was giving to the CIO and other senior staff.

4        Mr. Ansari did not call me and he did not contact Mike regarding network

5    problems prior to providing inaccurate information to the CIO and others. Among

6    other things, I have been informed that Dr. Ansari told Mr. Williams, my supervisor,

7    and all of my colleagues that the Firewalls were down and that there was no security;

8    that USDA was "running wide open". This was not factually correct.

9        When I returned from vacation, within days of my return, Mr. Williams and

10   Mr. Combs called a meeting of myself, Mr. Williams, Mr. Combs, Michael Thomas

11   and Dr. Ansari and told me what the week had been like with Dr. Ansari acting.

12   They were very upset. Dr. Ansari was in that meeting and he had little to say. After

13   the meeting, I informed Dr. Ansari, that I didn't think he would be acting for me "for

14   a little while". My decision was based solely on his performance during that week

15   when I was on vacation and based on the fact my superiors were very upset and

16   disappointed with his performance during that week. In my professional experience, I

17   have never been in such a meeting before where it was made crystal clear by several

18   individuals that performance had not been satisfactory. Dr. Ansari did not exercise

19   good judgment in handling the situation. The decision not to designate him as acting

20   for me for a while was based solely on the above and his age, religion, and national

21   origin had nothing at all to do with it.

Initials ____

1
2
3·

**Claim No 2: You were no longer authorized to attend OCIO meetings or engage in conversation with the Chief Information Officer or Deputy**

4        I disagree with Dr. Ansari's allegation that I informed him that he was

5   not to attend any staff meetings; meet with the OCIO staff or engage in conversation

6   with the Chief Information Officer or Deputy without my presence. However, given

7   that I am his supervisor, that would certainly have been my right to do so and I know

8   many supervisors who require that as a standard operating procedure. During the eight

9   weeks that he worked for me between August 3, 2005 and October 1, 2005 when he

10  was transferred to Cyber Security, Dr. Ansari sent emails to Mr. Williams, the Deputy

11  CIO and the other senior staff (Attachment A). Mr. Ansari went to Hagerstown and

12  met with Mr. Williams to brief him on the OCIO COOP site (August 29, 2005) and I

13  was not present (Attachment B). He led that briefing on August 29th for Mr. Williams

14  and another briefing in late September, 2005 for Mr. Combs regarding a security and

15  telecommunications conference that Dr. Ansari was planning for the OCIO in Los

16  Angeles. (Attachment C) At the Los Angeles conference, Dr. Ansari introduced Mr.

17  Combs in front of an audience of 200 or more people. I worked to get Dr. Ansari the

18  necessary approvals so that he could make a presentation at a conference in

19  Pennsylvania, even though I had to email Dr. Ansari several times in order to get any

20  information. (Attachment D). I have also attached additional emails from August,

21  2005 (Attachment E), September, 2005 (Attachment F), and October 2005

22  (Attachment G) showing that we had a courteous and good professional relationship.

Initials _____

**Lilja Aff.**

1    The only training I recall Mr. Ansari requesting that was not approved, was the

2    Federal Executive Institute Training, which cost ten thousand dollars. I did not have

3    that kind of money in my budget; and it would have to be approved by the CIO. I

4    asked to attend the same training myself and it was disapproved by Mr. Williams. This

5    occurred in 2005. I have been a Senior Executive at USDA for 16 years and have

6    made four separate requests to attend this training and been turned down each time. It

7    is very difficult to get approval to attend this training. The disapproval of Dr. Ansari's

8    training was based on the non-availability of monies and his age, religion, and national

9    origin were not factors considered.  As I recall, Dr. Ansari was required to take

10   supervisory training every year; and he didn't want to attend. The reason he gave was

11   that since he had been a supervisor for so many years, he didn't need it.

12   Between August 3 and October 1, I continued to include Dr. Ansari in important

13   meetings regarding the UTN and AT&T, the contractor. I have attached an email

14   (Attachment H) where I invited him to participate in a conference call with me and Dr.

15   Ed Amoroso, the head of cyber security for all of AT&T, on August 9. Dr. Ansari

16   agreed to call in. I also continued to support Dr. Ansari's work between August 3 and

17   October 1. I have attached an email (Attachment I), where I asked Dr. Ansari and

18   others if they needed any additional funds for their projects.  I was successful in

19   obtaining the additional funding for Dr. Ansari's conference in Los Angeles.

20   **Claim No. three:  On October 1, 2005, management reassigned you from your**
21   **OCIO position as Deputy Associate Chief Information Officer to the Cyber**
22   **Security Office to manage security operations**
23

Initials ____

**Lilja Aff.**

1          Mr. Ansari was moved to Cyber security because when Lynn Allen,

2    Associate CIO for Cyber Security joined USDA in July 2005, he said the function of

3    security operations that was performed by Mr. Ansari belonged in the Cyber

4    Security office and he wanted it moved there.  Subsequently, the Deputy CIO

5    concurred and the function and the FTE, i.e., Mr. Ansari and the two people who

6    reported to him, were moved to the Cyber Security office.  Under our previous

7    permanent Associate CIO for Cyber Security, the functions had been in Cyber

8    Security. They were moved to my organization while we had an Acting Associate

9    CIO for Cyber Security for a few years.  Dr. Ansari's age, religion and national

10   origin had nothing at all to do with the decision to return the functions to Cyber

11   Security. There was no change to Dr. Ansari's salary or his duty station; and to my

12   knowledge, there was no change in his duties and responsibilities. He never told me

13   he felt harassed and humiliated by the move from my office to the Cyber security

14   office.  His official title while he worked for me was Supervisory IT Specialist, and

15   as far as I know that was his official title when he worked in Cyber Security.

16         I deny the allegation that I told Mr. Ansari I no longer needed a Deputy.  I

17   also disagree with Mr. Ansari's allegation that the decision to move him to the Cyber

18   Security office was meant as harassment. I did not have an acting Deputy.  John

19   Donovan (late forties, American born), was assigned to me as my Deputy in April

20   2006 by Mr. Suda, my new supervisor, after the OCIO decided to reorganize and

21   assign new staff and responsibilities to my organization.

1    Meria Whitedove reported directly to me after Mr. Ansari left my organization; she

2    did not act as my Deputy. I detailed Michelle Carlson from NTSO into my office to

3    assist me with preparation of weekly reports. She did not act as my deputy; and she

4    did not perform any of the security functions. She was my special assistant.

5

6    **Claim No. Four: On October 1, 2005, you received a performance rating of fully**
7    **successful for fiscal year 2005.**
8

9    I disagree that with the allegation that age, religion and national origin were

10   factors in the rating assigned to Dr. Ansari. I gave him a rating of Fully successful

11   based on the leadership problems that occurred during the week he acted in July

12   2005, while I was on vacation. I disagree with his allegation that he did not have a

13   mid-year review. I held a mid-year review with Mr. Ansari on May 16, 2005. At

14   that time, there was no apparent problem with his leadership capabilities. I don't

15   understand how Dr. Ansari can compare himself with John Donovan, who did not

16   work for me nor report to me in 2004. Mr. Donovan started working under my

17   supervision approximately two months ago. Dr. Ansari had already left USDA. He

18   is correct, some of my employees did complain about the ratings they received.

19   Adrienne Bowman (white female, age 40), for example, complained to me that she

20   didn't deserve a "Superior" rating but should be Outstanding. However, her

21   performance rating was not changed and neither was anyone else.

22   Dr. Ansari did have some good accomplishments in FY 05. Dr. Ansari

23   submitted a list of his accomplishments; based on those and my knowledge of his

Initials ____

**Lilja Aff.**

1   work I rated him as "meets fully successful" in one performance element and

2   "exceeds fully successful" in three performance elements. I rated him as Does Not

3   Meet Fully successful in one non-critical performance element. Overall, it was not a

4   bad performance rating and obviously did not keep him from obtaining a promotion

5   at the Department of Transportation . What Dr. Ansari needed to improve in for a

6   rating above Fully successful is spelled out in his performance standards. He was

7   provided with a copy of his Performance standards in October 2004. The Rating at

8   issue was based solely upon how Dr. Ansari handled the acting position while I was

9   on vacation in July 2005; and the fact both the CIO and Deputy CIO were unhappy

10  with his behavior during my absence. Age, religion and national origin were not

11  factors considered in my decision to rate him as Fully successful.

12  **Claim No five: Never received Quality Step Increase:**

13          I disagree with Dr. Ansari's allegation of being denied Quality Step Increases

14  (QSI). He was not denied, I just never considered him for a QSI. However, while Mr.

15  Ansari did not receive Quality Step Increases; he got performance awards. For

16  example, in September 2005, I nominated him for a fifteen hundred-dollar award;

17  and in 2004, I nominated him for a thousand dollar award. The reason he did not

18  get a QSI was because he did not have sustained outstanding performance. To be

19  rated as outstanding, Mr. Ansari needed to exhibit good leadership—he needed to

20  represent situations accurately in what he said, i.e., be reliable and he needed to help

21  the team to work together. I have not given a QSI to anyone on my staff.

Initials ____

**Lilja Aff.**

1    I would like to add the following to my statement: I did not know with

2    certainty that Dr. Ansari had gone to the Inspector General regarding operation of

3    the Universal Telecommunication Network (UTN) until my meeting with the

4    investigator for this case. Subsequently I reviewed my old emails and I found an

5    email from the OIG to Dr. Ansari thanking him for meeting with them—I was copied

6    on the message. I did not previously remember that message nor do I recall reading

7    it at the time. I do not remember meeting with Dr. Ansari prior to his meeting with

8    the OIG. I am puzzled as to why Dr. Ansari has come to this point. He has never

9    talked to me about his concerns, and there hasn't even been an opportunity for

10   informal counseling or ADR. I am surprised and saddened about his complaints. I

11   don't ever recall ignoring Mr. Ansari when he walked into my office; and I always

12   spoke to him. I was the only Senior Executive from OCIO who went to his going

13   away party, which was held off site.

14       I have reviewed this statement, which consists of twelve pages, and I hereby

15   solemnly swear that it is true and complete to the best of my knowledge and belief. I

16   understand that the information I have given will not be held confidential and may

17   be shown to the interested parties as well as made a permanent part of the record of

18   investigation.

19

20   _____        _____

21   (Signature of Deponent)                    (Date )

22

Initials ____

**Lilja Aff.**

SunTrust Bank, 5450 Westbard Ave, Bethesda

1    Signed before me at : ~~1400 Independence Avenue, SW, Washington, D.C~~

2    On this _16th_ day of June, 2006

3

4    _____

5    Signature of ~~Investigator / Witness~~ *Notary*

6

7

8

9

Lina E. Bello
NOTARY PUBLIC
Montgomery County, Maryland
My Commission Expires 12/1/07

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HESHMAT ANSARI,             ) | |
|         Plaintiff,       ) | |
|                  ) | |
| v.                   ) | Civil Action No. 07-1778 |
|                  ) | |
| ED SCHAFER,          ) | |
|      SECRETARY, U.S. DEPARTMENT   ) | |
|      OF AGRICULTURE,       ) | |
|                  ) | |
|        Defendant.      ) | |
|                  ) | |

**DECLARATION OF Larry W. Newell**

I, Larry W. Newell, based on information obtained by me as an employee of the United States Department of Agriculture (USDA) in Washington, D.C., do hereby declare:

1.     I have been an employee of the USDA for 8 years and, since November 2004, have been employed by USDA as the Chief, of the Civil Rights Services Division, Office of Adjudication and Compliance (OAC).

2.     This Office sent Mr. Heshmat Ansari a letter dated February 17, 2006, outlining claims accepted and referred for investigation.  This letter is contained at Exhibit C in the administrative Report of Investigation of Mr. Ansari's discrimination complaint.

3.     The February 17, 2006, letter informs Mr. Ansari that he may submit a written statement concerning the Agency's articulation of the accepted claims.  The February 17, 2006, letter further informs that any such statement must be submitted

within seven (7) calendar days from receipt of the letter and will be included in the complaint file. The letter was sent by certified mail to his home, and Mr. Ansari signed the Domestic Return Receipt on February 24, 2006, acknowledging receipt of the February 17, 2006, letter of acceptance.

4.    This Office has no record of any written statement from Mr. Ansari, or any other entity, concerning the Agency's articulation of the accepted claims.

5.    All of the foregoing is based on my personal knowledge and I declare, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, that it is true and correct to the best of my information and belief.

**EXECUTED** this 7th day of February, 2008.

Larry W. Newell
Chief, Civil Rights Services
Office of Adjudication and Compliance
U.S. Department of Agriculture
1400 Independence Ave., SW
Washington, D.C. 20250-1400
(202) 720-5543

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
HESHMAT ANSARI,                               )
                                              )
              Plaintiff,                      )
                                              )
              v.                              )        Civil Action 07-1778 (RCL)
                                              )
MIKE JOHANNS,                                 )
                                              )
              Defendant.                      )
_____)

## ORDER

      Having considered Defendant's Motion to Dismiss Plaintiff's Whistleblower Claims, and

the entire record herein, it is, this _____ day of _____, 2008, hereby

      ORDERED that Defendant's Motion to Dismiss is GRANTED; and it is

      FURTHER ORDERED that, within 30 days of receipt of this Order, Plaintiff shall file an

amended complaint containing only those allegations which he believes support his claims of

employment discrimination based upon national origin, religion and disability; and it is

      FURTHER ORDERED that Defendant is not obligated to respond further to Plaintiff's

original Complaint.

      SO ORDERED.


                              _____
                              UNITED STATES DISTRICT JUDGE


Copy to:

ECF Counsel

Mr. Heshmat Ansari
11011 Grassy Knoll Terrace
Germantown, MD 20876