# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Heshmat Ansari,

    Planintiff

       v.

Mike Johanns,

    Defendant

CIVIL ACTION 07-1778 (RCL)

# RECEIVED

JUL 2 3 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Dear Honorable Judge Royce C. Lamberth,

I had look for attorney to represent me in this case but with my financial situation impossible to hire an affordable Attorney. They demanded any where from $8,000 to $10,000 retaining in order to counsel with one. I have also file motion for Court to appoint me with Attorney in proceeding with my case.

A recounting of the history of the indignities, retaliation, and discrimination directed at me over two years period at the Agency does not require emphasis to produce the reasonable conclusion that it was likely the cause of nearly constant stress for me. Indeed, that was the testimony of the witness during formal investigation which stated in Report of Investigation (ROI). Tuala V. Dep't of the Navy, EEOC appeal No. 01A13645 ("Objective evidence in support of a claim for nonpecuniary claims, may include statements from the Complainant and Others"). Yes, it was a lot of retaliation. It was stress on me. There are ample reasons that I stated in my filing documents regarding the Agency retaliations in subset of workplace discrimination. It is easier for me to demonstrate that I was retaliated against than that I was victims of discrimination in the first place. For instance, when on September 12, 2005, my supervisor stated that Management decided to remove me from my current position and reassign me to the Cyber Security office to

manage security operations. I stated to my supervisor that this is a demotion and I would be losing my title as a Deputy. Plus, I stated that I was hired for telecommunications services operations and not security operations. I also stated that I was hired as Deputy for Telecommunications and not Cyber Security. I asked my supervisor to read my position announcement and my job description. I also asked my supervisor under what authority had I been removed from this position. My supervisor stated that under Management authority and did not want to discuss it any more.

Regardless my protest, I was moved from the Deputy position to the Cyber Security Office without an SF-52 and a Position Description (PD). This move was degrading to me. I did not lose any money because of the move; but the level of undue stress to which I was subjected, harmed me. I was so shaken up by this move that I had to take a week's leave to get myself together. Additionally, the differences in my duties and responsibilities were that as Deputy, I was the second person in the Chain of Command with many responsibilities. On the other hand, as Security Specialist, I was the third person in the Chain of Command with fewer responsibilities. Plus, I was never furnished with SF-52 and PD.

I testified that I am a disabled veteran with 30% disability rating which included the back injury the certificate for which I presented to the Agency at the time of my hire in February 2003,  At that time I indicated to my supervisor that I needed a special chair to make it easier for me to sit for long periods.  The chair was never provided and I approached my supervisor again and again and never received one.  My supervisor never made a good faith effort to engage in an iterative process with me to determine and verify what my needs were, which was my supervisor obligation under the law.  See, e.g., Barenett v. US Air, Inc., 228 F.3d 1105, 1114(9th Cir. 2000) (holding that the "interactive process is a mandatory obligation on the part of employees under

the American with Disabilities Act and is triggered by an employee giving notice of disability and the desire for accommodation"); Bartee v. Michelin North America, Inc., 374F.3d 906, 916 (10th Cir. 2000) (after receiving notice from the employee, the employer has a duty to engage with him in a good faith effort to identify the precise limitation and potential reasonable accommodation).

These and many other situations are cited in affidavits which were provided by me and witnesses (Report of Investigation (ROI)) to include profanity words which I was called as " Camel Rider" stated by one of the witness's affidavit in ROI in regards to indignities, retaliation, and discrimination conducted by the Agency against me based National Origin (Iranian), and my religion (Muslim) which are clear evidences that greatly resulted in pain and suffering caused by high anxiety and mental stress; deprived my character, harmed, humiliated, and destroyed my reputation among staff, my peers, colleague, and my comrades;  harmed my personality and caused mental stress, family disturbance; and the trauma to my family and me has been considerable. I am never being able to recover my sanity and peace of mind and restore my reputation and damages caused to my family and I.

I am respectfully requesting a Hearing and provide possibility to hear my list of witnesses. I extracted and attached only two of the affidavits from ROI which was provided by Ms. Adrienne Bowman and Ms. Karen Sifford in considering this Hearing:

Adrienne Bowman, 717-580-3538

Karen Sifford, Staff of OIG, 816-823-3886

Karen Whiting-Diggs, Staff of ITS, 202-720-9017

Teresa Kelly-Reid, Staff of TSO, 301-504-2040

Steven Eckland, Staff of OIG, 816-823-3886

Dave Williams, Staff of TSO, 970-295-5209

Craig Chase, Staff of CSO, 202-690-0271

Ron Lester, Staff of TSO, 970-295-5314

Karl Hill, Staff of TSO, 970-295-5294


Respectfully Submitted,

Heshmat Ansari, Ph.D
11011 Grassy Knoll Terrace
Germantown, MD 20876
Home: 301-591-4409
Cell: 301-980-5847


Certified Copy Furnished to:

Christopher B. Harwood
Assistant United States Attorney
555 Fourth Street, N.W
Washington, DC 20530

1

## Witness' AFFIDAVIT

2

3   I, Adrienne Bowman, am an employee of the U.S. Department of Agriculture (USDA),

4   Office of Chief Information Officer (OCIO), located in Washington, DC in the capacity

5   of Management Analyst, GS-9. My telephone number during working hours is: (202)

6   720-8833.

7

8   **I HAVE BEEN ADVISED OF THE FOLLOWING:**

9   I am required by Federal regulations and Department of Agriculture policy to cooperate

10   fully and promptly with the investigator who has been assigned to conduct a thorough and

11   impartial investigation into a complaint of discrimination against the Department of

12   Agriculture. I must provide a statement for the investigative report which is true and

13   complete to the best of my knowledge and which discloses all of my first hand knowledge

14   having a bearing on the merits of the complaint. My statement, is provided under oath (or

15   affirmation), without a pledge of confidentiality, in accordance with Equal Employment

16   Opportunity Commission rules and regulations and Department of Agriculture policy.

17   This means that any employee(s) whom I accuse of discrimination or other acts of

18   impropriety may be shown relevant portions of this statement and be given an opportunity

19   to respond for the record. In addition, the complainant and the appropriate Departmental

20   officials involved in the EEO complaint process will receive the entire investigative file.

21   I have the right to review my statement prior to signing it and may make initialized

22   corrections if it is incomplete or inaccurate. I have the right to receive a copy of the

23   signed statement.

Initials _____    Page 1 of 21                    000261



1    Having been advised of the above information about my role as a witness in the

2    investigative process, I solemnly swear that the statement, which follows, is true and

3    complete to the best of my knowledge and belief, and addresses the concerns raised with

4    me by the investigator.

5    The investigator has informed me that the accepted claim(s) in this complaint are:

6    Whether since August 3, 2005; and continuing, the agency subjected Heshmat Ansari to

7    Discrimination and harassment (non sexual) based on age (D.O.B. 8/7/52), religion

8    (Muslim), and national origin (Iranian), when:

9

10    **1.  Allegedly, his supervisor informed him that I could no longer Act on her behalf**

11    **when she was out of the office;**

12

13    **2.  He was no longer authorized to attend OCIO meetings or engage in conversation**

14    **with the Chief Information Officer or Deputy;**

15

16    **3.  On October 1, 2005, management reassigned him from his OCIO position as**

17    **Deputy Associate Chief Information Officer to the Cyber security office to manage**

18    **security operations;**

19

20    **4.  On October 2, 2005, he received a performance rating of Fully Successful, for**

21    **fiscal  year 2005; and**

22

23    **5.  He was denied quality step increases.**



1   My full name is Adrienne Bowman. My position title and grade is: Management Analyst,

2   GS-9. I make the following statement freely and voluntarily to Sallie Jenkins who has

3   identified herself to me as an EEO Investigator, Janver, Inc. assigned by the US

4   Department of Agriculture to perform this investigation, knowing that this statement may

5   be used in evidence.

6

7   I am currently employed by the US Department of Agriculture; Office of Chief

8   Information Officer (OCIO), Washington, D.C. I have been in my current position as

9   Management Analyst, GS-9 for approximately four months. In terms of my

10  organizational relationship to (complainant) Dr. Heshmat Ansari, Deputy Associate Chief

11  Information Officer (ACIO) for Telecommunications Services and Operations (TSO) in

12  OCIO, we were co-workers; we both reported to Ms. Jan Lilja, ACIO for TSO. Dr.

13  Ansari was Ms Lilja's Deputy but I did not report to him. My age is 34 years, DOB

14  (12/20/71); my religion is Christian; my country of origin is: United States of America.

15

16  I am aware that Dr. Ansari is a disabled veteran but not aware of the details. I knew that

17  he had some sort of back injury he got during some type of exercise in the Army. He told

18  me one day, early 2005, that his back bothered him. I am not aware of any seizures but he

19  did tell Ms. Lilja and me in the office one day about a blackout that he had and that that is

20  why he was going to get checked out by the doctors, to make sure it was not anything

21  serious. I think he said that the blackout happened one day while he was traveling

22  somewhere. To my knowledge, he never blacked out while working at the USDA.

23

Initials _____ Page 3 of 21            000263



1    Dr. Ansari had many such appointments including a cat scan, that Ms. Lilja and I

2    commented one day to each other that we hoped he did not have a brain tumor.

3

4    I am making a more detailed statement regarding this matter because I have much to say

5    regarding the case.  There is no doubt in my mind that Dr. Ansari was discriminated

6    against by Ms. Lilja.  I was privy to many of the occurrences in TSO because I sat at a

7    desk in between Ms. Lilja's office and Dr. Ansari's office for 2 years, observing many of

8    the things that transpired.  Most of the time the door  was kept open to their offices and I

9    could hear almost every telephone conversation of Ms. Lilja and Dr. Ansari, due to the

10    close proximity of my desk to theirs.  Every visitor that came into my office had to pass

11    by my desk, and it was my job to keep both their calendars, making and breaking

12    appointments for them.

13

14    When I was hired by Ms. Lilja to be the secretary of Ms. Lilja and Dr. Ansari, Ms. Lilja

15    told me that the most important aspect of my job would be that of confidentiality.  Ms.

16    Lilja said that I might see and hear things that were confidential, but that I was to keep

17    everything to myself.  I was fine with that, however, as time went on in my job there as

18    secretary, both Dr. Ansari, and Ms. Lilja began to speak more freely around me and

19    consequently, I was privy to things that I did not wish to be privy, things that only

20    managers should know about,  Near the end of my time there, I began to ask if I could

21    shut Ms. Lilja's door, because quite frankly, I was tired of hearing things that were really

22    none of my business and things that should only transpire between managers.

23

Initials _____    Page 4 of 21    000264



1   That being stated, I will say that I noticed the discriminations from Ms. Lilja directed

2   towards Dr. Ansari, during the first few months after I started working there, and

3   observed that they only got worse as time went by. The discrimination against Dr. Ansari

4   got worse after the UTN episode (late July, 2005).

5

6   **Claim No. 1: Your supervisor informed you that you could no longer Act on her behalf**

7   **when she was out of the office.**

8

9   Yes, near the end of Dr. Ansari's time in TSO, Ms. Jan Lilja would not let Dr. Hesh

10  Ansari Act for her when she was out of the office. It started after Ms. Lilja was on

11  vacation for a week at the end of July 2005 (July 23-July 27). I think it was because Ms.

12  Lilja felt that Dr. Ansari did not do a good job handling the security breach that happened

13  with the UTN during that week. I have much to say about that in Dr. Ansari's defense

14  because I was in the office, when Dr. Ansari was handling the breach. To me, Dr. Ansari

15  did an excellent job, given the circumstances that he had to deal with. So, from the end

16  of July until October 1 (when he was transferred to Cyber Security), Dr. Ansari was not

17  allowed to Act. Ms. Lilja asked one of the lower managers to Act instead, Ms. Susan

18  Moore (White, American born, Director of Telecommunications Policy Program Division

19  for TSO). If Ms. Moore was not available, then one of the other lower managers would

20  Act, but not Dr. Ansari. To me, that did not make sense because Dr. Ansari was Ms.

21  Lilja's Deputy and she did not want him to Act. It was especially strange, because Dr.

22  Ansari was in the office most of the times and so he must have felt very uneasy and

23  humiliated as Deputy.

Initials _____ Page 5 of 21

1    However, this was not the first time that Dr. Ansari was not allowed to Act on Ms. Lilja's

2    behalf. I remember an occasion several months prior, maybe February, 2005, Dr. Ansari,

3    Ms. Lilja, and Ms. Kathleen Rundle (Associate Chief Information Officer, ACIO, for

4    National Information Technology Center, NITC in OCIO) were to have a meeting. It

5    turned out that Ms. Lilja could not make it to the meeting. I said "then I should still have

6    Hesh meet with Kathleen, right?" Ms. Lilja said "no, cancel the meeting. Don't ever let

7    Hesh meet with Kathleen alone. Whatever you do, do not let them meet together without

8    me". Again, I thought that was really strange. Dr. Ansari was Ms. Lilja's Deputy and yet

9    she would not let him meet with her peer, Ms. Rundle? It did not make any sense.

10

11    Acting at the Monday morning OCIO staff meetings (at 0900 hours every Monday) was

12    part of Dr. Ansari's job as Deputy. I would say at the end of July of 2005, after the UTN

13    incident, Ms. Lilja stopped letting Dr. Ansari Act for her even at the staff meetings. Part

14    of my job was to inform the rest of management who would be Acting when Ms. Lilja

15    was not in the office. Therefore, when Ms. Lilja would call into the office in the

16    mornings and say that she was running late, or if she could not make it to the office that

17    day, I would reaffirm with her that Dr. Ansari should go to the staff meeting for her.

18    Then by telephone, Ms Lilja would normally brief Dr. Ansari on what she wanted him to

19    cover and what not to mention in the staff meeting. However, during the end of

20    July/early August 2005 things started changing. I would ask her and she told me that she

21    did not want Dr. Ansari to Act any more at the staff meetings because according to her

22    "he talks too much." I heard this about Dr. Ansari from Ms. Lilja on several occasions

23    that Dr. Ansari "talks too much" at staff meetings.



Initials _____    Page 6 of 21                000266

1    One particular example of Ms. Lilja's feeling regarding Dr. Ansari's Acting for her when

2    she was out of the office happened in September of 2005 (see Attachment #1). I thought

3    the incident to be so strange, that I emailed a note back to myself to document it.

4

5    **Recent Times:**

6    I have noticed in recent times, since Mr. John Donovan (White, American born) replaced

7    Dr. Ansari as Deputy ACIO for TSO, Ms. Lilja has been out of the office more, taking

8    more time off and she is appointing Mr. Donovan to Act for her. I know this because it is

9    part of my job working for the CIO to inform the Management as to who is Acting when

10    any of the ACIOs or other managers are out of the office. That Ms. Lilja is taking more

11    time off and is having Mr. Donovan Act for her, shows me that Ms. Lilja trusts Mr.

12    Donovan and that she did not trust Dr. Ansari and discriminated against Dr. Ansari. Ms.

13    Lilja even allowed Mr. Donovan to Act for her when he was out of the office working

14    from home one day. The question I have to ask is why did Ms. Lilja discriminate against

15    Dr. Ansari?

16

17    **Claim No 2:  You were no longer authorized to attend OCIO meetings or engage in**

18    **conversation with the Chief Information Officer or Deputy**

19

20    I will restate some of what I wrote for Claim No. 1:

21

22    It was Dr. Ansari's duty as Deputy ACIO to attend the Monday morning OCIO staff meetings

23    (0900 hours) when Ms. Lilja was away from the office and unable to attend. I would say in



1    the end of July 2005, Ms. Lilja stopped letting Dr. Ansari attend the staff meetings, in her

2    stead. Part of my job was to inform the rest of management who would be Acting when Ms.

3    Lilja was not in the office. Therefore, when Ms. Lilja would call in in the mornings and say

4    that she was running late, or if she could not make it to the office that day, I would reaffirm

5    with her that Dr. Ansari should go to the staff meeting for her. Then by telephone, Ms Lilja

6    would normally brief Dr. Ansari on what she wanted him to cover and what not to mention in

7    the staff meeting. During the end of July (or early August) 2005, things started changing. I

8    would ask her and she told me that she did not want Dr. Ansari to attend the staff meetings

9    any more because according to her "he talks too much". I heard this about Dr. Ansari from

10   Ms. Lilja on several occasions that Dr. Ansari "talks too much" at the staff meetings.

11

12   In or around February, 2005, Dr. Ansari, Ms. Lilja, and Ms. Kathleen Rundle were to

13   have a meeting. It turned out that Ms. Lilja could not make it to the meeting. I said "then

14   I should still have Hesh meet with Kathleen, right?" Ms. Lilja said "no, cancel the

15   meeting. Don't ever let Hesh meet with Kathleen (Associate Chief Information Officer,

16   ACIO, of National Information Technology Center, NITC.) alone. Whatever you do, do

17   not let them meet together without me". Again, I thought that was really strange. Dr.

18   Ansari was her Deputy and yet she would not let him meet with her peer, Ms. Kathleen

19   Rundle? It did not make any sense.

20

21   I observed that Dr. Ansari was not allowed to send emails or to correspond to the CIO,

22   Mr. Scott Charbo (and later Mr. Dave Combs), or the Deputy CIO (Mr. Ira Hobbs, Mr.

23   Dave Combs, and later Mr. Jerry Williams). As part of the chain of command, that could



1  definitely be expected, however, Dr. Ansari was expected to 'CC' Ms. Lilja on ANY and

2  ALL emails that he sent to Ms. Lilja's peers, the ACIOs, the CIO, or the Deputy CIO.

3  This was a definite form of discrimination. It was disturbing to see a man with Dr.

4  Ansari's leadership abilities, his exemplary military background, numerous awards for

5  distinguished leadership, and his people skills, to not be able to make almost any

6  decisions on his own.

7

8  I remember a particular instance (late 2004) where Dr. Ansari asked me out of

9  desperation what he should do. The then CIO Scott Charbo, was sending Dr. Ansari

10  emails directly, asking him questions and drawing on Dr. Ansari's knowledge about the

11  security operations. Dr. Ansari would email Mr. Charbo back with an answer and 'CC'

12  Ms. Lilja on it. At one point, Mr. Charbo responded in an email to Dr. Ansari: 'whose

13  name do you see on the emails that I am sending to you? Please only respond back to

14  those who are on the email.' What Mr. Charbo was saying was, if Ms. Lilja is not CC'ed

15  in the original email, then please do not 'CC' her in your response back to me. Dr. Ansari

16  said that he felt at odds because he knew what a big deal Ms. Lilja would make if she

17  found out that Dr. Ansari was communicating directly, and not through Ms. Lilja, to the

18  CIO, but on the other hand, Mr. Charbo was telling Dr. Ansari not to include Ms. Lilja in

19  the emails. Ms. Lilja seemed to intimidate Dr. Ansari because she portrayed an image of

20  not trusting Dr. Ansari. Dr. Ansari confided in me in this particular instance, because he

21  was really unsure of what he should do. In this example, I see three things: Ms. Lilja's

22  oppression and distrust of Dr. Ansari; upper management's trust in Dr. Ansari's

23  authority/abilities/knowledge; and the possible distrust of Ms. Lilja by the CIO, since he



1  felt it better to go directly to Dr. Ansari for answers, purposely not including Dr. Ansari's

2  boss, Ms. Lilja.

3

4  I observed that Ms. Lilja gave Dr. Ansari very little freedom in making decisions. Dr.

5  Ansari not only had very little authority to make decisions on his own regarding his field

6  of expertise, computer security, but he was given no authority to manage any of TSO's

7  Division managers. They all reported directly to Ms. Lilja. Dr. Ansari, as Deputy ACIO

8  of Telecommunications, should have been able to lead the Division Managers and me,

9  who were all under him and under Ms. Lilja, but Ms. Lilja would not allow it.

10

11  This lack of authority that Dr. Ansari had caused a problem during the UTN incident when

12  Ms. Lilja was on vacation (end of July, 2005).

13

14  **Claim No. three:  On October 1, 2005, management reassigned you from your OCIO**

15  **position as Deputy Associate Chief Information Officer to the Cyber Security Office to**

16  **manage security operations**

17

18  To me, it seemed as though Dr. Ansari was moved to Cyber Security against his will. I

19  say this because he openly expressed himself that he did not wish to be moved. When

20  management started talking about moving him, he seemed to be very distraught about it.

21  He seemed to be worried; I overheard him talking with the other Security staff, Mr.

22  Kelvin Fairfax, Mr. Craig Chase, Mr. Dave Williams, and Mr. Karl Hill saying that they

23  were not giving him a job description (PD), and based upon my knowledge, they were not

Initials _____  Page 10 of 21          000270



1   giving him enough details as to what he would be responsible for. They also were not

2   going to give him the title of Deputy, but they were downgrading his title to: Director.

3

4   After his transfer to Cyber Security, now working as a director, Dr. Ansari was one rank

5   below Deputy ACIO, because the Director reports to the Deputy ACIO. So, for example,

6   the person who replaced Dr. Ansari in Cyber Security is Mr. Bryce Eckland. Recently,

7   when I was introduced to Mr. Bryce Eckland by Mr. Lynn Allen (ACIO of Cyber

8   Security), Mr. Allen said to me, "Bryce is the one who replaced Hesh". Since Mr. Lynn

9   Allen is the ACIO, and Ms. Mary Heard is the Deputy ACIO, then Mr. Bryce Eckland as

10  the Director, is third in rank. Whereas, when Dr. Ansari worked in TSO, he was the

11  second down from the top (Ms. Lilja was the ACIO, and Dr. Ansari was the Deputy

12  ACIO-second in ranking). Therefore, when Dr. Ansari was transferred to Cyber Security,

13  it was definitely a downgrade, in ranking, responsibilities, AND title. This is very clearly

14  a downgrade.

15

16  Another thing that I noticed that bothered me was that when Dr. Ansari was moved over

17  to Cyber Security, it was done very quietly, like the whole thing was something to be

18  ashamed of, not something to be proud of. It is normal practice in OCIO that when

19  someone is moved into a better position or at least an equal one, they are given a party or

20  are congratulated by others and people make a big deal about it. In Dr. Ansari's case, it

21  was very hush-hush. There were no congratulating emails or announcements. I felt this

22  to be very strange and an uncommon practice in OCIO.

23

1  It is also common practice in OCIO for management to give a party when someone leaves

2  the Agency. Usually, we have the party in the OCIO conference room in the Fourth Floor

3  and they are presented with a plaque and a cake, and everyone says congratulations to

4  them and thank you for a job well done. In Dr. Ansari's case, there was no party given by

5  management, when he was leaving USDA to go to the Department of Transportation

6  (DOT). The only reason that we had a party for him, is because I kept getting telephone

7  calls from Dr. Ansari's friends and colleagues at the USDA wondering when we were

8  going to have his going away party. I told them that currently, I had not heard that

9  management was planning anything for him.

10

11  Finally, two days before he was supposed to leave, since none of the managers at the

12  USDA had planned a party, I put together something last minute for him at a local

13  restaurant. But, if I had not put anything together for him, Dr. Ansari would have left the

14  USDA without any acknowledgement from Ms. Lilja or the rest of the OCIO

15  management team. Considering his three years in serving the USDA, and some of the

16  successful projects that he led during that time for OCIO, that would have been very sad.

17

18  **Claim No. Four: On October 1, 2005, you received a performance rating of fully**

19  **successful for fiscal year 2005. Please provide any information or knowledge you**

20  **have relating to the reason Dr. Ansari was rated as fully successful in 2005.**

21

22  Part of my job in TSO was to file personnel records of the TSO staff. Ms. Lilja asked me

23  to make a copy of all of the Performance Plans and Appraisals that she had done, and so

1    in making the copies, I saw what all of her managers got on their performance appraisals.

2    When I saw that she had given Dr. Ansari, not only the lowest score, but also, she docked

3    him in the LEADERSHIP category, I was shocked. Ms. Lilja had given all of her staff,

4    including me, higher ratings than her own Deputy. It was preposterous to see that she had

5    given Dr. Ansari the lowest category in the LEADERSHIP category because he was

6    recognized across the board as one of the best leaders in OCIO, and was well respected by

7    the employees in TSO as an excellent leader.

8

9    I am passionate about this issue because I had witnessed many of the TSO staff coming to

10    Dr. Ansari for Leadership guidance throughout my two years working in TSO. I

11    witnessed: Mr. Boris DeSousa, Mr. Stuart Adler, Mr. Rajiv Sharma, Ms. Teresa Kelly-

12    Reid, Mr. Roy Allums (all under Ms. Susan Moore's group), Mr. Jim Cole, Ms. Teresa

13    Kelly-Reid-after her transfer, Mr. Cyrus Karimian (on Ms. Vernelle Archer's team), Ms.

14    Meria Whitedove, Mr. Dave Williams, Mr. Karl Hill, Mr. Ron Lester, Mr. Gordon

15    Durflinger (Fort Collins' group-out with Mr. Mike Thomas), Ms. Vernelle Archer,

16    herself, Ms. Karen Whiting-Diggs, Mr. Fred Goings, all coming to Dr. Ansari's office for

17    Leadership help/advice. These visits were seldom on the calendar, but they would come

18    freely and close the door and talk to Dr. Ansari. After a few of the visits, Dr. Ansari

19    commented to me that he was giving them the support that their managers could not give

20    them.

21

22    I also observed that Ms. Susan Moore had such problems with leading her team that she

23    was sent to a leadership training class. These leadership problems of Ms. Lilja's lower

Initials _____ Page 13 of 21          000273



1    managers (Ms. Susan Moore, Mr. Mike Thomas, and Ms. Vernelle Archer) were common

2    knowledge throughout TSO.  These problems were brought to Ms. Lilja's attention on

3    many occasions, Ex: Ms. Meria Whitedove (under Mr. Mike Thomas) was intimidating

4    Mr. Dave Williams and Mr. Karl Hill.  Ms. Lilja knew about this because Dr. Ansari, Ms.

5    Lilja, and I discussed this situation freely in the office.  Dr. Ansari also told me that he

6    did inform Ms. Lilja about the leadership/management problems of her three managers to

7    make sure that she was aware of them, but it seemed as though nothing changed, because

8    the lower staff members were still talking to me about these issues up until I left TSO in

9    April of 2006.

10

11    These employees under the three managers were under such duress from the treatment of

12    the three managers (Ms. Susan Moore, Mr. Mike Thomas, Ms. Vernelle Archer) that they

13    would talk to me on the telephone to get moral support when they called the office.  One

14    of the employees, Caroline Glenn, confided in me that things were so bad under Mike

15    Thomas' leadership that she was taking prescription drugs to calm her nerves.  Under Ms.

16    Susan Moore's leadership, three of her staff confided in me that Ms. Moore would not

17    "allow" them to come down to the headquarter offices to participate in the many events

18    that OCIO put on, such as going away parties for OCIO employees, or CFC fundraisers.  I

19    was told by two of Ms. Vernelle Archer's  staff that she treated them differently

20    depending on the day and that she could hold grudges and would give them the silent

21    treatment.

22

1   During my Performance Review with Ms. Lilja, I told Ms. Lilja, that I was tired of Ms.

2   Lilja's staff approaching me regarding these leadership problems that they had with their

3   managers (Ms. Susan Moore, Mr. Mike Thomas, Ms. Vernelle Archer).  I implored Ms.

4   Lilja to do something about the poor leadership and controlling management style that

5   these three managers were demonstrating towards their staff.  I told her that when her

6   staff called so upset, it was taking up my own work time to talk to them and to give them

7   moral support.

8

9   Ms. Lilja's response to me was that everything that I was telling her was hearsay, and that

10   if her lower staff had problems with one of her three managers (Ms. Susan Moore, Mr.

11   Mike Thomas, Ms. Vernelle Archer), then they would have to contact her directly.  I told

12   Ms. Lilja that they would not come to Ms. Lilja directly because they were afraid of the

13   repercussions they might face for coming forward; that they were afraid that Ms. Lilja

14   would tell one of the three managers and then the treatment from these three managers

15   towards them would get worse.  I also told Ms. Lilja that I highly doubted that anyone

16   would come to her with their problems because they, in my opinion, were intimidated by

17   Ms. Lilja.  Ms. Lilja responded that she could not do anything; that until someone told her

18   of these problems directly, she could do nothing about it.  She suggested that the next

19   time someone started complaining about unfair treatment from one of the three managers

20   to me on the telephone, for me to tell them to contact her directly (which I did do from

21   that time forward).

22

23



**UTN Incident (July 23-July 27, 2005):**

2  It seemed to me that the UTN Incident (July 23-July 27, 2005) had some sort of effect on

3  the way that Ms. Lilja was treating Dr. Ansari because after Ms. Lilja returned from her

4  vacation, she started treating him worse, than before.  When Dr. Ansari was in the session

5  with Ms. Lilja going over his Performance Appraisal, I heard him say a little loudly "It

6  was one week, Jan".  When he came out from behind closed doors, I could tell from his

7  demeanor that he was probably given a bad rating (but I never thought as low as Fully

8  Successful, I thought he might have gotten Superior).  I think that the "one week" that I

9  heard Dr. Ansari say, was probably the last week in July, with the UTN incident.

10

11  I was in the office during that week in July, and what I observed was that Dr. Ansari

12  alerted management (Mr. Dave Combs, CIO, and Mr. Jerry Williams, Deputy CIO) that

13  the firewalls were down and from my understanding that meant that people could access

14  prohibited websites (gambling, pornography, etc.), and that the USDA network was open

15  to possible security attacks.  I, myself, wanted to test this, so I logged onto the Playboy

16  Website, and was successful in doing so.  (For the next several days, I continued to try to

17  log in to the Playboy Website, as a test to see if USDA was still vulnerable, and I was

18  successful at logging on for at least a week's time, if not more.)

19

20  I observed during that week that Dr. Ansari was making telephone calls, sending emails,

21  having conference calls with his team to fix the UTN vulnerability problem.  It seemed as

22  though Dr. Ansari's hands were tied when trying to fix the UTN problem.  I think that he

23  knew what had to be done and did everything he could, but he was not given the authority





1   to make decisions as Deputy ACIO. I could see that Dr. Ansari was frustrated and he

2   confided in me that Mr. Jerry Williams even asked him "Who is the Deputy, Hesh?" Dr.

3   Ansari had to go through Mr. Mike Thomas; Mr. Mike Thomas was making decisions

4   and in that, had more authority than Dr. Ansari, because that is the way that Ms. Lilja had

5   things running in TSO. Dr. Ansari was the Deputy ACIO and was even appointed as

6   Acting on Ms. Lilja's behalf while she was away that week, and therefore, Dr. Ansari

7   should have been able to make the decisions to fix the problem, however, I observed that

8   Mr. Mike Thomas would not follow orders from Dr. Ansari. In overhearing telephone

9   conversations with staff members and conversations with the TSO team during that week,

10   it seemed as though Mr. Thomas would not do anything without Ms. Lilja's permission.

11

12   Mr. Mike Thomas seemingly downplayed the importance of the security breach with an

13   apparent attitude that everything was under control, and that this breach was not as big a

14   deal as Dr Ansari was making out of it. Dr. Ansari confided in me that in order to show

15   the CIO and Deputy CIO, that indeed, this was a serious issue (contrary to what Mr.

16   Thomas seemed to be advising them), he asked them to log onto the Playboy Website,

17   which I am told that they did, and they were very upset that they could get onto the site. I

18   can only tell you what I observed in those few days and I do not know all the details, but

19   if there was any confusion while Ms. Lilja was on vacation and the UTN incident

20   occurred, it had nothing to do with Dr. Ansari's leadership ability, it was because, he had

21   never been given real authority as a Deputy by Ms. Jan Lilja.

22

23



1  In analyzing the point of this claim (Claim Number Four), I conclude that by giving Dr.

2  Ansari a Fully Successful on his Performance Appraisal (which was a lower rating than

3  Ms. Lilja's other managers and even myself), Ms. Lilja discriminated against Dr. Ansari.

4  In particular, docking him in the LEADERSHIP category (in my opinion, his strongest

5  attribute), I feel that Ms. Lilja treated Dr. Ansari unequally in comparison with her lower

6  three managers.  Upon request, I can give specific treatment examples of each of her three

7  managers' poor management/leadership.

8

9  If you ask almost anyone in TSO, in OCIO, in the USDA, and other colleagues outside of

10 the USDA about Dr. Ansari's Leadership and team building skills, they will tell you that

11 he was an excellent Leader, technically sound, always had a positive attitude, and lifted

12 up his team.

13 In his current job at DOT, I heard that he is managing 102 staff, and just recently was

14 awarded special recognition (see Attachment #2).  To me, that shows that he does not

15 have a problem in the Leadership category.  It seems as though it was an issue only to Ms.

16 Lilja.

17

18 **Claim No five:  Never received Quality Step Increase:**

19

20 Please state whether you have any knowledge of this claim.  To your knowledge, did Ms

21 Lilja give anyone else a Quality Step Increase?  If yes, whom?  What age, religion, and

22 country of origin?

23

Initials _____ Page 18 of 21            000278



1    As far as I know, Dr. Ansari did not receive a Quality Step Increase (QSI), at least for his

2    performance in FY 2005. By my understanding in OCIO, to receive a QSI, one needs to

3    have an Outstanding Rating in their Performance Appraisal. What I do know is that Dr.

4    Ansari was given the lowest rating of all of Ms. Lilja's staff lower than any other of the

5    other managers that were below him, which was very odd because he is highly respected

6    for his technical skill and his leadership among staff and management.

7

8    **Final Statement:**

9    There are two other occurrences that I observed, while working at TSO, that I found to be

10    peculiar:

11    1) Dr. Ansari had applied to a job in OCIO and it just so happened that Ms. Lilja was

12    appointed to be on the panel that was selecting for the position. I observed that Ms. Lilja

13    voted against Dr. Ansari for the job. I knew that because Ms. Lilja came back from

14    sitting on the panel and said to Dr. Ansari and me, "Hesh, there were a lot of REALLY

15    qualified candidates. I think your application was way too long. It was like THIS thick

16    (as she held her index finger two inches away from her thumb). You really need to

17    change it and make it only a few pages long. Everyone else's was shorter." Anyway, I

18    could tell right away from those comments that she voted against Dr. Ansari for the job.

19    If she would have voted FOR Dr. Ansari, she would have said something like "Hesh, I

20    did all that I could on the panel to fight for you, but the others wanted to choose one of

21    the other candidates. I'm sorry".

22

23

Initials _____ Page 19 of 21          



1    2) The other thing that was strange was that management was somehow asking Dr. Ansari

2    to lie. My desk was located in the middle, between the two offices, Ms Lilja's and Dr.

3    Ansari's office. One day (early July, 2005) following a closed-door meeting between Ms.

4    Lilja and Dr. Ansari in Ms. Lilja's office, the meeting ended and the door opened. Dr.

5    Ansari walked out and passed by my desk and I heard him say quietly as he passed by my

6    desk, "I am not going to lie". He was clearly upset; and walked into his office. About 30

7    seconds later he came back out and said to me, "Adrienne, they want me to lie. I'm not

8    going to lie. I'm going to tell the truth." I didn't ask for the details of what he was

9    talking about and Dr. Ansari did not give any, but that is what he said. Then he left the

10   office, very upset.

11

12   In closing, in my observations during the two years working in TSO with Ms. Lilja, and

13   Dr. Ansari, I definitely feel that Dr. Ansari was discriminated against by Ms. Lilja. This

14   is not surprising to me, because it is not the first time that I have seen discrimination by

15   Ms. Lilja in TSO. Ms. Lilja, it seemed, has discriminated against other minorities, Ms.

16   Teresa Kelly-Reid, Ms. Karen Whiting Diggs, and Ms. Vernelle Archer. I do not know

17   the details, but I have seen it, and was told by them that they felt discriminated against by

18   Ms. Lilja

19

20   Thank you for taking the time to read my statement. I feel very passionate about this

21   case, because Dr. Ansari was the reason that I decided to apply for and accept the position

22   in TSO. When I worked directly with Mr. Charbo, the then CIO of OCIO, in the Front

23   Office of OCIO (January 2003 to January 2004), I would sometimes encounter Dr. Ansari

Initials _____ Page 20 of 21                    000230



1   in the hallways.  He was one of the few people in OCIO that would say "Good Morning"

2   or "Good Afternoon".  He was always happily whistling as he was walking through the

3   hallways.  It was nice to see someone with a positive happy attitude.  I only ever came

4   across him in the hallways at that time, but I thought that it might be nice to work with

5   someone who was pleasant to be around, so I accepted the position as the Secretary in

6   TSO.

7

8   I have reviewed this statement, which consists of 21 pages, and I hereby solemnly swear

9   that it is true and complete to the best of my knowledge and belief.  I understand that the

10  information I have given will not be held confidential and may be shown to the interested

11  parties as well as made a permanent part of the record of investigation.

12

13  _Adrienne Bowman_                         7/8/06

14  (Signature of Deponent)

                                              (Date)

15

16  Signed before me at:  _10532 Jayriton Drive_

17  _Upper Marlboro, MD_

18  On this __8th__ day of July, 2006

19

20  _Nadine Jenkin_

21  (Signature of Witness)

22

Initials _AB_    Page 21 of 21          000281



### Sallie Jenkins

**From:** <Adrienne.Bowman@usda.gov>
**To:** <Adrienne.Bowman@usda.gov>; <Sallie.Jenkins@worldnet.att.net>
**Sent:** Saturday, July 08, 2006 12:40 PM
**Subject:** Attachment #1: Acting Acio

Hi Sallie,

This is attachment # 1.  Please print out.

Thanks

Adrienne

---------------------------------------------------------

Attachment #1:

———

From: Bowman, Adrienne
Sent: Wednesday, September 14, 2005 1:02 PM
To: Bowman, Adrienne
Subject: Acting Acio

I wanted to document this because I thought it was a little strange:

This morning when Jan came into the office, I gave her Hesh's request for leave slip and let her know that Hesh was reqesting this Friday off.  She said that that's not good because she also needed to take this Friday off (both Jan and Hesh really try to arrange it so that one of them is here to cover if the other takes off).  Then she was taken aback and said oh, well I guess that is ok, because he can't Act anyway. I made the comment, "oh, because of the transfer to Cyber Security?".  She abruptly said "no" and I got the feeling that it was none of my business, so I said "ok, oops" and didn't say anything.  Then as she was walking towards her desk she said, "no, it's because of what happened the last time I was out of the office".

I said "oops, oh" because it was really none of my business.

Anyway, I wanted to document that because that seemed a little weird.

000282

7/10/2006

**ATTACHMENT**



Hi Adrienne:
I received this email from Hesh on the awards he received while at DOT.
I wanted to pass it on to you.

Go Hesh!

___

From: Heshmat.Ansari@dot.gov [mailto:Heshmat.Ansari@dot.gov]
Sent: Wednesday, June 28, 2006 9:26 AM
To: Chase, Craig - Washington, DC
Subject: FY 06 Information Assurance Excellence Awards - Notifications

 Craig

Just less than 6 month working in the DOT, as Director of IT Development
and Modernization, my security team won three awards of Excellence for
Security Awareness, eAuthentication initiative as a front runner for the
DOT, and my Security Team Leader (William Few) received Secretary Award
of Excellence.  This is what I am talking........................I
thought to share this good news with you.

Hesh

 -----Original Message-----
From: Loranger, Phillip <OST>
Sent: Wednesday, June 21, 2006 9:20 AM
To: Ansari, Heshmat <FMCSA>
Cc: Ash, Darren <OST>; Harrell, Jim <OST>; Kelley, Carol <OST>
Subject: FY 06 Information Assurance Excellence Awards - Notifications

Congratulations

This e-mail is provided to advise you that your organization or a member
of your organization has been nominated and approved for an award in
Information Assurance Excellence for FY06.  The award will be presented
by the DOT CIO, Dan Mintz during the executive session of the DOT
IA/Privacy Awareness week, on 27 June 2006 at 0920 in room 2301.  Please
notify me or Jim Harrell if the following personnel will not be able to
be present:

Your lead for the IT security Team for E Authentication

Your lead for the IT Security team for Agency Wide Awareness

William Few

ATTACHMENT

Phillip (Phill) Loranger
Deputy Associate CIO for IT Investment
Deputy Chief Information Security Officer
Office 202-366-5636
Cell 571-237-8227

000284

1          ## Witness AFFIDAVIT

2

3    I, Karen S. Sifford, am an employee of the U.S. Department of Agriculture, Office of

4    Inspector General (OIG), located in Kansas City Missouri, in the capacity of Senior

5    Information technology Specialist, GS-2210-13. My telephone number during

6    working hours is: (816) 823-3886.

7    ## I HAVE BEEN ADVISED OF THE FOLLOWING:

8    I am required by Federal regulations and Department of Agriculture policy to
9    cooperate fully and promptly with the investigator who has been assigned to conduct
10   a thorough and impartial investigation into a complaint of discrimination against the
11   Department of Agriculture. I must provide a statement for the investigative report
12   which is true and complete to the best of my knowledge and which discloses all of my
13   first hand knowledge having a bearing on the merits of the complaint. My statement,
14   is provided under oath (or affirmation), without a pledge of confidentiality, in
15   accordance with Equal Employment Opportunity Commission rules and regulations
16   and Department of Agriculture policy. This means that any employee(s) whom I
17   accuse of discrimination or other acts of impropriety may be shown relevant portions
18   of this statement and be given an opportunity to respond for the record. In addition,
19   the complainant and the appropriate Departmental officials involved in the EEO
20   complaint process will receive the entire investigative file. I have the right to review
21   my statement prior to signing it and may make initialized corrections if it is
22   incomplete or inaccurate. I have the right to receive a copy of the signed statement.
23

24   Having been advised of the above information about my role as a witness in the

25   investigative process, I solemnly affirm that the statement, which follows, is true and

26   complete to the best of my knowledge and belief, and addresses the concerns raised

27   with me by the investigator.

28   The investigator has informed me that the accepted claim(s) in this complaint are:

29   Whether since August 3, 2005; and continuing, the agency subjected Heshmat Ansari
30   to Discrimination and harassment (non sexual) based on age (D.O.B. 8/7/52), religion
31   (Muslim), and national origin (Iranian), when:
32

33       1.  Allegedly, his supervisor informed him that he could no longer act on her
34           behalf when she was out of the office;

Initials _____                                    Page 1 of 13

2. He was no longer authorized to attend OCIO meetings or engage in conversation with the Chief Information Officer or Deputy;

3. On October 1, 2005, management reassigned him from his OCIO position as Deputy Associate Chief Information Officer to the Cyber security office to manage security operations;

4. On October 32, 2005, he received a performance rating of Fully Successful, for fiscal year 2005; and

5. He was denied quality step increases.

My full name is Karen S. Sifford. My position title and grade is: Senior Information Technology Specialist, GS-13. I make the following statement freely and voluntarily to Sallie Jenkins who has identified herself to me as an EEO Investigator, Janver, Inc. assigned by the US Department of Agriculture to perform this investigation, knowing that this statement may be used in evidence.

I am currently employed by the U S Department of Agriculture; Office of the Inspector General, Kansas City, Missouri. I have been in my current position as Senior Information Technology Specialist for 6 years. I have no organizational relationship to (complainant) Heshmat Ansari. My age is 49 years (DOB: 2/21/57). My religion is Christian. My country of origin is: United States of America.

I am not aware that Mr. Ansari has a physical disability. However, he told me that due to the amount of stress he was under he suffered with a re-occurrence of seizures. He told me this during the end of July 2005 and again on August 5, 2005. I did not observe either of them.

**Claim No. 1: Your supervisor informed you that you could no longer act on her behalf when she was out of the office**

Initials _____

1

2      I am not aware of what Mr. Ansari was told by his supervisor but I know that

3  Ms Lilja and Mike Thomas did not want Mr. Ansari to talk with anyone at AT&T or

4  the CCOPS contractors who were responsible for the Department's new backbone

5  (Universal Telecommunications Network), which included testing of the network to

6  ensure intrusion detection and other system security controls were properly

7  implemented. Mr. Ansari stated that he felt the reason they did not want Mr. Ansari

8  to talk with them was because the implementation was not going well and they didn't

9  want Mr. Ansari talking with OIG about the problems. I was in Washington, DC on

10  July 25 and 26, 2005, and was made aware of some of the deficiencies by Craig Chase

11  and Barry Wasser. On August 21, 2005, I was made aware that "there appears to be a

12  growing attempt to blame the AT&T security failures on Karl Hill, Dave Williams,

13  and Hesh Ansari ..." (page 7)

14  **Claim No 2: You were no longer authorized to attend OCIO meetings or engage**
15  **in conversation with the Chief Information Officer or Deputy**
16

17  I am not familiar with this claim. However, the Universal Telecommunications

18  Network (UTN) was not working well, and Mr. Ansari was responsible for security

19  operations; therefore, Mr. Anasri was the logical person for me to talk to regarding

20  security controls on the UTN and how the OCIO was meeting the reporting

21  requirements of the Federal Information Security Management Act (FISMA) since

22  Mr. Ansari was the Deputy of Security Operations during the development and

Initials

1   implementation of the UTN.  Mr. Ansari told me that he could not talk with me about

2   these problems in his office; he would go outside and call me from his cell phone so

3   he would not be overheard. Ms Lilja was always present when I talked with Mr.

4   Ansari in meetings.  I never attended a meeting when Mr. Ansari was acting for Ms

5   Lilja.

6   **Claim No. three:  On October 1, 2005, management reassigned you from your**
7   **OCIO position as Deputy Associate Chief Information Officer to the Cyber**
8   **Security Office to manage security operations**
9

10       I know that Mr. Ansari was moved to Cyber Security but I am not aware of

11   the specifics.  I am attaching an email (page 13) from Mr. Ansari stating that he "lost

12   his creditability with management" I felt that Ms. Jan Lilja and Mr. Mike Thomas

13   did not respect the amount of knowledge Mr. Ansari has with the UTN system

14   archecture.  For example, during a meeting in July or August 2005, Mr. Ansari was

15   talking and Ms Lilja would cut him off and not allow him to participate fully in the

16   meeting. However, Mike Thomas was allowed to talk freely. I don't know the reason

17   why Mr. Ansasri was not allowed to talk freely during the meeting.

18       I was conducting the Federal Information Security Management Act (FISMA)

19   review and one of my objectives was to determine how many intrusions were

20   occurring in the network and how the intrusions were being reported to

21   management for corrective action and inclusion in the FISMA report.  Mr. Mike

22   Thomas and Ms. Jan Lilja did not readily have this information available.  After my

23   inquiries, Mike and Jan started working with AT&T and CC-OPS to obtain.  Mr.

Initials _____

00232

Page 4 of 13

1  Ansari and his security team were aware of the FISMA requirements and were very

2  concerned because the requirements had not been included in the development and

3  implementation of UTN, to ensure security reporting requirements for FISMA

4  requirements were met.

5  Cyber security was part of Mr. Ansari's job. I would see the move from

6  Deputy to supervisor in Cyber security, as a downgrade because his level of

7  responsibility was changed to less than it was as Deputy. I believe Mr. Ansari's

8  level of integrity was a factor considered in the move. I believe Mr. Ansari and his

9  staffs were knowledgeable of the Department's backbone and the UTN architecture,

10  but were not allowed to get involved with the day-to-day activities of the UTN.

11  (pages 7-13.)

12  **Claim No. Four: On October 1, 2005, you received a performance rating of fully**
13  **successful for fiscal year 2005.**
14

15  I have no knowledge of this claim.

16  **Claim No five:  Never received Quality Step Increase:**

17  I have no knowledge of this claim. However, in the OIG we do not get

18  Quality Step Increases, we get performance awards.

19  I have reviewed this statement, which consists of six pages and 7 pages of

20  email attachments, and I hereby solemnly affirm that it is true and complete to the

21  best of my knowledge and belief. I understand that the information I have given

22  will not be held confidential and may be shown to the interested parties as well as

23  made a permanent part of the record of investigation.

Initials _____

1

2    _____    6/28/2006

3    (Signature of Deponent)                              (Date )

4

5    Signed before me at: USDA, Kansas City Missouri

6

7    On this _____ day of June, 2006

8

9    _____

10    Signature of Investigator/Witness

11

12

Initials

**From:**   Karl Hill
**To:**     Karen SIFFORD
**Date:**   8/21/2005 2:41:49 PM
**Subject:**  FW: Meeting I had with Jan and action items acquired

Karen,
Hesh suggested I make you aware of this. There appears to be a growing
attempt to blame the AT&T security failures on myself, Hesh and Dave as
opposed to admitting any wrong doing on their (Jan and Mike) part.
// Karl


--

<EOF>
================================================
::[ RFC 2795 ]::
Karl Hill    | IT Security Specialist
970.295.5293 | USDA - OCIO
"...firewalls are speed bumps not brick walls."
fingerprint: 836C FC80 73B6 B6C4 3855  CDF3 AF00 A305 0D24 69E9


------ Forwarded Message
From: "Ansari, Heshmat" <Heshmat.Ansari@USDA.gov>
Date: Sun, 21 Aug 2005 10:35:59 -0600
To: "Hill, Karl" <Karl.Hill@usda.gov>
Subject: Re: Meeting I had with Jan and action items acquired

karl,

you should forward your email to Karen at OIG.  They need to know what you
said.

Hesh

--- Original Message ---
From: "Hill, Karl" <Karl.Hill@usda.gov>
Sent: Sat 8/20/2005 9:40 pm
To: "Ansari, Heshmat" <Heshmat.Ansari@USDA.gov>
Cc: "Williams, Dave" <Dave.Williams@USDA.GOV>
Subject: Meeting I had with Jan and action items acquired

Hesh,

As I said, I had a meeting with Jan, Mike, Pam and for a bit some CC-OPS
people (Dave Hoisch, etc.). During this meeting Jan made a few things clear,
that she believes it was Thorne and Bill Hadesty's fault for not involving
us in the UTN security design and that she believes the failure of UTN is
out fault for not trying hard enough.

During the teleconference she told me that she wanted Dave and I to log into
the UTN IDS web interface to review events. I pointed out to Jan that more
than 3 years ago it was recognized that Dave and I had too much work to do
and be IDS analyzers which is why we have an IDS monitoring contract. Also,

I pointed out that why are we paying AT&T and CC-OPS for IDS if she expects Dave and I to manually look through the log ourselves. It was clear that in her mind NTSO/CC-OPS/AT&T is not at fault. In her mind we are being provided all the information we need, but we're not willing to use it appropriately.

I received 3 action items from Jan:

1) Talk with AT&T (through Pam Weber) and work with them (through Pam) to "tune" the IDS signatures. I pointed out this was largely an exercise in futility because we cannot eliminate most signatures due to the sprawling nature of the USDA.

2) Talk with Dave Williams and have him resubmit his proposal to block peer-to-peer software at the firewalls that no one has been interested in applying to this point.

3) Work with AT&T (again through Pam Weber) to help them make an IDS signature to catch the zotob through its IRC command and control component. What are we paying AT&T/CC-OPS for?

It was largely an infuriating meeting because while Jan and Mike were both on the same conference call and could hear one another they would tell me to do opposite things. For example Jan told me to call AT&T and work with them, then Mike would tell me I cannot talk to AT&T, I had to work through his group. Neither Jan nor Mike would comment on what the other was telling me to do despite the fact they were in direct contradiction to one another. I did not leave the meeting with a clear understanding of what I was supposed to do.

It is my opinion Jan and Mike need to talk together and develop a specific guideline for dealing with AT&T and present this to us if they want us to work with AT&T. Otherwise we have conflicting requests and are doomed to failure and to making someone angry because we didn't do what they asked.

Please tell me what, if anything I should follow up with and if you request I spend my time dealing with penetration testing and the UDIDS/WTSS please inform Jan of your directions to me. Thank you.

// Karl

```
--
<EOF>
=================================================
::[ RFC 2795 ]::
Karl Hill    | IT Security Specialist
970.295.5293 | USDA - OCIO
"...firewalls are speed bumps not brick walls."
fingerprint: 836C FC80 73B6 B6C4 3855  CDF3 AF00 A305 0D24 69E9
```

------ End of Forwarded Message



VI.B.039d

**From:**   Karl Hill
**To:**     Karen SIFFORD,Heshmat Ansari,Craig Chase
**Date:**   8/24/2005 3:20:37 PM
**Subject:** Re: Request

In response to some of Jan's comments, I just overheard Truman Harsha on a
conversation with Gary Davis and AT&T and they said that more than 800 ITS
sites were non-functional last week. Jan's claim that the network is stable
is obviously wrong.
// Karl


On 8/24/05 6:50 AM, "SIFFORD, Karen -OIG" <Karen.SIFFORD@usda.gov> wrote:

> OIG management and the FISMA team had an lengthy meeting with Jan and Lynn
(1
> ½
> hours) on August 23, 2005.  I am attaching a copy of Jan's suggested changes
> for your review and a copy of the listing of requests OIG made during the
> meeting (followed by an email with listing attached).
>
> As always, I need assistance in confirming what we were told during the
> meeting.  Please see what you can do about providing me evidence/support for
> the following information.
>
> (1) Firewall rules, preferrable something that show's Jan's approval or
> acceptance, after the deny all rules were finalized as a result of GAO's
Audit
> (2) Firewall rules now...which I thought Dave said he could get
> (3) Confirmation that virus filtering was not in place in the old
> backbone....I'm almost positive that Hadesty put this in place.
> (4) Confirmation that the old firewalls were not stateful packet inspection
>
> I truly appreciate your assistance in obtaining this information or letting
me
> know that you are not able to provide.
>
> Karen
>
>
>
>
>
>
>
>


--

<EOF>
================================================
::[ RFC 2795 ]::
Karl Hill   | IT Security Specialist

9 of 13

970.295.5293 | USDA - OCIO
"...firewalls are speed bumps not brick walls."
fingerprint: 836C FC80 73B6 B6C4 3855  CDF3 AF00 A305 0D24 69E9


CC:        JULIE SIFFORD

10 of 13

**From:**       Karl Hill
**To:**         Karen SIFFORD, STEVEN BRYCE ECKLAND
**Date:**       9/15/2005 12:32:32 AM
**Subject:**    FW: USDA Incidents

I thought you should know about these statistics. I believe Jan told you
that Dragon IDS will be deployed into the UTN Internet gateways (IG's) by
mid-November. Today she mentioned to Hesh that she thought AT&T was getting
up to speed and that perhaps Dragon wasn't needed at the UTN IG's. This is
obviously not true and simply an attempt at damage control regarding AT&T's
poor security controls. I just wanted to make sure that we would be living
up to OIG's requirements, one of which apparently was the deployment of
Dragon to the IG's.
// Karl

--
<EOF>
================================================
::[ RFC 2795 ]::
Karl Hill    | IT Security Specialist
970.295.5293 | USDA - OCIO
"...firewalls are speed bumps not brick walls."
fingerprint: 836C FC80 73B6 B6C4 3855  CDF3 AF00 A305 0D24 69E9

------ Forwarded Message
From: Karl Hill <karl.hill@usda.gov>
Date: Wed, 14 Sep 2005 23:27:22 -0600
To: Heshmat Ansari <Heshmat.Ansari@USDA.gov>
Subject: USDA Incidents

Hesh,

Here are some statistics about incidents since August 15 through today.

The UDIDS has caught 15 incidents, AT&T has not caught any of these
compromises.

2 incidents were reported to us by US-CERT because USDA websites were
defaced and published on a public defacement archive. Based on the position
the UDIDS is currently deployed at, there is no way the UDIDS could have
caught these compromises, and would have if we still had sufficient UDIDS
coverage. AT&T did not catch either of these compromises.

AT&T has caught 2 compromises. Again, the UDIDS could not have seen these
based on its deployment, but would have if we had sufficient Dragon
coverage.

I hate to imagine how many USDA hosts are sitting on the network completely
compromised that AT&T has not caught because their IDS implementation is
inadequate.

It is clear based on these statistics that Dragon NEEDS to be deployed at
the UTN Internet gateways to return the USDA to the security posture it was
in before UTN. It is clear AT&T's efforts are left wanting and they are

simply not up to the task.

I put this together for you to share with Lynn or Jan to justify out IDS
deployment to the UTN IG's.

// Karl

```
--
<EOF>
=================================================
::[ RFC 2795 ]::
Karl Hill    | IT Security Specialist
970.295.5293 | USDA - OCIO
"...firewalls are speed bumps not brick walls."
fingerprint: 836C FC80 73B6 B6C4 3855  CDF3 AF00 A305 0D24 69E9
```

------ End of Forwarded Message

**From:**      Karen SIFFORD
**To:**        ECKLAND, STEVEN BRYCE
**Date:**      9/1/2005 10:00:31 PM
**Subject:**   Fwd: new position:

Bryce, fyi.

Julie, please add this email into evidence.

thx
k

>>> Heshmat Ansari 9/1/2005 8:21:05 PM >>>
Hi karen,

I was informed by Jan Lilja that I am reassigned to cyber security. She stated
that I lost my credobilty with management to be Deputy ACIO for TSO.  This is
depromotion with this reassignment.  I knew they will retaliate soon or later.

this is the payoff for speaking principals and honesty.

Hesh

--- Original Message ---
From: "SIFFORD, Karen -OIG" <Karen.SIFFORD@usda.gov>
Sent: Thu 9/1/2005 12:36 pm
To: "Ansari, Heshmat" <Heshmat.Ansari@USDA.gov>
Subject: Read:

                    This message is a Read Receipt Notification

                    Your Message :
                    Was Read By : Karen.SIFFORD@usda.gov
                            On : Thu, 1 Sep 2005 12:34:00 -0400

CC:       SIFFORD, JULIE

