UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

——————————————————————

HESHMAT ANSARI,                          )
                                         )
          Plaintiff,                     )
                                         )
               v.                        )          Civil Action 07-1778 (RCL)
                                         )
ED SCHAFER,                              )
                                         )
          Defendant.                     )
——————————————————————)

## DEFENDANT'S (1) RESPONSE TO PLAINTIFF'S JULY 23, 2008 MOTION AND (2) CROSS-MOTION FOR AN ORDER REQUIRING PLAINTIFF TO FILE AN AMENDED PLEADING BY A NEW DATE CERTAIN

In his initial Complaint in this action, Plaintiff, who is appearing pro se, asserted whistleblower claims arising under the Whistleblower Protection Act.  (See Docket No. 1.)  In addition, Plaintiff asserted employment discrimination claims—based upon his religion, national origin and alleged disability—arising under Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act.[1]  (See id.)  However, the allegations in the Complaint relating to Plaintiff's employment discrimination claims were undeveloped such that they failed to satisfy the pleading requirements of Federal Rule of Civil Procedure 8.  Moreover, it was difficult to tell from the Complaint which allegations related to Plaintiff's employment discrimination claims, which allegations related to his whistleblower claims and which allegations, if any, related to both sets of claims.  The majority of the allegations appeared to relate solely to Plaintiff's whistleblower claims.

———————————————

[1] Plaintiff also asserted employment discrimination claims arising under the Americans with Disabilities Act (the "ADA").  Yet, those claims were not cognizable because the ADA "does not apply to federal defendants."  Brown v. Paulson, 541 F. Supp. 2d 379, 382 n.1 (D.D.C. 2008).

On February 7, 2008, Defendant filed a motion to dismiss in which he asked this Court to: (1) dismiss Plaintiff's whistleblower claims on the ground that the Court lacked jurisdiction over them; and (2) require Plaintiff to file an amended pleading setting forth only those allegations that he believes support his claims of employment discrimination. (See Docket No. 8.) On May 19, 2008, Plaintiff filed his response to Defendant's February 7, 2008 motion to dismiss in which he: (1) acknowledged that "his complaint was not drafted properly"; (2) stated that he "has no objection to [the] dismiss[al of his] whistleblower claims"; (3) "ask[ed] that his Title VII discrimination claims not be dismissed"; and (4) requested that "he be given 45 days . . . to find counsel and [file an] amend[ed] . . . Complaint." (Docket No. 9.) Thereafter, on June 20, 2008, this Court issued an Order in which it: (1) granted Defendant's motion to dismiss; and (2) stated that "Plaintiff has forty five days (45) from the date of this order to retain counsel and amend his Title VII Complaint." (Docket No. 10.)

Pursuant to this Court's June 20, 2008 Order, Plaintiff's deadline to file an amended complaint was August 4, 2008. Yet, he did not file an amended pleading by that date. Instead, on July 23, 2008, Plaintiff filed a 4-page motion in which he: (1) stated that he has been unable to retain counsel; (2) appeared to renew his request (which this Court previously denied) that he be appointed counsel[2]; (3) asked this Court to hold an evidentiary hearing on the issue of whether he was discriminated against as a result of his religion, national origin and alleged disability; and (4) alleged facts in an attempt to support his claims of employment discrimination. (See Docket No. 11.)

Notably, however, Plaintiff's July 23, 2008 motion fails to allege facts sufficient to show that he possesses a viable claim for employment discrimination. In his July 23, 2008 motion,

---

[2] On October 3, 2007, Plaintiff filed a motion for appointment of counsel. (See Docket No. 2.) This Court denied that motion on October 5, 2007. (See Docket No. 3.)

Plaintiff asserted that: (1) in September 2005, he was reassigned from a position in telecommunications where he had the title "Deputy" and was "the second person in the Chain of Command with many responsibilities" to one in cyber security where he was "the third person in the Chain of Command with fewer responsibilities"; (2) he had a "back injury" and allegedly requested from his "supervisor," but was "never provided" with, "a special chair to make it easier for [him] to sit for long periods"; and (3) at some unspecified time, he was purportedly called a "Camel Rider" by an unspecified person. (See id. at 1-3.) Yet, as shown below, such assertions provide an insufficient basis to support a claim of employment discrimination.

First, Plaintiff has failed to allege a single fact that (1) gives rise to an inference that he was reassigned from a position in telecommunications to one in cyber security in September 2005 as a result of discrimination based upon his religion, national origin and/or alleged disability; or (2) contradicts the non-discriminatory reason that Defendant has asserted for the reassignment:

> [Plaintiff] was moved to Cyber security because when Lynn Allen, [the new] Associate CIO [Chief Information Officer] for Cyber Security[,] joined [the Department of Agriculture (the 'agency')] in July 2005, he [concluded that] the function of security operations that was [then being] performed by [Plaintiff] belonged in the Cyber Security office and he wanted it moved there. Subsequently, the Deputy CIO concurred and . . . [Plaintiff] and the two people who reported to him[] were moved to the Cyber Security office. Under [the agency's] previous permanent Associate CIO for Cyber Security, the functions [that Plaintiff was performing regarding security] had been in Cyber Security.

(Ex. 1 at 8; see Ex. 2 at 119.)[3] Moreover, Plaintiff's reassignment to a position in cyber security could not have been the product of retaliation because the reassignment occurred in September

---

[3] Notably, Plaintiff's reassignment to a position in cyber security did not result in a "change to [his] salary or duty station." (Ex. 1 at 8.) Indeed, Plaintiff concedes that he "did not lose any money because of the move." (Docket No. 11 at 2.) Moreover, Plaintiff has not identified a single job responsibility that he lost as a result of the reassignment. Nor has he alleged that the persons who reported to him before the reassignment no longer reported to him after the reassignment.

2005, before Plaintiff had filed his EEO complaint against the agency.[4]  (See Ex. 3 (stating that

November 2, 2005 was the date of Plaintiff's initial contact with the agency's EEO office).)

Second, Plaintiff has failed to allege facts sufficient to support a claim of employment

discrimination based upon his alleged disability.  In his July 23, 2008 motion, Plaintiff asserts

that he was denied "a special chair to make it easier for [him] to sit for long periods."  (Docket

No. 11 at 2.)  Yet, to state a viable claim for disability discrimination, Plaintiff must establish

(among other things) that at the time he was denied a "special chair," he was disabled as that

term is defined by the Rehabilitation Act—i.e., that he had a physical impairment and that, as a

result of that impairment, he was substantially limited as to a major life activity.[5]  See Heasley v.

D.C. Gen. Hosp., 180 F. Supp. 2d 158, 165 (D.D.C. 2002).  This Plaintiff cannot do—as a matter

of law, Plaintiff's purported inability "to sit for long periods" was not an impairment that

substantially limited a major life activity.  See Colwell v. Suffolk County Police Dep't, 158 F.3d

635, 644 (2d Cir. 1998) (holding that a plaintiff who had trouble sitting "for too long" was not

substantially limited as to a major life activity); Batac v. Pavarini Constr. Co., No. 03-9783, 2005

WL 2838600, at *6 (S.D.N.Y. Oct. 27, 2005) ("Difficulty sitting . . . for long periods does not

_____

[4] In his July 23, 2008 motion, Plaintiff cites his reassignment to a position in cyber
security as proof that he was retaliated against by Defendant.  (See Docket No. 11 at 1.)

[5] Plaintiff could also try to establish that he was disabled within the meaning of the
Rehabilitation Act by showing that he had a record of a physical impairment that substantially
limited a major life activity or that he was regarded by Defendant as having such an impairment.
See Thompson v. Rice, 422 F. Supp. 2d 158, 174-75 (D.D.C. 2006).  Yet, Plaintiff has not
alleged facts sufficient to satisfy either of those requirements.  (See Docket No. 11 at 2-4.)
Plaintiff's assertion that he retired from the armed services with a "30% disability rating" (see id.
at 2), even if true, does not establish that he had a record of a physical impairment that
substantially limited a major life activity or that he was regarded by Defendant as having such an
impairment.

4

create a disability under the ADA."), <u>aff'd in relevant part</u>, 216 Fed. Appx. 58, 60 (2d Cir.

2007).[6]

    <u>Finally</u>, Plaintiff's assertion that at some unspecified time, he was called a "Camel Rider"

by an unspecified person is insufficient to sustain a claim of employment discrimination.  In

certain circumstances, stray remarks can be probative of discrimination.  <u>See</u> <u>Valles-Hall v. Ctr.</u>

<u>for Nonprofit Advancement</u>, 481 F. Supp. 2d 118, 141 (D.D.C. 2007).  However, Plaintiff here

has failed to allege that there was any nexus between the purported "Camel Rider" remark and an

employment decision that is at issue in this case.  Indeed, Plaintiff has not even alleged that the

"Camel Rider" remark was made by one of his supervisors.  Thus, the remark (even assuming it

was made) is not probative of discrimination.  <u>See</u> <u>Simms v. Gov't Printing Office</u>, 87 F. Supp.

2d 7, 9 n.2 (D.D.C. 2000) ("'stray remarks,' even those made by a supervisor, are insufficient to

create a triable issue of discrimination where . . . they are unrelated to the employment decision

involving the plaintiff"); <u>see also</u> <u>Hussain v. Principi</u>, 344 F. Supp. 2d 86, 100 (D.D.C. 2004)

(stating that alleged discriminatory behavior by an individual who had nothing to do with the

employment decisions at issue are immaterial).[7]

---

[6] The standards governing claims arising under the Rehabilitation Act are the same as those governing claims arising under the ADA.  <u>See</u> <u>Brown v. Snow</u>, 407 F. Supp. 2d 61, 67 n.5 (D.D.C. 2005).  Thus, the fact that the <u>Heasley</u>, <u>Colwell</u> and <u>Pavarini</u> cases address claims arising under the ADA is immaterial.

[7] Plaintiff attached to his July 23, 2008 filing affidavits from two of his co-workers with the agency—Adrienne Bowman and Karen S. Sifford—(which were executed in 2006 in connection with the agency's investigation of his administrative complaint) presumably in an attempt to show that he possesses viable claims of employment discrimination.  However, neither affidavit is of any help to Plaintiff.  Although Ms. Bowman repeatedly asserts in her affidavit that she believes that Plaintiff was discriminated against during his employment with the agency, she provides no facts to support her assertions.  (<u>See</u> Docket No. 11 at 5-28.)  Rather, she merely provides examples of situations where she believes that Plaintiff's first-line supervisor treated him unfairly, and blindly attributes that perceived unfair treatment to discrimination.  (<u>See</u> <u>id.</u>)  Moreover, Ms. Sifford's affidavit contains nothing to suggest that Plaintiff was discriminated against during his employment with the agency, much less that he

Because Plaintiff's July 23, 2008 motion fails to allege facts sufficient to support a claim of employment discrimination, this Court should deny Plaintiff the relief that he has requested therein.[8]  Moreover, because Plaintiff failed to adhere to this Court's June 20, 2008 Order and file an amended pleading by August 4, 2008, there currently is no operative pleading in this case to which Defendant may respond.  Thus, Defendant respectfully submits that Plaintiff should be required to file by a new date certain (with or without the assistance of counsel) an amended pleading setting forth those allegations that he believes support his claims of employment discrimination.  If Plaintiff fails to file an amended pleading by the new date certain, this case should be dismissed.

## CONCLUSION

For the reasons set forth above, Defendant respectfully requests that this Court DENY Plaintiff's July 23, 2008 motion.  Defendant further respectfully requests that this Court: (1) order Plaintiff to file by a new date certain an amended pleading setting forth those allegations that he believes support his claims of employment discrimination; and (2) caution Plaintiff that a failure to file an amended pleading by the new date certain will result in the dismissal of this case.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney

---

was discriminated against as a result of his religion, national origin and/or alleged disability. (See id. at 29-41.)
[8] That said, to the extent that Plaintiff's July 23, 2008 motion seeks reconsideration of this Court's prior denial of his request for appointment of counsel, Defendant takes no position with respect to that request.

      /s/
_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

      /s/
_____
CHRISTOPHER B. HARWOOD
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 307-0372
Fax: (202) 514-8780
Christopher.Harwood@usdoj.gov

**Of Counsel:**

Steven C. Brammer
Attorney-Advisor
U.S. Department of Agriculture

**CERTIFICATE OF SERVICE**

I hereby certify that on August 7, 2008, I caused a copy of the foregoing to be served via

first class prepaid postage as follows:

Mr. Heshmat Ansari
11011 Grassy Knoll Terrace
Germantown, MD 20876

_____/s/_____
Christopher B. Harwood

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                            )
HESHMAT ANSARI,                             )
                                            )
            Plaintiff,                      )
                                            )
            v.                              )        Civil Action 07-1778 (RCL)
                                            )
ED SCHAFER,                                 )
                                            )
            Defendant.                      )
_____)

## **ORDER**

 Having considered Defendant's (1) Response to Plaintiff's July 23, 2008 Motion and

(2) Cross-Motion for an Order Requiring Plaintiff to File an Amended Pleading by a New Date

Certain, it is this _____ day of _____, 2008:

 ORDERED that Plaintiff's July 23, 2008 Motion is DENIED; and it is

 FURTHER ORDERED that within 30 days of the issuance of this Order, Plaintiff must

file an amended pleading setting forth those allegations that he believes support his claims of

employment discrimination; and it is

 FURTHER ORDERED that a failure by Plaintiff to file an amended pleading within 30

days of the issuance of this Order will result in the dismissal of this case.


       _____
       UNITED STATES DISTRICT JUDGE

Copy to:

ECF Counsel

Mr. Heshmat Ansari
11011 Grassy Knoll Terrace
Germantown, MD 20876

1                              Witness' AFFIDAVIT

2

3        I, Janice G. Lilja, am an employee of the U.S. Department of Agriculture, Office of

4        the Chief Information Officer, located in Washington, DC in the capacity of

5        Associate Chief Information Officer, for Telecommunications. I am a member of the

6        SES. My telephone number during working hours is: 202 720-8695.

7        **I HAVE BEEN ADVISED OF THE FOLLOWING:**

8        I am required by Federal regulations and Department of Agriculture policy to
9        cooperate fully and promptly with the investigator who has been assigned to conduct
10       a thorough and impartial investigation into a complaint of discrimination against the
11       Department of Agriculture. I must provide a statement for the investigative report
12       which is true and complete to the best of my knowledge and which discloses all of
13       my first hand knowledge having a bearing on the merits of the complaint. My
14       statement, is provided under oath (or affirmation), without a pledge of confidentiality,
15       in accordance with Equal Employment Opportunity Commission rules and
16       regulations and Department of Agriculture policy. This means that any employee(s)
17       whom I accuse of discrimination or other acts of impropriety may be shown relevant
18       portions of this statement and be given an opportunity to respond for the record. In
19       addition, the complainant and the appropriate Departmental officials involved in the
20       EEO complaint process will receive the entire investigative file. I have the right to
21       review my statement prior to signing it and may make initialized corrections if it is
22       incomplete or inaccurate. I have the right to receive a copy of the signed statement.
23

24       Having been advised of the above information about my role as a witness in the

25       investigative process, I solemnly affirm that the statement, which follows, is true and

26       complete to the best of my knowledge and belief, and addresses the concerns raised

27       with me by the investigator.

28       The investigator has informed me that the accepted claim(s) in this complaint are:

29       Whether since August 3, 2005; and continuing, the agency subjected Hesh Ansari to
30       discrimination and harassment (non sexual) based on age (D.O.B. 8/7/52), religion
31       (Muslim), and national origin (Iranian), when:
32              1.  His supervisor informed him that he could no longer act on her behalf when
33                  she was out of the office;
34              2.  He was no longer authorized to attend OCIO meetings or engage in
35                  conversation with the Chief Information Officer or Deputy;

Initials _____                                                    Page 1 of

1    3. On October 1, 2005, management reassigned him from my OCIO position as
2       Deputy Associate Chief Information Officer for Telecommunications to the
3       Cyber security office to manage security operations;
4    4. On October 32, 2005, he received a performance rating of Fully Successful,
5       for fiscal year 2005; and
6    5. He was denied quality step increases.
7
8    My full name is Janice G. Lilja. My position title and grade is: Associate Chief

9    Information Officer for Telecommunications, SES. I make the following statement

10   freely and voluntarily to Sallie Jenkins who has identified herself to me as an EEO

11   Investigator, Janver, Inc. assigned by the US Department of Agriculture to perform

12   this investigation, knowing that this statement may be used in evidence.

13       I am currently employed by the U S Department of Agriculture, Office of the

14   Chief Information Officer, Telecommunication Services and Operations, Washington,

15   D C. I have been in my current position as Associate Chief Information Officer for

16   approximately four years. My organizational relationship to (complainant) Heshmat

17   Ansari is that I was his immediate supervisor. My age is 51 years, (DOB 4/30/55), my

18   religion is (Congregationalist – United Church of Christ). My country of origin is

19   (United States of America). I was born in Beirut, Lebanon and attended elementary

20   school there.

21       I am aware that Mr. Ansari has a physical disability resulting from his military

22   service. I did not know details about what was involved other than that it was a back

23   injury. I learned about his physical disability from the selection certificate, where he

24   was shown as a ten- point veteran; which means disabled veteran, and he was at the

25   top of the selection certificate. Additionally, Dr. Ansari went back to the VA hospital

Initials ____                                                    Page 2 of

1    every year for check ups and recertification of his disability status. I never heard Dr.

2    Ansari say anything about having seizures and I never witnessed any. He never told

3    me anything about a mental disorder (seizures). If Dr. Ansari's alleged mental

4    disability was aggravated by activities of the job, he didn't tell me anything about it. I

5    was also aware, immediately after he joined my organization, that he had a lot of

6    personal family issues. Shortly after he started working with me in 2003, he

7    informed me that he had separated from his wife. She used to call him frequently at

8    the office and they would argue. My understanding is that that separation continued

9    throughout the time he worked for me. Also, his son was a Marine serving in

10    Afghanistan, and in addition Dr. Ansari worried about paying for his daughter's law

11    school education. I remember that he worried that everyone was placing financial

12    demands on him. Nevertheless, he was always up-beat and high energy; never acted

13    as though he was depressed and never had any mental seizures. However, when Mr.

14    Ansari was transferred to Cyber Security at the beginning of October, 2005, he was in

15    another office around the corner, reporting to a different supervisor and I did not see

16    him every day. I have no knowledge of Mr. Ansari's feelings of depression and

17    humiliation because of the move to Cyber Security. He never expressed anything to

18    me relating to how he felt about the move to Cyber Security; or how the move

19    affected him.

20          I disagree wholeheartedly with the allegation that I discriminated against Mr.

21    Ansari because of his age, religion and national origin. We are both over 50 and have

Initials ____                                      Page 3 of

| | |
|---|---|
| 1 | children nearly the same age. We are contemporaries. It is preposterous that I would |
| 2 | discriminate against him based on religion or national origin. I studied comparative |
| 3 | religion and Islam in college. My father, a political scientist who taught at the |
| 4 | American University of Beirut, was a founding member of the Middle East Studies |
| 5 | Association. My daughter is a Near Eastern Studies major at Cornell and studies |
| 6 | Arabic. I attended elementary school in Beirut, Lebanon and socialized with |
| 7 | Lebanese children. To make such a claim displays total ignorance of who I am, my |
| 8 | education, my religion, and of my cultural breadth and understanding. I find it |
| 9 | deeply offensive and insulting. |
| 10 11 12 | **Claim No. 1: Your supervisor informed you that you could no longer act on her behalf when she was out of the office** |
| 13 | The idea that Dr. Ansari should not act in my absence for a while, was based |
| 14 | on his behavior during the week of July 25, 2005, while I was on vacation and he was |
| 15 | acting for me. We had been working on a major technical project for a long time— |
| 16 | rebuilding the USDA wide area network; and the final implementation date was the |
| 17 | weekend of July 23, 2005. I was on vacation at the time and Mr. Ansari was acting |
| 18 | for me. On Monday, July 25, 2005, there were some technical issues, which is not |
| 19 | unusual with a major deployment. A few people even experienced difficulty with |
| 20 | getting on the internet. While I was on vacation and assisting my disabled mother, I |
| 21 | was informed of this by one of the GS-15s who work for me, Michael (Mike) Thomas |
| 22 | who was in charge of the entire project. Mr. Thomas is physically located in Fort |

Initials ____                                                        Page 4 of

1    Collins, Colorado. He called to let me know there were a few problems with the

2    network and that things were spinning out of control in Washington, DC due to

3    reports that Mr. Ansari was giving to the CIO and other senior staff.

4        Mr. Ansari did not call me and he did not contact Mike regarding network

5    problems prior to providing inaccurate information to the CIO and others. Among

6    other things, I have been informed that Dr. Ansari told Mr. Williams, my supervisor,

7    and all of my colleagues that the Firewalls were down and that there was no security;

8    that USDA was "running wide open". This was not factually correct.

9        When I returned from vacation, within days of my return, Mr. Williams and

10   Mr. Combs called a meeting of myself, Mr. Williams, Mr. Combs, Michael Thomas

11   and Dr. Ansari and told me what the week had been like with Dr. Ansari acting.

12   They were very upset. Dr. Ansari was in that meeting and he had little to say. After

13   the meeting, I informed Dr. Ansari, that I didn't think he would be acting for me "for

14   a little while". My decision was based solely on his performance during that week

15   when I was on vacation and based on the fact my superiors were very upset and

16   disappointed with his performance during that week. In my professional experience, I

17   have never been in such a meeting before where it was made crystal clear by several

18   individuals that performance had not been satisfactory. Dr. Ansari did not exercise

19   good judgment in handling the situation. The decision not to designate him as acting

20   for me for a while was based solely on the above and his age, religion, and national

21   origin had nothing at all to do with it.

1    **Claim No 2:  You were no longer authorized to attend OCIO meetings or engage**
2    **in conversation with the Chief Information Officer or Deputy**
3.

4          I disagree with Dr. Ansari's allegation that I informed him that he was

5    not to attend any staff meetings; meet with the OCIO staff or engage in conversation

6    with the Chief Information Officer or Deputy without my presence.  However, given

7    that I am his supervisor, that would certainly have been my right to do so and I know

8    many supervisors who require that as a standard operating procedure. During the eight

9    weeks that he worked for me between August 3, 2005 and October 1, 2005 when he

10   was transferred to Cyber Security, Dr. Ansari sent emails to Mr. Williams, the Deputy

11   CIO and the other senior staff (Attachment A).  Mr. Ansari went to Hagerstown and

12   met with Mr. Williams to brief him on the OCIO COOP site (August 29, 2005) and I

13   was not present (Attachment B). He led that briefing on August 29th for Mr. Williams

14   and another briefing in late September, 2005 for Mr. Combs regarding a security and

15   telecommunications conference that Dr. Ansari was planning for the OCIO in Los

16   Angeles. (Attachment C) At the Los Angeles conference, Dr. Ansari introduced Mr.

17   Combs in front of an audience of 200 or more people.  I worked to get Dr. Ansari the

18   necessary approvals so that he could make a presentation at a conference in

19   Pennsylvania, even though I had to email Dr. Ansari several times in order to get any

20   information. (Attachment D).  I have also attached additional emails from August,

21   2005 (Attachment E), September, 2005 (Attachment F), and October 2005

22   (Attachment G) showing that we had a courteous and good professional relationship.

Initials ____                                                                    Page 6 of

1    The only training I recall Mr. Ansari requesting that was not approved, was the

2    Federal Executive Institute Training, which cost ten thousand dollars. I did not have

3    that kind of money in my budget; and it would have to be approved by the CIO. I

4    asked to attend the same training myself and it was disapproved by Mr. Williams. This

5    occurred in 2005. I have been a Senior Executive at USDA for 16 years and have

6    made four separate requests to attend this training and been turned down each time. It

7    is very difficult to get approval to attend this training. The disapproval of Dr. Ansari's

8    training was based on the non-availability of monies and his age, religion, and national

9    origin were not factors considered.  As I recall, Dr. Ansari was required to take

10   supervisory training every year; and he didn't want to attend. The reason he gave was

11   that since he had been a supervisor for so many years, he didn't need it.

12    Between August 3 and October 1, I continued to include Dr. Ansari in important

13   meetings regarding the UTN and AT&T, the contractor.  I have attached an email

14   (Attachment H) where I invited him to participate in a conference call with me and Dr.

15   Ed Amoroso, the head of cyber security for all of AT&T, on August 9.  Dr. Ansari

16   agreed to call in.  I also continued to support Dr. Ansari's work between August 3 and

17   October 1.  I have attached an email (Attachment I), where I asked Dr. Ansari and

18   others if they needed any additional funds for their projects.  I was successful in

19   obtaining the additional funding for Dr. Ansari's conference in Los Angeles.

20   **Claim No. three:  On October 1, 2005, management reassigned you from your**
21   **OCIO position as Deputy Associate Chief Information Officer to the Cyber**
22   **Security Office to manage security operations**
23

Initials _____

000096

1        Mr. Ansari was moved to Cyber security because when Lynn Allen,

2    Associate CIO for Cyber Security joined USDA in July 2005, he said the function of

3    security operations that was performed by Mr. Ansari belonged in the Cyber

4    Security office and he wanted it moved there.   Subsequently, the Deputy CIO

5    concurred and the function and the FTE, i.e., Mr. Ansari and the two people who

6    reported to him, were moved to the Cyber Security office.   Under our previous

7    permanent Associate CIO for Cyber Security, the functions had been in Cyber

8    Security. They were moved to my organization while we had an Acting Associate

9    CIO for Cyber Security for a few years.   Dr. Ansari's age, religion and national

10   origin had nothing at all to do with the decision to return the functions to Cyber

11   Security. There was no change to Dr. Ansari's salary or his duty station; and to my

12   knowledge, there was no change in his duties and responsibilities. He never told me

13   he felt harassed and humiliated by the move from my office to the Cyber security

14   office.   His official title while he worked for me was Supervisory IT Specialist, and

15   as far as I know that was his official title when he worked in Cyber Security.

16        I deny the allegation that I told Mr. Ansari I no longer needed a Deputy.  I

17   also disagree with Mr. Ansari's allegation that the decision to move him to the Cyber

18   Security office was meant as harassment.  I did not have an acting Deputy.   John

19   Donovan (late forties, American born), was assigned to me as my Deputy in April

20   2006 by Mr. Suda, my new supervisor, after the OCIO decided to reorganize and

21   assign new staff and responsibilities to my organization.

Initials _____.

1      Meria Whitedove reported directly to me after Mr. Ansari left my organization; she

2      did not act as my Deputy.  I detailed Michelle Carlson from NTSO into my office to

3      assist me with preparation of weekly reports.  She did not act as my deputy; and she

4      did not perform any of the security functions. She was my special assistant.

5

6      **Claim No. Four: On October 1, 2005, you received a performance rating of fully**
7      **successful for fiscal year 2005.**
8

9            I disagree that with the allegation that age, religion and national origin were

10     factors in the rating assigned to Dr. Ansari.  I gave him a rating of Fully successful

11     based on the leadership problems that occurred during the week he acted in July

12     2005, while I was on vacation.  I disagree with his allegation that he did not have a

13     mid-year review.  I held a mid-year review with Mr. Ansari on May 16, 2005.  At

14     that time, there was no apparent problem with his leadership capabilities.  I don't

15     understand how Dr. Ansari can compare himself with John Donovan, who did not

16     work for me nor report to me in 2004.  Mr. Donovan started working under my

17     supervision approximately two months ago.  Dr. Ansari had already left USDA.  He

18     is correct, some of my employees did complain about the ratings they received.

19     Adrienne Bowman (white female, age 40), for example, complained to me that she

20     didn't deserve a "Superior" rating but should be Outstanding.  However, her

21     performance rating was not changed and neither was anyone else.

22            Dr. Ansari did have some good accomplishments in FY 05.  Dr. Ansari

23     submitted a list of his accomplishments; based on those and my knowledge of his

Initials _____

00058

1    work I rated him as "meets fully successful" in one performance element and

2    "exceeds fully successful" in three performance elements.  I rated him as Does Not

3    Meet Fully successful in one non-critical performance element.  Overall, it was not a

4    bad performance rating and obviously did not keep him from obtaining a promotion

5    at the Department of Transportation .  What Dr. Ansari needed to improve in for a

6    rating above Fully successful is spelled out in his performance standards.  He was

7    provided with a copy of his Performance standards in October 2004.  The Rating at

8    issue was based solely upon how Dr. Ansari handled the acting position while I was

9    on vacation in July 2005; and the fact both the CIO and Deputy CIO were unhappy

10    with his behavior during my absence.  Age, religion and national origin were not

11    factors considered in my decision to rate him as Fully successful.

12    **Claim No five:  Never received Quality Step Increase:**

13    I disagree with Dr. Ansari's allegation of being denied Quality Step Increases

14    (QSI).  He was not denied, I just never considered him for a QSI. However, while Mr.

15    Ansari did not receive Quality Step Increases; he got performance awards.  For

16    example, in September 2005, I nominated him for a fifteen hundred-dollar award;

17    and in 2004, I nominated him for a thousand dollar award.  The reason he did not

18    get a QSI was because he did not have sustained outstanding performance.  To be

19    rated as outstanding, Mr. Ansari needed to exhibit good leadership -- he needed to

20    represent situations accurately in what he said, i.e., be reliable and he needed to help

21    the team to work together. I have not given a QSI to anyone on my staff.

1       I would like to add the following to my statement:  I did not know with

2       certainty that Dr. Ansari had gone to the Inspector General regarding operation of

3       the Universal Telecommunication Network (UTN) until my meeting with the

4       investigator for this case.  Subsequently I reviewed my old emails and I found an

5       email from the OIG to Dr. Ansari thanking him for meeting with them—I was copied

6       on the message.  I did not previously remember that message nor do I recall reading

7       it at the time.  I do not remember meeting with Dr. Ansari prior to his meeting with

8       the OIG.  I am puzzled as to why Dr. Ansari has come to this point.   He has never

9       talked to me about his concerns, and there hasn't even been an opportunity for

10      informal counseling or ADR.  I am surprised and saddened about his complaints.  I

11      don't ever recall ignoring Mr. Ansari when he walked into my office; and I always

12      spoke to him.  I was the only Senior Executive from OCIO who went to his going

13      away party, which was held off site.

14      I have reviewed this statement, which consists of twelve pages, and I hereby

15      solemnly swear that it is true and complete to the best of my knowledge and belief. I

16      understand that the information I have given will not be held confidential and may

17      be shown to the interested parties as well as made a permanent part of the record of

18      investigation.

19

20      _____          June 16, 2006

21      (Signature of Deponent)                         (Date )

22

SunTrust Bank, 5450 Westbard Ave, Bethesda

1    Signed before me at : ~~1400 Independence Avenue, SW, Washington, D.C~~

2    On this __16th__ day of June, 2006

3

4    _____

Lina E. Bello

NOTARY PUBLIC

Montgomery County, Maryland

My Commission Expires 12/1/07

5    Signature of ~~Investigator / Witness~~

_Notary_

6

7

8

9

Initials _____

Witness' AFFIDAVIT #2
(ADDENDUM in response to Complainant's Second Affidavit)

I, Janice G. Lilja, am an employee of the U.S. Department of Agriculture, Office of the Chief Information Officer, located in Washington, DC in the capacity of Associate Chief Information Officer for Telecommunications. I am a member of the SES. My telephone number during working hours is: 202-720-8695.

I am writing this second affidavit in response to an email received from Ms. Sallie Jenkins, EEO investigator, on July 17, 2006, late in the evening. Due to deadlines, my response is required within 48 hours. Consequently, there will not be extensive documentation attached.

I HAVE BEEN ADVISED OF THE FOLLOWING:

I am required by Federal regulations and Department of Agriculture policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the Department of Agriculture. I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my first hand knowledge having a bearing on the merits of the complaint. My statement, is provided under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal Employment Opportunity Commission rules and regulations and Department of Agriculture policy. This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown relevant portions of this statement and be given an opportunity to respond for the record. In addition, the complainant and the appropriate Departmental officials involved in the EEO complaint process will receive the entire investigative file. I have the right to review my statement prior to signing it and may make initialized corrections if it is incomplete or inaccurate. I have the right to receive a copy of the signed statement.

Having been advised of the above information about my role as a witness in the investigative process, I solemnly affirm that the statement, which follows, is true and complete to the best of my knowledge and belief, and addresses the concerns raised with me by the investigator.

The investigator has requested that I respond to the following allegations:

Claim no 1 (a).....she deprived, harmed, humiliated, and destroyed my reputation among staff, OCIO staff, my peers, colleagues, and comrades. He states.."I felt I wasn't given the authority to act" as your deputy).

    a. ....she harmed my personality and reputation, and caused mental stress and family disturbance

    b. Dr. Ansari alleges he was subjected to a series of hostile, abusive and humiliating actions over a two year period.

Claim no 2 (?)

The series of hostile, abusive, and humiliating actions referred to include the following:

    a. He was denied FEI for management training in 2005. This training was approved for Susan Moore during the same period, i.e., 2005.

    b. He alleges you told him that Susan Moore would act in your absence, and he would report to her....that she was his boss.

    c. Complainant contends he went to your office to talk and on his way out, you told him "wake up to reality" that you were not the one who ran to Mr. Combs and to Mr. Williams while you were on vacation...you had not obligation to discuss it with him.

Claim No. 3

Complainant states you told him on September 12, 2005, that management decided to remove him from his current position and reassign him to Cyber Security to manage security operations. He responded to you that the move was a demotion because of losing his title as Deputy.

Complainant said he believes the move was meant as harassment because he didn't want to move.

Complainant states Mr. Donovan was hired to replace him and was nothing short of favoritism.

Claim No. 4

Complainant states you told him during the mid-year review that if he kept up with his current performance, he should have no problem getting outstanding and a QSI.

Claim No.5

Complainant states he asked you during 2003, 2004, and again in 2005, what he needed to do to get an outstanding rating and you never gave him a straight answer.

Claim no 1: ...she deprived, harmed, humiliated, and destroyed my reputation among staff, OCIO staff, my peers, colleagues, and comrades. He states..."I felt I wasn't give the authority to act" as your deputy).

I dispute this allegation. On the contrary, I found myself repeatedly in situations where I had to defend Dr. Ansari and his actions. For example, shortly after arriving at USDA, Dr. Ansari put himself on the agenda for IT Leadership to talk to the CIO's about the status of the telecommunication closets in the downtown headquarters complex. He had a good presentation, but no recommendations on how to proceed to fix it. He was still thinking like an OIG person, which he was at Treasury. CIOs from the agencies complained at the meeting, and to me later about this, but I worked with Dr. Ansari to develop a strategy to correct the problem.

Another time, in particular, I recall that in a meeting in my office a group of us were trying to diagnose a cyber-security incident. Dr. Ansari was asked several times what the source of the incident could be. He shrugged his shoulders and said "It's some random thing, Jan, I don't know." Both the ACIO for Cyber Security and Rich Roberts rolled their eyes in dismay at such a poorly prepared answer.

Finally, my resource manager complained about Dr. Ansari regarding his funds management and use of government resources. In particular, he was using his government cell phone to receive and make personal calls. She brought this to my attention and I required Dr. Ansari to write a check for over $500 to reimburse the federal government and to stop this practice.

Dr. Ansari did many things on his own that influenced how people thought of him. My challenge, as his manager and the person who was responsible for bringing him into USDA, was to guide him and give him opportunities where he could excel and make a contribution. Over the course of time that he worked for me, Dr. Ansari was given leadership opportunities where I felt he could succeed. Examples of this include: developing the training program for the telecommunications experts that grew into the IT technology summit; managing the security operations for my organization; serving as the lead for USDA on developing the enterprise agreement for the Cisco Security Agent; serving as the lead for the RFI for the Managed Assets Repository System (MARS).

When I went on travel or was out of the office, Dr. Ansari was designated to act for me and had full authority. Sometimes, upon my return, his colleagues in TSO would raise concerns with me that they felt he had exceeded the scope of his authority by changing direction in my absence. Over time, my division directors expressed less confidence in his judgment rather than more.

...."she harmed my personality and reputation, and caused mental stress and family disturbance"

I disagree with this allegation. During the time that I knew Dr. Ansari he was an upbeat and energetic individual. Dr. Ansari has a good sense of humor. I would say we had a

harmonious office environment.   As I mentioned in my previous statement, he did have family problems and I believed those continued through the time that he was at USDA.

Dr. Ansari was in a job that had stress associated with it. His job, like mine, requires 24x7 availability.   The USDA network is a 24X7 operation.   Cyber security attacks can occur at any time.   Dr. Ansari was responsible about this—almost always available by phone or Blackberry and frequently calling me on the weekend to discuss how to manage cyber security incidents.   There is stress in this kind of work, no question about it.   I am aware of that and as his manager did not create additional stress.

Dr. Ansari did not have healthy habits to help manage stress on the job. He smoked and only drank coffee for lunch. I never heard him discuss exercise or a recreational activity. This could have contributed to the stress levels he says he felt.

<u>Dr. Ansari alleges he was subjected to a series of hostile, abusive and humiliating actions over a two year period.</u>

I deny this allegation totally. Dr. Ansari received a spot award for $200 in January 2004, an extra effort award for $1,000 in June 2004, an extra effort award for $800 in July 2004, an extra effort award for $1,000 in September 2004, and an Extra Effort award for $1500 in September 2005.   I do not consider this to be hostile, abusive, or humiliating.

At the end of a TSO award ceremony in 2004, Dr. Ansari and Adrienne Bowman (my confidential assistant) surprised me in front of all my employees by presenting me with an award for being a good leader. I don't think that he would have done this if I had been hostile, abusive and humiliating to him over this time period.   Frankly, I was embarrassed by this award since the focus was supposed to be on the employees at this ceremony, but the two of them had a good time planning together and surprising me.

<u>Claim no 2.   The series of hostile, abusive, and humiliating actions referred to include the following:</u>

 a.   <u>He was denied FEI for management training in 2005.   This training was approved for Susan Moore during the same period, i.e., 2005.</u>

I disagreed with this allegation in my earlier statement. FEI training is extremely expensive, $10,000, and must be approved by the CIO. No one in my organization, including myself, was approved for FEI training by the CIO in any year.   It is extremely difficult to get approved for FEI training since it is so expensive and requires an individual to be out of the office for 4-6 weeks.   This was not a hostile, abusive, or humiliating action but a business decision about the use of scarce resources.

 b.   <u>He alleges you told him that Susan Moore would act in your absence, and he would report to her...that she was his boss.</u>

I don't remember the specifics of any conversation (nearly one year ago), but yes, if I was absent and designated Susan Moore (one of my direct reports, equal to Dr. Ansari) or anyone else to act for me, then yes, I would expect Dr. Ansari to report to that person for that time period and for that time period they would be his "acting" boss. That has been standard operating procedure at USDA during the 16 years of my tenure. I do not have any idea why Dr. Ansari is interpreting that standard operating procedure as a personal insult or something that is hostile, abusive, and humiliating. His reaction surprises me.

c.  Complainant contends he went to your office to talk and on his way out, you told him "wake up to reality" that you were not the one who ran to Mr. Combs and Mr. Williams while you were on vacation...you had no obligation to discuss it with him.

I do not remember this conversation. My presumption is that Dr. Ansari is alleging that this occurred in early August 2005, nearly one year ago. As mentioned in my earlier affidavit, the CIO and Deputy CIO had a meeting on August 2, 2005 with Dr. Ansari, myself, and Mike Thomas to discuss Dr. Ansari's performance while I was on annual leave.  They were displeased with his performance, to put it mildly. Dr. Ansari took this very hard and would show up in my office, unscheduled and unannounced, wanting to talk—essentially wanting some counseling. I tried to do what I could, but since I wasn't on duty while this occurred, I couldn't provide much insight into what went wrong. I can't imagine saying that I didn't have an obligation to discuss it with him, but that I couldn't discuss it with him since I wasn't on duty at the time.

It does seem to me that the fact that he admits he voluntarily come to my office to talk undercuts the allegations he has made that I was hostile, humiliating and abusive. If I was indeed all those things—why was he walking into my office for unannounced conversations? That just doesn't seem logical to me.

Claim No 3:  Complainant states you told him on September 12, 2005, that management decided to remove him from his current position and reassign him to Cyber Security to manage security operations. He responded to you that the move was a demotion because of losing his title as Deputy.

Again, I do not remember a conversation on this date. I remember discussing Hesh's planned reassignment to Cyber Security after he talked to Mr. Allen and Dr. Ansari was quite excited about the opportunity. He felt that he would get more staff and that Mr. Allen had some big plans for good activities. He believed that Mr. Allen would get more resources than we had in TSO. For the record, Hesh's official title while working for me was Supervisory Information Technology Specialist, GS-15.  I have no idea why he felt a change in his "working" title was such a demotion. Working titles and positions change rather frequently in OCIO since it is such a fast-moving area.

Complainant said he believes the move was meant as harassment because he didn't want to move.

The reassignment of cyber security operations function was not directed personally to Dr. Ansari or the two people who worked for him. Previously, when we had a permanent ACIO for Cyber Security, this function was assigned to Cyber Security. While we had an Acting ACIO for Cyber Security it was assigned to me for 18 months. When Mr. Allen, the new permanent ACIO for Cyber Security came on board he was quite insistent that the function should be returned, and the CIO agreed. Had somebody other than Dr. Ansari been in that job, the same thing would have happened.

Complainant states Mr. Donovan was hired to replace him and was nothing short of favoritism. I do not know why this issue has any relevance to Dr. Ansari or any bearing on his case, since Dr. Ansari accepted a promotion at the Department of Transportation and left the USDA in January, 2006. Mr. Donovan was selected by my new supervisor, Robert Suda, to be my Deputy in April, 2006—four months after Dr. Ansari started at the Department of Transportation in his SES job. Upper management has the authority to reassign individuals to new positions— what happened to Mr. Donovan is the same thing that happened to Dr. Ansari. They were both reassigned.

Claim No. 4. Complainant states you told him during the mid-year review that if he kept up with his current performance, he should have no problem getting outstanding and a QSI. I deny this allegation. I am an experienced manager and would never have promised any employee a specific rating and most certainly would not have promised a QSI—which requires higher levels of approval. Also, a QSI requires sustained outstanding performance. Dr. Ansari's mid-year review was in May, 2005. The big problem with his performance was in July 2005. I consider the meeting that we had with the CIO, the Deputy CIO, Dr. Ansari and Mike Thomas in August 2005 to be an extreme counseling session for Dr. Ansari regarding his performance. Certainly after that he couldn't possibly have continued to expect a high rating. If he did, he wasn't listening.

I note that in his earlier statement Dr. Ansari claimed that I didn't give him a mid-year review. Now he states that he had a mid-year review and remembers exact statements that he alleges I made. This is an appalling contradiction between his two statements.

Claim No. 5. Complainant states he asked you during 2003, 2004, and again in 2005, what he needed to do to get an outstanding rating and you never gave him a straight answer. Frankly, I do not recall Dr. Ansari asking this question. I do recall modifying his performance standards at one point to add the explicit statement that he would double check on the accuracy of facts and statements

before informing others, and that if information was preliminary he would identify it as such. Dr. Ansari had a problem with accuracy in the things that he would report to people and I remember discussing this with him at some point. I also remember discussing with him the importance of leadership when I left him to Act for me. I remember saying to him early on—2003 or 2004—that I didn't like returning from vacation and finding everyone upset. I do give outstanding ratings, but not many of them.

Also, I don't see how this allegation, that I never gave him a straight answer, fits logically with his allegation that in his mid-year review I told him that if he kept his performance up he would get an outstanding. Logically, these allegations contradict each other.

I have reviewed this statement, which consists of seven pages, and I hereby solemnly swear that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well and made a permanent part of the record of investigation.

_Jamie S. Lifin_    _July 19, 2006_
Signature of Deponent    Date

Signed before me at _Bethesda Maryland_
:
On this _19th_ day of July, 2006.

_[signature]_
Signature of Witness    Lina E. Bello
NOTARY PUBLIC
Montgomery County, Maryland
My Commission Expires 12/1/07

# INFORMAL EEO COMPLAINT
# INITIAL INTAKE FORM

ALLEGED DISCRIMINATING AGENCY: OCIO
Date of Action: October 31, 2005    Date of Initial Contact: 11-2-2005
90TH Day of Processing: _____    Case Type:    Individual  X    Class _____

## AGGRIEVED EMPLOYEE'S INFORMATION

NAME: HESHMAT ANSARI _____ Gender: Male: X   Female: _____
Status: 1 _____ (1 Permanent/ 2 Temporary/ 3 Applicant / 4 Former Employee/ 5 Special)
Job Title/Series/Grade: Director of Security operations, OCIO/ 2210/ GS-15
Service Computation Date: _____ USDA Agency you currently work for: _____ Room 436
Work Address: 1400 Grassy Knoll Terrace Independence Ave, S.W, Washington, D
Work Phone#: 202-720-0492 __ Work Fax#: _____ 2025
Home Address: 11011 GRASSY KNOLL Terrace, Germantown MD 20876   20 25
Home Phone#: 301-540-0271 ____ Home Fax#: _____
Attorney/Representative's Name: None
Attorney/Representative's Address: None
_____
Attorney/Representative's Phone#. _____    Fax#: _____

Requesting Anonymity: Yes _____ No ✓    Union Member: Yes _____ No ✓

## COMPLAINT INFORMATION

## INDICATE BASIS(ES) – check ALL that apply

_____ Sex:
     X Male
     _ Female
_____ Race
     ___ African-American
     ___ Hispanic
     ___ Asian
     ___ Native American
     ___ White
     X Other (specify: IRANIAN)
_____ Color
     Specify: _____
_____ Age
     Date of Birth: 08/07/52

✓ Religion
     Specify: MUSLIM
✓ National Origin
     Specify: IRAN
✓ Physical Disability
     Specify: Lower Back Injury
✓ Mental Disability
     Specify: Seizure Disorder
_____ Reprisal
_____ Parental Status
_____ Sexual Orientation
_____ Political Party
_____ Marital Status
_____ Genetic Information

Claims of discrimination on the following bases are not covered by Federal anti-discrimination statutes: political belief, sexual orientation, marital status, family status, parental status, or genetic information. Consequently, individuals who file EEO discrimination complaints on these bases have NO appeal rights after a final agency decision AND NO rights to a hearing before the Equal Employment Opportunity Commission.

## INFORMAL EEO COMPLAINT
## INITIAL INTAKE FORM

(Fully Suassio)

INDICATE ISSUE(S): circle All that apply

| | | | |
|---|---|---|---|
| A. Appointment/Hire | J. Examination/Test | R. Retirement | K. 11-2-05 |
| B. Assignment of Duties | K. Evaluation/Appraisal | S. Time and Attendance | D. 9-12-05 |
| C. Awards | L. Harassment/Non-sexual | T. Training | |
| D. Demotion | M. Harassment/Sexual | U. Term/Conditions of Employment | |
| E. Reprimand | N. Promotion/Non-selection | V. Other – Reasonable Accommodations | |
| F. Suspension | O. Reassignment Denied | W. Other: | |
| G. Termination | P. Reassignment Direct | | |
| H. Duty Hours | Q. Reinstatement | | |
| I. Equal Pay Act Violation | | | |

Responsible USDA Agency: _O C I O_   Responsible State: _DC_

Responsible Management Official's (RMO)

Name: _JAN LILJA_   Title: _Associate CIO_

RMO Phone#: _202-730-8695_   RMO Fax#: _____

Name: _____   Title: _____

RMO Phone#: _____   RMO Fax#: _____

Resolving Agency Official (if known) _____   Phone#: _____

Do you have any pending complaints? NO: _X_   YES ___, If yes,

A. INFORMAL _____   DATE COMPLAINT INITIATED: _____

B. FORMAL _____   DATE(S) FILED: _____   Case#: _____

Status: _____

### ELECTION OF PARTICIPATION - INFORMAL EEO COMPLAINT PROCESS
### (PLEASE CHECK ONE)

| | |
|---|---|
| | Alternative Dispute Resolution (ADR) |
| X | Traditional EEO Counseling |

| Has the Aggrieved been given a written copy of their Notice of Rights and Responsibilities | YES X | NO ___ |
|---|---|---|

Aggrieved Employee's Signature: _[signature]_   Date: _11/2/2005_

COMMENTS: _See Attachment_.

| Office of Civil Rights Use Only. |
|---|
| Contact Person's Name _Trishwa Marshall_   Title _EOS_ |
| Phone number _202-401-4086_   Fax number _(202) 205-8694_ |
| If ADR elected, date file sent to CPRC: _____ |
| If Counseling elected, date file sent for counselor contracting: _____ |